IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MERCK & CO., INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-230 (GMS) |
| | ) | |
| APOTEX, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MERCK'S ANSWERING BRIEF IN OPPOSITION TO APOTEX'S
MOTION FOR LEAVE TO FILE A FIRST AMENDED ANSWER,
AFFIRMATIVE DEFENSES AND COUNTERCLAIMS**

OF COUNSEL:

John DeQ. Briggs
John F. Lynch
Kenneth W. Donnelly
Aaron Myers
HOWREY, LLP
1299 Pennsylvania Ave. NW
Washington, D.C.  20004
202.783.0800

Nicolas G. Barzoukas
Suzy S. Harbison
Jason C. Abair
WEIL, GOTSHAL & MANGES
700 Louisiana, Suite 1600
Houston, TX  77002
713.546.5000

Paul D. Matukaitis
Edward W. Murray
Gerard M. Devlin
MERCK & CO., INC.
126 E. Lincoln Avenue RY28-320
Rahway, NJ  07065-0907
732.594.4000

Dated:  November 7, 2006

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
302.658.9200

*Attorneys for Plaintiff Merck & Co., Inc.*

# TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS ............................................................1

STATEMENT OF FACTS .................................................................................................3

SUMMARY OF ARGUMENT ..........................................................................................4

ARGUMENT ......................................................................................................................9

I.      LEGAL STANDARD FOR AMENDMENT UNDER RULE 15(a) ...........................9

II.     APOTEX'S PROPOSED ANTITRUST COUNTERCLAIM IS FUTILE ................10

        A.      Apotex Is Required to Plead Facts Establishing Antitrust Standing...............10

                1.      Apotex Suffers No Injury from the 30-Month Stay............................13

                        a.      The 30-Month Stay Will Be Lifted Automatically upon
                                Entry of Dismissal ..................................................................14

                        b.      The Statute Authorizes the Court to Shorten the 30-Month
                                Stay ..........................................................................................16

                2.      Apotex Suffers No Injury from the 180-Day Exclusivity Period
                        Established by Congress ....................................................................17

                        a.      *City of Pittsburgh v. West Penn Power* (3d Cir. 1998)............19

                        b.      *Teva v. Pfizer* (Fed. Cir. 2006)...............................................22

                        c.      *In re Tamoxifen Citrate Antitrust Litig.* (2d Cir. 2006) ..........25

                        d.      *Bristol-Myers Squibb v. Copley* (D. Mass. 2000) ...................26

                        e.      *Apotex v. FDA* (D.C. Cir. 2006)..............................................27

                        f.      *Merck v. Watson* (D. Del. 2006) .............................................29

                3.      Apotex Cannot Establish Injury in Fact...............................................29

B. Apotex Fails to Allege Facts Sufficient to Overcome *Noerr-Pennington* Immunity ................................................................................................32

  1. Communications Between Apotex and Merck on Which Apotex Relies in its Counterclaim Show that Apotex's Allegations Are False and Made in Bad Faith .................................................................34

  2. Apotex's Remaining Allegations Are Insufficient to Show That Merck's Suit Was Objectively Baseless ................................................36

III. APOTEX'S PROPOSED AFFIRMATIVE DEFENSE IS MOOT ............................38

CONCLUSION ....................................................................................................................39

# TABLE OF AUTHORITIES

## CASES

*Apotex, Inc. v. FDA,*
449 F.3d 1249 (D.C. Cir. 2006) ..................................................................................27, 28, 29

*Associated General Contractors, Inc. v. California State Council of Carpenters,*
459 U.S. 519 (1983) ....................................................................................................10, 11, 30

*Atlantic Richfield Co. v. USA Petroleum Co.,*
495 U.S. 328 (1990) ....................................................................................................12, 18, 20

*Augustine Med., Inc. v. Gaymar Indus.,*
181 F.3d 1291 (Fed. Cir. 1999) .................................................................................................37

*Axis, S.p.A. v. Micafil, Inc.,*
870 F.2d 1105 (6th Cir. 1989) ...........................................................................................19, 26

*Billy Baxter, Inc. v. Coca-Cola Co.,*
47 F.R.D. 345 (S.D.N.Y. 1969),
*aff'd*, 431 F.2d 183 (2d Cir. 1970) ..........................................................................................35

*Blue Shield of Virginia v. McCready,*
457 U.S. 465 (1982) ...................................................................................................................30

*Bristol-Myers Squibb Co. v. Copley Pharm.,*
144 F. Supp. 2d 21 (D. Mass. 2000) ...................................................................................26, 27

*Bristol-Myers Squibb Co. v. Pharmachemie B.V.,*
361 F.3d 1343 (Fed. Cir. 2004) .................................................................................................37

*Brubaker v. City of Richmond,*
943 F.2d 1363 (4th Cir. 1991) ...................................................................................................36

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
429 U.S. 477 (1977) ...........................................................................................................12, 18

*In re Burlington Coat Factory Sec. Litig.,*
114 F.3d 1410 (3d Cir. 1997) ...............................................................................................9, 34

*In re Buspirone Antitrust Litig.,*
208 F.R.D. 516 (S.D.N.Y. 2002) ...............................................................................................14

*Caplan v. American Baby, Inc.*,
582 F. Supp. 869 (S.D.N.Y. 1984) ....................................................................33

*Cheminor Drugs, Ltd. v. Ethyl Corp.*,
168 F.3d 119 (3d Cir. 1999)......................................................................32, 38

*City of Pittsburgh v. West Penn Power Co.*,
147 F.3d 256 (3d Cir. 1998)............................................................... passim

*Cowell v. Palmer Twp.*,
263 F.3d 286 (3d Cir. 2001)............................................................................9

*Datamize, Inc. v. Fidelity Brokerage Servs., LLC*,
2004 U.S. Dist. LEXIS 29100 (E.D. Tex. Apr. 22, 2004) ...............................38

*Dayco Products, Inc. v. Total Containment, Inc.*,
329 F.3d 1358 (Fed. Cir. 2003)......................................................................38

*Dentsply Inter'l v. New Tech. Co.*,
1996 U.S. Dist. LEXIS 19846 (D. Del. Dec. 19, 1996)...................................36

*Dey, L.P. v. Eon Labs., Inc.*,
2005 U.S. Dist. LEXIS 39475 (C.D. Cal. Dec. 22, 2005) ...............................16

*Dystar Textilfarben GmbH v. C.H. Patrick Co.*,
464 F.3d 1356, 2006 U.S. App. LEXIS 24642 (Fed. Cir. 2006) ............................37

*Eastern R. Presidents Conference v. Noerr Motor Freight, Inc.*,
365 U.S. 127 (1961).......................................................................................32

*Eichorn v. AT&T Corp.*,
248 F.3d 131 (3d Cir. 2001)...........................................................................12

*Electronics Communs. Corp. v. Toshiba Am. Consumer Prods., Inc.*,
129 F.3d 240 (2d Cir. 1997)...........................................................................10

*Estee Lauder, Inc. v. Fragrance Counter, Inc.*,
189 F.R.D. 269 (S.D.N.Y. 1999) ....................................................................33

*First Graphics, Inc. v. M.E.P. Cad, Inc.*,
2002 U.S. Dist. LEXIS 14914 (N.D. Ill. Aug. 14, 2002)..........................33, 35, 36

*Garr v. U.S. Healthcare*,
22 F.3d 1274 (3d Cir. 1994)...........................................................................35

*Glaberson v. Comcast Corp.,*
2006 U.S. Dist. LEXIS 62672 (E.D. Pa. Aug. 31, 2006)...................................................12, 29

*Greater Rockford Energy & Technology Corp. v. Shell Oil Co.,*
998 F.2d 391 (7th Cir. 1993) ...........................................................................................12

*Green v. Associated Milk Producers, Inc.,*
692 F.2d 1153 (8th Cir. 1982) .........................................................................................19

*H&B Equipment Co. v. International Harvester Co.,*
577 F.2d 239 (5th Cir. 1978) ...........................................................................................19

*Hodges v. WSM, Inc.,*
26 F.3d 36 (6th Cir. 1994) ...............................................................................................19

*Hoffmann La Roche, Inc. v. Invamed Inc.,*
213 F.3d 1359 (Fed. Cir. 2000)...............................................................................35, 36, 37

*Joint Stock Soc'y v. UDV N. Am., Inc.,*
53 F. Supp. 2d 692 (D. Del. 1999)....................................................................................31

*Joint Stock Soc'y v. UDV N. Am., Inc.,*
266 F.3d 164 (3rd Cir. 2001) ......................................................................................31, 32

*In re K-Dur Antitrust Litig.,*
338 F. Supp. 2d 517 (D. Pa. 2004)....................................................................................10

*Kochert v. Greater Lafayette Health Servs.,*
463 F.3d 710, 2006 U.S. App. LEXIS 23181 (7th Cir. Ind. Sept. 12, 2006)..........................19

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992).................................................................................................10, 32

*Maio v. Aetna, Inc.,*
221 F.3d 472 (3d Cir. 2000)............................................................................................10

*Merck & Co., Inc. v. Watson Labs., Inc.,*
2006 U.S. Dist. LEXIS 36026 (D. Del. June 2, 2006)........................................................2, 29

*Merck & Co., Inc. v. Barr Labs., Inc.,*
Case No. 01-CV-8223 (S.D.N.Y.) .....................................................................................24

*Merck & Co., Inc. v. Teva Pharms. USA, Inc.,*
395 F.3d 1364 (Fed. Cir. 2005).....................................................................................24, 38

*Merck & Co., Inc. v. Teva Pharms. USA, Inc.,*
228 F. Supp. 2d 480 (D. Del. 2002), *aff'd*, 347 F.3d 1367 (Fed. Cir. 2003)..........................3, 5

*Morse v. Lower Merion Sch. Dist.,*
132 F.3d 902 (3d Cir. 1997)...................................................................................................9

*In re NAHC Inc. Sec. Litig.,*
306 F.3d 1314 (3d Cir. 2002)................................................................................................9

*Nami v. Fauver,*
82 F.3d 63 (3d Cir. 1996)......................................................................................................9

*O'Shea v. Littleton,*
414 U.S. 488 (1974)............................................................................................................32

*Ortho Pharmaceutical Corp. v. Smith,*
959 F.2d 936 (Fed. Cir. 1992)............................................................................................38

*Pension Benefit Guar. Corp. v. White Consol. Indus.,*
998 F.2d 1192 (3d Cir. 1993)..............................................................................................34

*Professional Real Estate Investors v. Columbia Pictures Indus.,*
508 U.S. 49 (1993).............................................................................32, 33, 36, 38

*In re Rockefeller Ctr. Props. Sec. Litig.,*
311 F.3d 198 (3d Cir. 2002)...........................................................................................9, 13

*Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co.,*
113 F.3d 405 (3d Cir. 1997).................................................................................................9

*Sony Elecs., Inc. v. Soundview Techs., Inc.,*
281 F. Supp. 2d 399 (D. Conn. 2003).................................................................................19

*Spanish International Communs. Corp., SIN, Inc. v. Leibowitz,*
608 F. Supp. 178 (S.D. Fla. 1985) .....................................................................................33

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.,*
171 F.3d 912 (3d Cir. 1999)................................................................................................30

*Super Sack Mfg. Corp. v. Chase Packing Corp.,*
57 F.3d 1054 (Fed. Cir. 1995)........................................................................................2, 29

*In re Tamoxifen Citrate Antitrust Litig.,*
277 F. Supp. 2d 121 (E.D.N.Y. 2003) ..........................................................................25, 26

*In re Tamoxifen Citrate Antitrust Litig.,*
2006 U.S. App. LEXIS 22154 (2d Cir. N.Y. Aug. 10, 2006)......................................19, 25, 26

*In re Terazosin Hydrochloride Antitrust Litig.,*
352 F. Supp. 2d 1279 (S.D. Fla. 2005) ................................................................................14

*Teva Pharms. USA, Inc. v. Pfizer Inc.,*
395 F.3d 1324 (Fed. Cir. 2005)................................................................................... passim

*Transco Prods. v. Performance Contracting,*
38 F.3d 551 (Fed. Cir. 1994)........................................................................................37

*United Mine Works v. Pennington,*
381 U.S. 657 (1965)..................................................................................................32

*In re Warfarin Sodium Antitrust Litig.,*
214 F.3d 395 (3d Cir. 2000)..............................................................................11, 12, 18

*Weiss v. York Hospital,*
745 F.2d 786 (3d Cir. 1984).........................................................................................11

*Whitmore v. Arkansas,*
495 U.S. 149 ................................................................................................................32

*Zachair, Ltd. v. Driggs,*
965 F. Supp. 741 (D. Md. 1997)....................................................................................33

*Zimmerman v. National Football League,*
632 F. Supp. 398 (D.D.C. 1986) .................................................................................19

## STATUTES

15 U.S.C. § 15..............................................................................................................11

15 U.S.C. § 26..............................................................................................................11

21 U.S.C. § 355(j)(2)(A)(vii)(IV) ..............................................................................1, 2

21 U.S.C. § 355(j)(5)(B)(iii) .......................................................................2, 14, 16, 35

21 U.S.C. § 355(j)(5)(B)(iv) ...................................................................................18, 27

21 U.S.C. § 355(j)(5)(C)(i)(III)....................................................................................35

28 U.S.C. § 2201 .................................................................................................15

35 U.S.C. § 271(e)(2)(A) ........................................................................................1

35 U.S.C. § 271(e)(5) ...........................................................................................15

35 U.S.C. § 282 ..........................................................................................33 36 37

## RULES

Fed. R. Civ. P. 41 ...............................................................................................29

Fed. R. Evid. 201(b) ............................................................................................16

## TREATISES

P. Areeda & H. Hovenkamp, Antitrust Law ¶ 363(b) (1995)..................................19

Plaintiff Merck & Co., Inc. ("Merck") opposes Apotex, Inc.'s ("Apotex") motion for leave to file its proposed First Amended Answer, Affirmative Defenses, and Counterclaims ("Counterclaim"). Apotex's motion should be denied because its proposed new defense is moot and its proposed antitrust counterclaim is futile for want of damages, injury in fact, antitrust injury, and standing. Apotex's effort late last Friday to substitute a new and materially different counterclaim underscores the futility of Apotex's motion.[1]

## NATURE AND STAGE OF THE PROCEEDINGS

Merck filed this action for infringement of nine Merck patents based upon Merck's receipt of a February 24, 2006 "paragraph IV" letter from Apotex stating that Apotex had filed an Abbreviated New Drug Application ("ANDA") seeking Food and Drug Administration ("FDA") approval to market a generic version of Merck's FOSAMAX® tablets. *See* Exhibit A. Apotex's paragraph IV certification constitutes an act of infringement.[2] Counterclaim, ¶ 14; *see* 35 U.S.C. § 271(e)(2)(A). In response to Apotex's letter, Merck requested access to "all relevant information" from Apotex's ANDA, but Apotex failed to provide any further

---

[1]  Late Friday, November 3, Apotex filed a motion seeking to drop paragraphs 39 and 42 from its originally proposed Counterclaim. Apotex did not advise the Court that those paragraphs (a) represented the core of the Counterclaim or (b) were dropped only after Merck sent to Apotex again last week the letters attached hereto as Exhibits B, C and D. These letters, which Merck originally sent to Apotex months ago for the purpose of obtaining information from Apotex's ANDA, show that Apotex's allegations in paragraphs 39 and 42 were false when made in an important way. Merck confronted Apotex about these clearly false allegations and asked Apotex to withdraw its motion for leave to file the proposed Counterclaim, but Apotex refused. Instead, Apotex filed a motion seeking quietly and with stealth simply to drop those core paragraphs from its Counterclaim without explanation. But the explanation – an explanation of what Apotex *did not do* upon receipt of Merck's letters – is central to why Apotex has no claim at all, as this brief will demonstrate in a variety of ways.

[2]  Apotex's paragraph IV letter notified Merck that Apotex had field an ANDA; that Apotex intended to market a generic version of FOSAMAX® before the expiration of nine Merck patents listed in the FDA's Orange Book for FOSAMAX®; and that in the ANDA, Apotex certified pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) that those patents are invalid, unenforceable and/or will not be infringed by the commercial manufacture, use, or sale of Apotex's generic tablets before those patents' expiration. Counterclaim, ¶¶ 11-13, 31-36; *see also* Exhibit A. Apotex's paragraph IV certification constitutes an act of infringement as a matter of law. *See* 35 U.S.C. § 271(e)(2)(A).

information to Merck.  *See* Exhibits B, C, D.  In view of Apotex's failure to respond to Merck's requests for information, Merck filed its patent infringement complaint on April 7, 2006, to protect Merck's rights under the Hatch-Waxman Act.[3]  D.I. 1.  On May 9, 2006, Apotex answered the complaint by denying the infringement allegations and asserting a counterclaim seeking a declaration of invalidity and noninfringement of the nine patents.[4]  D.I. 8.  Merck answered Apotex's counterclaim on May 30, 2006.  D.I. 11.

After Merck filed suit, Apotex finally provided excerpts of the ANDA to Merck (as Merck had been requesting before it filed suit).  Counterclaim, ¶ 57.  After reviewing these excerpts, Merck notified Apotex that it would grant an unqualified covenant not to sue on the patents in suit.  *Id.* ¶ 59.  Merck forwarded a copy of the covenant not to sue to Apotex on August 7, 2006.  D.I. 15 (Ex. C).  At a scheduling conference held on August 8, Apotex indicated it would contest dismissal.  D.I. 16 (Ex. D at 3-4).  On August 16, Merck filed its motion to dismiss, pointing out that under governing Federal Circuit precedent the Court no longer enjoys subject matter jurisdiction.[5]  D.I. 15.  That motion, now fully briefed, awaits a decision.  The bedrock Federal Circuit principles set forth in that motion, as well as the legal

---

[3]  Merck had 45 days from receipt of Apotex's paragraph IV letter to file suit for Apotex's infringement; if Merck failed to file suit within that period, the FDA would be permitted to approve Apotex's ANDA once all FDA exclusivities have expired and the FDA determines that the proposed generic is the bioequivalent to the approved drug and is otherwise approvable.  *Id.* ¶¶ 15-16; *see also* 35 U.S.C. § 355(j)(5)(B)(iii).  It was proper under Rule 11 for Merck to file suit under these circumstances.  *See infra* at 33-38

[4]  These nine patents are U.S. Patent Nos. 5,358,941 ("the '941 patent"); 5,681,590 ("the '590 patent"); 5,849,726 ("the '726 patent"); 5,994,329 ("the '329 patent"); 6,008,207 ("the '207 patent"); 6,015,801 ("the '801 patent"); 6,090,410 ("the '410 patent"); 6,194,004 ("the '004 patent"); and 6,225,294 ("the '294 patent").

[5]  Both the Federal Circuit and this Court have held that such a covenant moots the alleged infringer's counterclaims for declaratory judgment of invalidity and non-infringement and deprives the Court of Article III jurisdiction.  *See Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1058-60 (Fed. Cir. 1995); *Merck & Co., Inc. v. Watson Laboratories, Inc.*, 2006 U.S. Dist. LEXIS 36026 (D. Del. June 2, 2006).

principles set forth herein, together yield but a single conclusion:  that this controversy, such as it was, is concluded.  Nevertheless, on October 13, Apotex filed its Motion for Leave to File Its First Amended Answer, Affirmative Defenses, and Counterclaims.  D.I. 28.

**STATEMENT OF FACTS**

Merck developed the prescription drug FOSAMAX® for the treatment and prevention of osteoporosis.  The active ingredient in FOSAMAX® is alendronate sodium, the use of which is protected by a Merck patent that the Federal Circuit has found to be valid.  Counterclaim ¶¶ 25-27, 102-103; *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 228 F. Supp. 2d 480 (D. Del. 2002), *aff'd*, 347 F.3d 1367 (Fed. Cir. 2003).  Merck also owns other patents relating to the formulation and dosage of FOSAMAX® tablets.  *Id.* ¶¶ 28-30.  Merck filed this patent infringement action against generic drug-maker Apotex in good faith to enforce its rights under Merck's formulation and dosage patents.  After Apotex finally provided confidential information to Merck regarding the composition of Apotex's generic alendronate sodium tablets – information which Merck twice requested but Apotex failed to provide before Merck filed suit – Merck provided an unconditional covenant not to sue Apotex for infringement and moved to dismiss this case for lack of subject matter jurisdiction.  Apotex has opposed Merck's motion to dismiss the case.

Apotex now seeks leave to amend to allege an antitrust counterclaim against Merck.  Apotex's proposed counterclaim is based on allegations that Merck allegedly refused a pre-suit offer of confidential information from Apotex and filed suit allegedly knowing its infringement allegations were objectively baseless so it could then provide a covenant not to sue and dismiss the suit without an adverse decision on the merits, allegedly with the intent and effect of

3

postponing the date on which Apotex might potentially obtain FDA approval for its ANDA for a generic version of FOSAMAX®. *See id.* ¶¶ 1, 38-39, 48-56.

## SUMMARY OF ARGUMENT

Apotex is attempting to fabricate an Article III controversy that does not exist given Merck's conveyance to Apotex of an unqualified covenant not to sue. Apotex's attempt to create a live controversy by fashioning an antitrust counterclaim out of Merck's legitimate enforcement of its patent rights fails because, among other things, Apotex cannot show antitrust injury or injury in fact as required to establish antitrust standing. In fact, the same absence of any Article III injury and controversy that necessitates dismissal of Merck's patent suit also necessitates the denial of Apotex's motion for leave to assert its proposed antitrust counterclaim. What Apotex in essence complains of as "antitrust injury" is the lack of a "right" to litigate a "controversy" with Merck, but the Federal Circuit and this Court have made clear that *Apotex never had that right in the first place*. For all practical purposes, Apotex's allegation is that Merck's alleged conduct placed Apotex in the same position in which it would have been had Merck never filed suit at all. Had Merck never filed suit at all, Apotex could not have sought a declaratory judgment of either patent invalidity or non-infringement because Apotex would not have had any reasonable apprehension of suit. Having now provided to Apotex an unqualified covenant not to sue (upon the belated and untimely receipt from Apotex of information requested months ago – *see supra* at 1-2 and n.1), Merck has restored the *status quo ante*. In these circumstances, there is hardly an injury of any sort to Apotex, much less an antitrust injury on which to base a claim for attempted monopolization.

As demonstrated below, Apotex's proposed antitrust counterclaim is futile and asserted in bad faith, a conclusion now further evident by the odd and incommunicative way by which

Apotex seeks quietly to delete paragraphs 39 and 42 of the originally proposed pleading. In neither pleading has Apotex alleged well pleaded facts to establish antitrust injury or injury in fact, nor can it do so, because nothing Merck did in this suit has had any impact on Apotex's ability to manufacture, market or sell its proposed generic version of FOSAMAX®. Indeed, Apotex's allegations reveal that Apotex is barred from selling its generic product for a number of reasons unrelated to Merck's suit.

Foremost, Apotex must receive approval from the FDA. The Hatch-Waxman Act provides that the first approved ANDA filer has a right to enter the market before subsequent filers, and here, Apotex alleges that its generic competitor Teva Pharmaceuticals USA, Inc. ("Teva") was the first to file an ANDA for generic alendronate sodium tablets. Counterclaim, ¶¶ 81, 88-92. As the first to file, Teva may begin selling its generic drug no earlier than February 6, 2008, when Merck's '077 patent exclusivity expires. *Id.* ¶¶ 25-27, 81-82.[6] Upon commencing sales of its generic drug, Teva will enjoy a 180-day exclusivity period before subsequent filers, such as Apotex, may enter the market if approved to do so by the FDA. Consequently, the Hatch-Waxman Act precludes Apotex from obtaining final FDA approval of its ANDA until at least August 5, 2008, the earliest date on which Teva's 180-day exclusivity period will expire. *Id.* ¶¶ 18-19, 89. Moreover, Apotex has not obtained even *tentative* FDA approval for its generic drug, let alone final approval, and such approvals must be obtained before Apotex can begin to sell its product. *Id.* ¶¶ 113-14. These admitted facts show that if

---

[6] Merck's patent on the active ingredient in FOSAMAX® is U.S. Pat. No. 4,621,077 ("the '077 patent"), which the Federal Circuit found to be valid in *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 228 F. Supp. 2d 480 (D. Del. 2002), *aff'd*, 347 F.3d 1367 (Fed. Cir. 2003). Counterclaim, ¶¶ 25, 27. Merck's FDA exclusivity under this patent expires on February 6, 2008. *Id.* ¶ 26. Teva was the first to file an ANDA for generic FOSAMAX®. *Id.* ¶ 81. Apotex cannot obtain FDA approval for its later-filed ANDA at least until Teva's 180-day exclusivity period expires. *Id.* ¶ 113. Under Hatch-Waxman, if Teva begins marketing its generic immediately upon the expiration of Merck's '077 patent exclusivity, Teva's 180-day exclusivity period will expire on August 5, 2008. *See id.* ¶ 82.

the Court dismisses Merck's patent action as moot (and thus Apotex's original declaratory

relief counterclaims along with it), Apotex will be in the same position that it was in before

Merck filed the case:  barred from entering the market until 180 days after Teva begins selling

its generic product.  Consequently, Apotex cannot show that it will suffer any injury by virtue

of anything done by Merck – either in filing the suit initially, or in supplying a covenant not to

sue removing any case or controversy.

      Apotex contends it will be injured because its potential entry into the market will be

delayed by the 30-month stay that went into effect when Merck filed suit.  *Id.* ¶¶ 17, 50.  That

contention is based on Apotex's allegation that the 30-month stay remains in place even upon

the dismissal of Merck's claims and Apotex's original counterclaims necessitated by Merck's

covenant not to sue.  *Id.* ¶¶ 51-53.  As a legal conclusion, not a factual allegation, Apotex's

contention enjoys no presumption of truth; indeed, it is wrong as a matter of law for two

reasons.  First, the Hatch-Waxman Act provides that the 30-month stay is lifted upon entry of a

judgment reflecting "any substantive determination that there is no cause of action for patent

infringement or invalidity."  A determination by this Court that due to Merck's covenant not to

sue there no longer is a case or controversy to support subject matter jurisdiction for Apotex's

counterclaim for a declaration that Merck's patents are invalid will be a "substantive

determination that there is no cause of action for . . . invalidity" that lifts the 30-month stay.

Indeed, Apotex is well aware that the 30-month stay will be lifted when this case is dismissed.[7]

---

[7]  Just last year, Apotex was sued by Novartis Pharmaceuticals Corp. ("Novartis") after Apotex made a
paragraph IV certification for Novartis's drug ZADITOR®.  Novartis's suit against Apotex caused the
imposition of a 30-month stay, which unless lifted would not expire until late 2007.  Novartis's suit was
dismissed with prejudice in August 2005, without a finding of non-infringement or invalidity being
made by the Court.  Nonetheless, Apotex obtained final FDA approval for its generic version of
ZADITOR® about nine months later, which would not have been possible had the FDA found that the
30-month stay remained in place despite the dismissal of the suit.  These facts are established in
documents of which this Court may take judicial notice.  *See infra* n.13.

Second, the Act authorizes courts to shorten the 30-month stay, and Merck has notified Apotex that Merck will agree to inclusion of a provision in the order of dismissal explicitly dispensing with the 30-month stay upon dismissal of this case.

Since there will be no 30-month stay following dismissal of this suit, the only purported "injury" revealed by Apotex's proposed counterclaim is that by providing a covenant not to sue and mooting this case, Merck allegedly "deprives" Apotex of the possibility of obtaining a favorable decision on the merits of all the patents in suit which favorable decision would permit it to obtain FDA approval to enter the market at the same time as Teva (upon the expiration of Merck's '077 patent and the pediatric exclusivity period –February 6, 2008), instead of being required to wait until the expiration of Teva's 180-day exclusivity period (no earlier than August 5, 2008). *See supra* n.6. As more fully argued below, this claim also fails to show antitrust injury or injury in fact to Apotex.

Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Apotex's claimed injury in this case is the result not of any action by Merck, but instead is the result of the operation of the Hatch-Waxman regulatory scheme as applied by the Federal Circuit. Numerous courts have held on similar facts that a litigant's inability to enter a market due to a regulatory bar eliminates the required direct causation between the claimed injury and any alleged anti-competitive scheme to prevent market entry. Injury attributable to a regulatory bar is not "injury of the type the antitrust laws were designed prevent" and does not "flow from that which makes defendants' acts unlawful." Apotex essentially is arguing that once Merck filed suit, Merck was required to maintain the suit no matter what until the Court renders a decision on patent validity, enforceability or infringement, and that Merck's provision of a covenant not

to sue and related request to dismiss the suit (allegedly to "avoid" such a decision) constitutes an attempt to monopolize. Apotex's claimed injury of "deprivation of a chance in court to defeat Merck's patents," however, does not flow from any alleged violation of the antitrust laws, but rather from Article III itself. Both this Court and the Federal Circuit have held that a covenant not to sue moots a prior pending patent infringement case (including the alleged infringer's counterclaims) and deprives the Court of Article III jurisdiction to decide the patent issues. Consequently, the imposition of the Hatch-Waxman Act regulatory scheme, which precludes Apotex's market entry absent the requisite regulatory approvals, and Article III, which deprives this Court of jurisdiction, sever the causal chain between the alleged antitrust violation and the injury alleged by Apotex.[8]

Apotex's conclusory allegations that Merck undertook the alleged anti-competitive scheme with the intent further to delay Apotex's market entry does not show antitrust injury since, in the end, the conduct alleged by Apotex merely maintained the status quo. Before this suit, Apotex could not obtain FDA approval to begin selling its generic version of FOSAMAX® until Teva's 180-day exclusivity period expired, thus no earlier than August 5, 2008. Upon dismissal of this suit, Apotex will be in the exact same position. Consequently, Apotex's exclusion from the market during that period of exclusivity cannot be attributed to any alleged conduct by Merck, which can only be said to have been competition-neutral.

Apotex's speculative allegations also fail to show injury in fact. Apotex's claimed injury is not only speculative because it is difficult to measure, it is speculative because it may never occur. But for Merck's alleged conduct, Apotex still may not have been able obtain an

---

[8] In addition, it seems likely that there would never have been a suit by Merck but for Apotex's failure twice to respond to Merck's letters seeking information. Thus, Apotex's failure led to the suit, which it now claims must proceed no matter what. Apotex's argument is all bootstrap and no boot.

adverse decision on validity or infringement of Merck's patents, and still may not have been able to obtain tentative and final FDA approval for its generic alendronate sodium tablets with sufficient speed to enter the market prior to August 5, 2008. Since Apotex's claimed injury is contingent on obtaining favorable results in litigation and prompt regulatory approval, Apotex does not allege and cannot show injury in fact.

Finally, Apotex fails to allege any well pleaded facts to support its claim that Merck's suit was "objectively baseless" when filed and thus within the "sham litigation" exception to *Noerr-Pennington* immunity for litigation activity.

## ARGUMENT

## I.    LEGAL STANDARD FOR AMENDMENT UNDER RULE 15(a)

"[L]eave to amend need not be granted when amending the complaint would clearly be futile." *Cowell v. Palmer Twp.*, 263 F.3d 286, 296 (3d Cir. 2001). "In assessing 'futility,' the district court applies the same standard of legal sufficiency as applies under Rule 12(b)(6)." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997); *see also In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1332 (3d Cir. 2002). Under the familiar Rule 12 pleading standard, the Court is obligated "to view the complaint as a whole and to base rulings not upon the presence of mere words but, rather, upon the presence of a factual situation which is or is not justiciable." *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 263 (3d Cir. 1998) (herein "*West Penn Power*"). The Court is not required to accept as true "unsupported conclusions", *Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997), "bald assertions", *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997), or allegations that are "self-evidently false." *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996). "Similarly, legal conclusions draped in the guise of factual allegations may

not benefit from the presumption of truthfulness." *In re Rockefeller Ctr. Props. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). Courts "do draw on the allegations of the complaint, but in a realistic, rather than a slavish, manner." *West Penn Power*, 147 F.3d at 263. Where under the "legal theory presented" and "economic harm alleged" it would not be possible for the pleader to cure a "fundamental problem" to survive a motion to dismiss, leave to amend should be denied. *See Maio v. Aetna Inc.*, 221 F.3d 472, 500 (3d Cir. 2000) (affirming dismissal of complaint with prejudice where appellants failed to allege cognizable injury flowing from appellees' conduct).[9]

## II.    APOTEX'S PROPOSED ANTITRUST COUNTERCLAIM IS FUTILE

### A.    Apotex Is Required To Plead Facts Establishing Antitrust Standing

Apotex alleges that its counterclaim "arises under the Antitrust Laws of the United States, particularly Section 2 of the Sherman Act, 15 U.S.C. § 2." Counterclaim, ¶ 126. Apotex demands "treble its actual damages" and injunctive relief "prohibiting Merck from engaging in the unlawful acts alleged in this Counterclaim." *Id.*, Prayer for Relief, ¶¶ C, D. In addition to establishing Article III standing, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992),[10] a party seeking damages or injunctive relief under the antitrust laws must plead facts sufficient to establish standing to bring an antitrust claim. *West Penn Power*, 147

---

[9]  In assessing the sufficient of an antitrust complaint, "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Associated General Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 528 n.17 (1983). In antitrust particularly, the law "does not permit conclusory statements to substitute for minimally sufficient factual allegations." *Electronics Communs. Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 243 (2d Cir. 1997); *see also In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 529 (D. N.J. 2004) (same).

[10]  In *Lujan*, the Supreme Court outlined the three elements of standing required in all cases: (1) an invasion of a concrete and particularized, actual or imminent *legally protected* interest; (2) a causal connection between the injury and the conduct of which the plaintiff complains; and (3) it must be likely, not merely speculative, that the injury will be redressed by a favorable decision. *Id.* at 560-561. The party seeking relief bears the burden of proving that it has standing. *Id.* at 561.

F.3d at 264.  Antitrust standing is a question of law and claims brought by a party who lacks

standing must be dismissed.  *See id.* at 259 (affirming dismissal of antitrust claim for lack of

standing).

　　　　To establish standing under the Sherman Act, in addition to alleging a violation of the

Act, an antitrust plaintiff "must also prove the right to either the treble damage remedy given

by section 4 of the Clayton Act or the equitable remedy afforded by section 16 of that Act."[11]

*Weiss v. York Hospital*, 745 F.2d 786, 805 (3d Cir. 1984).  "[T]he right to antitrust damages is

limited to those plaintiffs who can demonstrate a causal relationship between the defendants'

unlawful conduct and their economic injury."  *Id.*  "A section 4 plaintiff's standing is tested by

an application of a number of factors designed to determine if the asserted damage goes

beyond speculation and, that if there is cognizable damage, the plaintiff is the appropriate

person to assert it for antitrust purposes."  *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395,

399 (3d Cir. 2000) (citing *Associated General*, 459 U.S. at 538).  "Section 16 is not as

demanding, but it does require a showing that there is a 'significant threat of injury from [a] . . .

violation of the antitrust laws.'"  *Id.* (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*,

395 U.S. 100, 130 (1969)).

　　　　The Third Circuit employs the five-factor antitrust standing test set forth by the

Supreme Court in *Associated General*:  "(1) the causal connection between the antitrust

violation and the harm to the plaintiff; (2) whether the plaintiff's alleged injury is of the type

that the antitrust laws were intended to redress; i.e., did the plaintiff suffer antitrust injuries; (3)

the directness of the injury; (4) the existence of more direct victims of the violation; and (5) the

---

[11]  Under Section 4 of the Clayton Act, 15 U.S.C. § 15, "any person who shall be injured . . . by reason
of anything forbidden in the antirust laws may sue."  Under Section 16 of the Clayton Act, 15 U.S.C. §
26, "[a]ny person . . . shall be entitled to sue for . . . injunctive relief . . . against threatened loss . . . by
[an antitrust violation.]"

potential for duplicative recovery or complex apportionment of damages." *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d at 399 (citing *Associated General*, 459 U.S. at 535-46); *see also West Penn Power*, 147 F.3d at 264. "The first step in determining whether a plaintiff has antitrust standing begins with the second factor in the balancing test, commonly known as the antitrust injury requirement." *Glaberson v. Comcast Corp.*, 2006 U.S. Dist. LEXIS 62672, at *15 (E.D. Pa. Aug. 31, 2006) (citing *West Penn Power*, 147 F.3d at 264 n.14, 265). "If there is no antitrust injury, that is the end of the inquiry, and the claim should be dismissed." *Id.* (citing *West Penn Power*, 147 F.3d at 265).

An antitrust injury is an "injury of 'the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anti-competitive effect either of the violation or of anti-competitive acts made possible by the violation." *Eichorn v. AT&T Corp.*, 248 F.3d 131, 140 (3d Cir. 2001) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). "[T]he antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior." *West Penn Power*, 147 F.3d at 266 (quoting *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990)).

"The concept of antitrust injury overlaps with the first factor in the balancing test" – the causal connection between the antitrust violation and the harm to the plaintiff – "because the injury must be casually related to the defendant's allegedly anti-competitive activity." *Glaberson*, 2006 U.S. Dist. LEXIS 62672, at *15-16 (citing *West Penn Power*, 147 F.3d at 265). A plaintiff must not only show that the injury is of the type intended to be protected by the antitrust laws, but also that the violation was "the cause-in-fact of the injury; that 'but for'

12

the violation, the injury would not have occurred." *Greater Rockford Energy & Technology Corp. v. Shell Oil Co.*, 998 F.2d 391, 394-96 (7th Cir. 1993).

Apotex's claimed injury is that the allegedly anti-competitive scheme proximately caused, in two ways, an extension of the period during which Apotex will be barred from potentially (if ever) obtaining FDA approval for its generic version of FOSAMAX®. ***First,*** Apotex alleges that Merck filed this suit to obtain a 30-month stay which will preclude Apotex from obtaining FDA approval until 30 months after the date that Merck received actual notice of Apotex's paragraph IV certification (February 28, 2006), thus until August 28, 2008. ***Second,*** Apotex alleges that by filing suit and then providing a covenant not to sue, Merck allegedly has deprived Apotex of an opportunity to obtain a decision finding Merck's patents invalid or not infringed, which, if obtained, could allow Apotex to obtain final FDA approval for its proposed generic sixth months earlier than it otherwise might have under the Hatch-Waxman regulatory scheme (on February 6, 2006, instead of having to wait until the expiration of Teva's 180-day exclusivity period, which will not commence until February 6, 2006, or later).

### 1.      Apotex Suffers No Injury from the 30-Month Stay

Apotex alleges injury because its hypothetical entry into the market will be delayed by a 30-month stay that it contends remains in place even if the Court grants Merck's pending motion to dismiss. Counterclaim, ¶¶ 51-52, 68. Apotex's contention is a legal conclusion, not a factual allegation, and enjoys no presumption of truth. *See In re Rockefeller Ctr. Props. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). Apotex is wrong as a matter of law for two reasons.

### a. The 30-Month Stay Will Be Lifted Automatically upon Entry of Dismissal

"A dismissal of the Hatch-Waxman infringement lawsuit lifts the thirty month stay." *In re Terazosin Hydrochloride Antitrust Litig.*, 352 F. Supp. 2d 1279, 1289 (S.D. Fla. 2005).[12] The plain language of the Hatch-Waxman Act, 21 U.S.C. § 355(j)(5)(B)(iii), directs this conclusion:

> If such an action is brought . . . the approval shall be made effective upon the expiration of the thirty-month period beginning on the date of the receipt of the notice . . . **except that--**
> **(I) if before the expiration of such period the district court decides that the patent is invalid or not infringed (including any substantive determination that there is no cause of action for patent infringement or invalidity), the approval shall be made effective on--**
> **(aa) the date on which the court enters judgment reflecting the decision; . . . .**

21 U.S.C. § 355(j)(5)(B)(iii)(I) (emphasis added). Under this subsection, if the Court enters judgment reflecting a "substantive determination that there is no cause of action for patent infringement or invalidity," the 30-month stay is lifted. The only question, then, is whether this Court's dismissal of Merck's patent infringement action and Apotex's declaratory relief counterclaims will constitute a "substantive determination that there is no cause of action for patent infringement or invalidity." It appears there are no published legal authorities interpreting this language. In absence of such guidance, the Court should employ a plain

---

[12] *See also In re Buspirone Antitrust Litig.*, 208 F.R.D. 516, 525 (S.D.N.Y. 2002): "The filing of the patent infringement suits merely began the process of obtaining for Bristol-Myers the 30-month stay that prevented the generic companies from selling buspirone. It was not sufficient, however, for Bristol-Myers merely to file the patent infringement suits in order to enjoy the 30-month stay. To maintain the stay, Bristol-Myers had to actively litigate the case or else the stay could be terminated through an order of the court. 21 U.S.C. § 355(j)(5)(B)(iii). Thus, Bristol-Myers was required to respond to Court orders and file papers resisting the generic companies' motion for summary judgment. To merely have filed the complaints and failed to prosecute them would assuredly have resulted in a termination of the stay."

reading of the statute. The language at issue here seems directed to precisely the type of dismissal that ordinarily would flow from Merck's covenant not to sue.

A review of the issues raised in the parties' briefs regarding Merck's pending motion to dismiss readily demonstrates that the Court's resolution of that motion will be both a "substantive determination that there is no cause of action for patent infringement" and a "substantive determination that there is no cause of action for patent . . . invalidity" as described in section 355(j)(5)(B)(iii)(I). Merck contends that its provision of an unqualified covenant not to sue Apotex removes any controversy between the parties. Apotex disagrees, contending that despite the covenant, a cause of action remains due to Apotex's counterclaim for declarations of invalidity and non-infringement. Apotex contends that despite Article III jurisprudence, it is entitled under the Declaratory Judgment Act, 28 U.S.C. § 2201, to seek a judicial ruling under 35 U.S.C. § 271(e)(5) that Merck's patents are invalid. Counterclaim, ¶¶ 4, 5; Prayer for Relief, ¶ A. But the covenant not to sue, not to mention the entry of an Order dismissing Merck's case, will *ipso facto* be a determination that Merck does not have a "cause of action for patent infringement" against Apotex, and that Apotex does not have a "cause of action for patent . . . invalidity" against Merck under the Declaratory Judgment Act. To remove any doubt, the Court's order of dismissal may recite that the Court has determined that due to the covenant that Merck provided to Apotex, Merck does not have a cause of action for patent infringement against Apotex, and Apotex does not have a cause of action for patent invalidity against Merck.

Indeed, Apotex's allegation that the 30-month stay remains in place as a matter of law cannot be reconciled with Apotex's knowledge that the 30-month stay did not remain in effect following the dismissal of at least one other patent infringement action against it. In April

2005, Apotex was sued by Novartis Pharmaceuticals Corp. ("Novartis") after Apotex filed an

ANDA with a paragraph IV certification for Novartis's branded drug ZADITOR®.  Novartis's

suit triggered the 30-month stay, which unless lifted would not expire until late August 2007, at

the earliest.  Novartis's suit was dismissed with prejudice in August 2005, without any finding

of non-infringement or invalidity.  Nevertheless, Apotex obtained final approval from the FDA

for its generic version of ZADITOR® about nine months later, which would not have been

possible had the FDA determined that the 30-month stay remained in place despite dismissal of

the suit.  Today Apotex sells its generic version of ZADITOR®.  Thus, Apotex is aware that

the FDA has deemed the 30-month stay to be lifted upon dismissal of a patent infringement

suit against Apotex.[13]

> **b.      The Statute Authorizes the Court to Shorten the 30-Month Stay**

The statute also empowers the Court to shorten the 30-month stay and thereby eliminate

any purported injury to Apotex from it:

> If such an action is brought . . . the approval shall be made effective upon the expiration of the thirty-month period . . . **or such shorter or longer period as the court may order because either party to the action failed to reasonably cooperate in expediting the action. . . .**

21 U.S.C. § 355(j)(5)(B)(iii)(emphasis added).  Courts have recognized their power to shorten

the 30-month stay upon dismissal; in fact, one court has shortened the stay in response to

contentions that the patentee failed to conduct a reasonable pre-suit inquiry.  *Dey, L.P. v. Eon*

*Labs, Inc.*, 2005 U.S. Dist. LEXIS 39475, at *11-12 (C.D. Cal. Dec. 22, 2005) (shortening 30-

---

[13]  *See* Novartis's Complaint for Patent Infringement, 05 Civ. 3855 (S.D.N.Y. 2005) (Ex. E hereto); Notice of Dismissal (Ex. F); FDA approval to Apotex for generic ZADITOR® (Ex. G); Apotex.com product listing for generic ZADITOR® (Ex. H); Walgreens.com webpage for Apotex's generic ZADITOR® (Ex. I).  The Court may properly take judicial notice of these documents.  *See* Fed. R. Evid. 201(b) (authorizing the court to take judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").

month stay based on patentee's failure to conduct a thorough pre-suit inquiry into inventorship). Accordingly, and for good measure, Merck has offered to agree to an order explicitly dispensing with the 30-month stay upon dismissal. The Court thus can resolve any doubt as to the effect of the stay – and remedy Apotex's purported injury – by providing such a provision in its order of dismissal. If Apotex opposes such an order, it will be clear that Apotex, not Merck, is causing itself the purported "injury" to Apotex from the 30-month stay. Apotex should not be permitted to inflict injury on itself and then claim such injury gives rise to an antitrust claim.

### 2. Apotex Suffers No Antitrust Injury from the 180-Day Exclusivity Period Established by Congress

Apotex alleges it has shown antitrust injury because, *inter alia*, Merck's alleged anti-competitive acts "have a dangerous probability of harming competition and causing injury to Apotex by preventing the FDA from giving Apotex final approval to market its alendronate sodium drug product as a therapeutic equivalent to Merck's FOSAMAX® until the expiration of the 30 month stay or until the first generic filer enters the market, whichever is later." Counterclaim, ¶ 115. "But for Merck's anti-competitive acts," Apotex alleges, "Apotex would likely be able to obtain a court decision finding the patents asserted by Merck to be invalid and/or not infringed, which decision would terminate the 30 month stay and trigger the 180 day exclusivity period of the first generic filer, thus allowing Apotex and any other secondary generic applicants to enter the market for generic alendronate sodium on February 6, 2008, the same time as the first generic applicant(s) enter the market." *Id.* ¶ 116. Apotex contends that these alleged anti-competitive acts "will cause injury to Apotex by delaying its entry into the generic market for alendronate sodium for at least the first 180 days. . . ." *Id.* ¶¶ 117.

These allegations fail to establish antitrust injury. Before Merck filed suit, Apotex was precluded by the Hatch-Waxman statutory framework from obtaining FDA approval to market its generic version of FOSAMAX® until at least the expiration of Teva's 180-day exclusivity period. 21 U.S.C. § 355(j)(5)(B)(iv). Given that Apotex was already precluded from entering the market, the 30-day stay had and is having no effect. *Id.* § 355(j)(5)(B)(iii). As discussed above, the 30-month stay is lifted by operation of law upon dismissal of Merck's suit. *See id.* Consequently, Merck's covenant not to sue returns Apotex to the *status quo ante*: precluded under Hatch-Waxman from entering the market at least until the expiration of Teva's 180-day exclusivity period. Furthermore, as Apotex had admitted, Apotex also was (and still is) precluded from entry into the market by virtue of having no tentative, much less final, approval from the FDA to market its generic product. Counterclaim, ¶¶ 113-14. In particular, the FDA has made no determination that Apotex's proposed generic product meets the bioequivalence requirements of the FDA to allow it to be marketed to consumers. Thus under the applicable legal standard, which requires the Court to accept Apotex's well-pleaded factual allegations as true, the purported scheme of bringing objectively baseless litigation, covenanting not to sue and then seeking dismissal of the case, if successful, will have had no effect whatsoever on Apotex's ability to enter the market. Accordingly, Apotex cannot show that it has suffered any injury that flows from the alleged anti-competitive conduct or from any competition-reducing aspect of that alleged conduct. *See Atlantic Richfield*, 495 U.S. at 344; *Brunswick*, 429 U.S. at 489; *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d at 399.

Numerous courts have held that, where government approval is a necessary precondition to participation in a relevant market, a plaintiff without such approval lacks standing to bring an antitrust claim. *See, e.g., West Penn Power*, 147 F.3d 256, 266-68 (3d Cir.

1998); *Teva Pharms. USA, Inc. v. Pfizer Inc.*, 395 F.3d 1324, 1329 (Fed. Cir. 2005); *In re Tamoxifen Citrate Antitrust Litig.*, 2006 U.S. App. LEXIS 22154, at *15-16 (2d Cir. N.Y. Aug. 10, 2006); *Axis, S.p.A. v. Micafil, Inc.*, 870 F.2d 1105, 1111 (6th Cir. 1989); *see also* 2 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 363(b), at 222 (1995) ("[A] plaintiff cannot be injured in fact by private conduct excluding him from the market when a statute prevents him from entering that market in any event.") (as cited in *West Penn Power*, 146 F.3d at 268).

### a.    *City of Pittsburgh v. West Penn Power* **(3d Cir. 1998)**

The Third Circuit has held that where government approval is a necessary precondition to participation in a relevant market, a plaintiff lacks standing to bring an antitrust claim premised on unlawful exclusion from that market where the plaintiff has yet to receive the required government approval. *West Penn Power*, 147 F.3d at 266-68.[14]  In *West Penn Power*, the City of Pittsburgh filed suit against two electrical power companies (Allegheny Power and Duquesne Light) claiming their pre-merger agreement and planned merger injured the City and

---

[14]  The Third Circuit's holding in *West Penn Power* is echoed by numerous decisions in sister circuits holding that a plaintiff fails to show antitrust injury where, due to regulatory bars or other reasons, the plaintiff cannot show it would be in the market, or able to enter the market, from which it alleges it has been excluded.  *See, e.g., H&B Equipment Co. v. International Harvester Co.,* 577 F.2d 239 (5th Cir. 1978) (distributor's claim against supplier for unlawfully preventing distributor from bidding on contracts failed for lack of antitrust injury where distributor had not shown it was able to penetrate the markets that supplier had allegedly reserved to itself); *Hodges v. WSM, Inc.*, 26 F.3d 36, 37-39 (6th Cir. 1994) ("If Plaintiff would have suffered the same injury without regard to the allegedly anti-competitive acts of Defendants, Plaintiff has not suffered an antitrust injury."); *Kochert v. Greater Lafayette Health Servs.*, 463 F.3d 710, 2006 U.S. App. LEXIS 23181, at *15, 21-22 (7th Cir. Ind. Sept. 12, 2006) (alleged anti-competitive behavior was not the "but for" cause of plaintiff's claimed injury); *Green v. Associated Milk Producers, Inc.*, 692 F.2d 1153 (8th Cir. 1982) (claim for exclusion as a result of anti-competitive market division agreement failed for lack of antitrust injury where such exclusion was caused by conduct unrelated to the alleged antitrust violation); *Zimmerman v. National Football League*, 632 F. Supp. 398, 409 (D.D.C. 1986) ("What Zimmerman wants is to be a free agent, to be able to negotiate with all 28 NFL teams.  That would not have happened even in the absence of the challenged draft.  Therefore, as a matter of law, Zimmerman cannot show that he was injured 'by reason of' the [challenged] draft."); *Sony Elecs., Inc. v. Soundview Techs., Inc.*, 281 F. Supp. 2d 399, 402 (D. Conn. 2003) (indisputable fact "leads inexorably to the conclusion that 'a force other than the antitrust violation fully accounts for the [counterclaim] plaintiff's injury,' thus foreclosing a showing of antitrust injury") (quoting 2 Antitrust Law P338b at 320)).

competition because it caused one of the companies to withdraw an application to the Public

Utility Commission ("PUC") to supply electricity in competition with the other company.  *Id.*

at 256, 260-262.  The District Court dismissed the City's claims on the ground that the City

lacked antitrust standing because there was no causal relationship between the challenged

conduct and any harm to competition, since the regulatory structure prevented competition

between the two companies prior to the merger absent PUC approval, and any claim based on

loss of potential competition was contingent on predicting the outcome of the PUC proceeding

and thus too speculative to be actionable.  *Id.* at 262.

On appeal, the Third Circuit affirmed.  The court noted that "[t]he plaintiff has alleged

anti-competitive behavior in an industry which is highly regulated; those who wish to compete

to provide their services must obtain a certificate from the PUC to do so."  *Id.* at 263.  The

court found that since potential competitor lacked that regulatory approval, "any injury

suffered by the City did not flow from the defendants' conduct, but, rather, from the realities of

the regulated environment in which all three were actors."  *Id.* at 265.[15]  The court also found

that the City lacked standing to assert its claims for injunctive relief to prevent threatened harm

because any future harm likewise was contingent on uncertain regulatory action (*id.* at 267-68,

emphasis added):

> Allegheny Power was not legally able to provide power . . . and we do not know
> whether the PUC would ever have granted the permission for it to do so.  Thus,
> as a matter of law, the court cannot conclude that the loss of potential
> competition was causally related to the decision of the two power companies to
> merge.  **The City is really claiming that it would have benefited from**

---

[15]  The court further explained:  "[It] is sufficient that we can determine from the face of the complaint
that Allegheny Power never had [PUC approval].  It never did compete, and, therefore, any injury to the
City did not result from a lessening of competition.  In fact, as the district court correctly points out, the
actions of the utilities merely maintained the status quo.  Thus, the utilities' purported antitrust violation
can only be said to have been competition-neutral and as such, is not actionable."  *Id.* at 266 (citing
*Atlantic Richfield*, 495 U.S. at 344).

> **competition it hoped would occur.  However, the appellants cannot foist their version of what might have been on the court under the rubric of antitrust injury.  The presence of the regulatory scheme and need for approval . . . cuts the causal chain and converts what might have been deemed antitrust injury in a free market into only a speculative exercise.**

As in *West Penn Power*, this case involves a highly regulated industry in which Apotex and other potential competitors are not legally able to sell generic versions of Merck's FOSAMAX® tablets until they receive FDA approval; thus in the circumstances presented here, the injury Apotex claims it will suffer in the future does not flow from Merck's conduct but rather "from the realities of the regulatory environment in which [Merck and Apotex] are actors."  *See id.* at 265.  Furthermore, as in *West Penn Power*, Merck's alleged actions "merely maintained the status quo."  *See id.* at 265.  Like the City in *West Penn Power*, Apotex is "really claiming that it would have benefited from competition it hoped would occur. . . . [But Apotex] cannot foist [its] version of what might have been on the court under the rubric of antitrust injury."  *See id.* at 267.  Consequently, "the presence of the regulatory scheme and need for approval . . . cuts the causal chain" and defeats Apotex's ability to show antitrust injury.  *See id.* at 267-68.

It appears the Third Circuit has not yet confronted a case in which it applied *West Penn Power* to a case involving an ANDA filer claiming it was injured by acts of a brand drug maker that allegedly precluded the generic from entering the market.  However, the Federal Circuit, Second Circuit, and a district court in the First Circuit have encountered such facts, and in each case, both the district courts and the courts of appeal found that the requisite injury to establish standing was not present.

### b.    *Teva v. Pfizer* (Fed. Cir. 2005)

The facts underlying the Federal Circuit's decision in *Teva Pharms. USA, Inc. v. Pfizer Inc.*, are closely analogous to the instant case on the issue of Apotex's claimed injury.  In *Teva*, at issue was even a lesser standard than antitrust injury, namely, the injury-in-fact standard of Article III.  In *Teva,* the plaintiff, generic drug maker Teva, the second to file an ANDA for a generic version of Pfizer's ZOLOFT® tablets, made a paragraph III certification that it would not market its generic drug until Pfizer's '518 patent expires, and a paragraph IV certification that Teva's generic drug did not infringe Pfizer's '699 patent or that such patent was invalid. 395 F.3d at 1326-27.  After Pfizer failed to sue Teva for infringement during the 45-day period following Pfizer's receipt of notice of the paragraph IV certification, Teva filed a declaratory judgment action seeking a determination that Teva's generic drug did not infringe Pfizer's '699 patent or that the claims of the patent were invalid.  *Id.* at 1327.  The district court dismissed Teva's suit for lack of subject matter jurisdiction, finding that Teva had failed to establish an actual case or controversy because it lacked reasonable apprehension of suit by Pfizer.  *Id.*  On appeal, the Federal Circuit affirmed.  *Id.*

Like Apotex here, Teva argued that Pfizer had an interest in avoiding a determination of invalidity or noninfringement of the '699 patent, either of which might trigger the commencement of the first generic filer's 180-day exclusivity period before the expiration of the '518 patent.  *Id.* at 1337.  Also like Apotex, Teva argued that (a) if Pfizer can avoid triggering the first filer's 180-day exclusivity period until the expiration of the '518 patent, Pfizer could expect to enjoy six months of selling ZOLOFT® tablets with only one generic competitor; and (b) if the '699 patent were held invalid or not infringed, it would mean that during the six-month period following expiration of the '518 patent, Pfizer would face

competition in the ZOLOFT® market not only from the first generic filer, but from another generic manufacturer as well. *Id.* And just like Apotex here, Teva argued that these circumstanced "constitute injury to it, because the effect of Pfizer's not bringing suit against Teva was to prevent Teva from challenging the '699 patent and thereby possibly opening the door to its being able to sell [its generic drug] during the 180-day exclusivity period following the expiration of the '518 patent." *Id.* at 1337-38. (For Apotex's equivalent allegations, *see* Counterclaim, ¶¶ 57-71, 88-99.)

The Federal Circuit rejected Teva's arguments, holding that under its reasonable apprehension test, Teva had not established any "injury" such to create an actual controversy between Teva and Pfizer (*id.* at 1338, emphasis added):

> The fact that Teva is disadvantaged from a business standpoint by [the first generic filer's] 180-day exclusivity period and the fact that Pfizer's decision not to sue Teva creates an impediment to Teva's removing that disadvantage are matters separate and distinct from whether an Article III controversy exists between Teva and Pfizer. **The injury about which Teva complains is the product of the Hatch-Waxman scheme and the fact that Pfizer has acted in a manner permitted under that scheme.** It is not the product of a threat of suit by Pfizer. That is the problem that Teva faces in seeking to establish district court jurisdiction.
>
> If it is the view of Congress that the 180-day exclusivity period for a first ANDA filer creates inequities, it can amend the Hatch-Waxman Amendments accordingly. Until it does so, however, we must apply the statutory scheme as written. . . . **[I]n order to rule in Teva's favor, we would have to hold that the Article III requirement of an actual controversy is satisfied, not because Teva is under an imminent threat of suit by Pfizer, but because the combined circumstances of the Hatch-Waxman scheme and Pfizer's lawful conduct under that scheme have created a situation in which Teva finds itself at a competitive disadvantage vis-a-vis [the first generic filer]. Those circumstances do not amount to an actual controversy between Teva and Pfizer, however.**

The Federal Circuit's analysis in *Teva* is compelling and directly on point. The only difference is that in *Teva*, the patentee chose not to sue at all, whereas in the present case,

Merck sued to protect its rights under the Hatch-Waxman Act (having been denied a response to its pre-complaint requests for information from Apotex) but then exercised its right under Federal Circuit case law to dismiss its suit following presentation of a covenant not to sue.  In both cases, the gravamen of the plaintiff's claim is that the patentee was intentionally avoiding a decision on validity or infringement of its patent in order to delay the plaintiff's potential entry into the market with its generic version of the patentee's drug by requiring the plaintiff to wait for the expiration of the first generic filer's 180-day exclusivity period.  In both cases, the injury alleged is that as a result of the alleged conduct the plaintiff was deprived of an opportunity to obtain such a decision and thereby open the door to entering the market at the same time as the first generic filer.  Just as the Federal Circuit found that Teva's allegations in *Teva v. Pfizer* failed to establish an "injury" for purposes of creating Article III standing, this Court should find that Apotex's allegations fail to establish any "injury" for purposes of standing to bring its purported antitrust claim.  *See Teva*, 395 F.3d at 1338; *see also supra* n. 10 and accompanying text.

Apotex will suffer no more injury than it would have suffered in the absence of any infringement claims by Merck at all; to the contrary, Apotex will be in precisely the same position that the Federal Circuit found Teva to be in when Pfizer chose not to assert its patents against Teva in *Teva v. Pfizer*.  Simply put, Apotex is required by the Hatch-Waxman Act to wait for the company that was the first to file a paragraph IV certification against Merck's patents (here, according to the Apotex's counterclaim, Teva) to begin selling its generic product and receive its 180-day statutorily granted exclusivity period.  *See Merck & Co., Inc. v. Teva Pharms., USA, Inc.*, 395 F.3d 1364 (Fed. Cir. 2005); *see also Merck & Co., Inc. v. Barr*

*Labs., Inc.*, Case No. 01-CV-8223 (S.D.N.Y.).[16]  That reality – created by the Hatch-Waxman

Act and not any alleged conduct by Merck – does not constitute injury for standing purposes.

*See Teva v. Pfizer*, 395 F.3d at 1338.

> **c.    *In re Tamoxifen Citrate Antitrust Litig.* (2nd Cir. 2006)**

Similar to Third Circuit and Federal Circuit precedent, the Second Circuit's recent

decision in *In re Tamoxifen Citrate Antitrust Litig.*, 2006 U.S. App. LEXIS 22154 (2nd Cir.

N.Y. Aug. 10, 2006), holds that antitrust injury cannot exist where the claimed injury flows not

from the allegedly anti-competitive scheme, but instead from regulatory barriers that prevent a

potential competitor from market entry.  In *Tamoxifen*, the plaintiff consumer class alleged that

defendant drug companies Zeneca, Inc. ("Zeneca") and Barr Laboratories, Inc. ("Barr") entered

into an illegal settlement agreement that monopolized and allocated the United States market

for tamoxifen, and that but for that settlement agreement, a judgment declaring Zeneca's patent

would have been affirmed, Barr's 180-day exclusivity period would have been triggered, and a

competitive market for tamoxifen would have resulted, leading to lower prices for the class.  *In*

*re Tamoxifen Citrate Antitrust Litig.*, 277 F. Supp. 2d 121, 123-24, 127 (E.D.N.Y. 2003)

("*Tamoxifen II*").  The district court granted the defendants' motion to dismiss, holding that

even if the plaintiffs could show that the settlement agreement violated the antitrust laws,

plaintiffs could not show antitrust injury.  *Id.* at 136.  The court found that the claimed injury –

higher prices for tamoxifen – resulted not from the allegedly illegal settlement agreement, but

instead from the fact that no other manufacturer had received FDA approval to sell tamoxifen.

---

[16]  Indeed, stripped of its legal conclusions and distilled to its essence, Apotex's proposed counterclaim
reveals only one claimed "injury":  that by not pressing patent infringement claims against Apotex,
Merck has allegedly deprived Apotex of the opportunity to obtain a favorable court decision against
Merck's patents and thereby usurp Teva's 180-day exclusivity period.  *See, e.g.,* Counterclaim, ¶¶ 89,
94-96.

*Id.* The court held that antitrust injury "must be caused by something other than the regulatory action limiting entry to the market." *Id.* at 136-37 (citing *West Penn Power*, 147 F.3d at 267-68).

On appeal, the Second Circuit affirmed. Accepting for the sake of argument that the plaintiffs had stated an antitrust violation, the court of appeal agreed with the district court's conclusion that any injury that the plaintiffs suffered "resulted . . . from the inability of other generic manufacturers to establish that the [Zeneca] patent was either invalid or not infringed – and not from any agreement between Barr and Zeneca that Barr should employ its exclusivity powers to exclude competition." *In re Tamoxifen Citrate Antitrust Litig.*, 2006 U.S. App. LEXIS, at *94 (citing *Tamoxifen II*, 277 F. Supp. 2d at 136-38). The court emphasized that the allegation of injury was based on a hypothetical world in which competition would otherwise have existed, whereas in fact, irrespective of the alleged anti-competitive scheme, competition still would have been precluded. *Id.* at *96 (citing *Axis, S.p.A. v. Micafil, Inc.*, 870 F.2d 1105, 1111 (6th Cir. 1989) (finding no antitrust injury where plaintiffs had stated an antitrust violation, but where the alleged injury would have resulted even in the absence of the antitrust violation because of the existence of patents preventing market entry)). The Court of Appeal also affirmed the district court's denial of leave to amend on grounds of futility. *Id.* at *98.

### d. *Bristol-Myers Squibb v. Copley* (D. Mass. 2000)

On facts similar to those at issue here, the District Court in Massachusetts relied on the Third Circuit's reasoning in *West Penn Power* to grant a motion to dismiss an antitrust counterclaim brought by a second ANDA filer against the plaintiff brand drug maker on grounds the counterclaimant failed to plead facts showing antitrust injury. *Bristol-Myers Squibb Co. v. Copley Pharm.*, 144 F. Supp. 2d 21, 23-25 (D. Mass. 2000).

26

In that case, Bristol-Myers Squibb Co. ("Bristol"), the patentee pioneer drug maker, sued

Copley Pharmaceuticals ("Copley"), a subsequent ANDA filer, for patent infringement and

declaratory judgment that Copley's ANDA was deficient. *Id.* at 22. Copley counterclaimed

alleging that Bristol's patent claims were frivolous and that Bristol filed the suit to maintain an

unlawful monopoly. *Id.* Bristol responded that Copley lacked standing because it failed to

show a causal link, "*i.e.*, that by bringing this allegedly baseless lawsuit, Bristol has prevented

Copley from entering the generic-drug market." *Id.* The court agreed, finding that "the

statutory scheme, not [Bristol's] lawsuit, prevents Copley from entering the market," both

because Copley had not even received tentative FDA approval for its ANDA, and because even

if Copley had obtained such approval, a different generic drug maker had filed the first ANDA

and was entitled to the 180-day exclusivity period. *Id.* at 23-25 (citing *West Penn Power*, 147

F.3d at 268).

### e.  *Apotex v. FDA* (D.C. Cir. 2006)

Based on the foregoing authorities, it is clear that irrespective of whether Apotex could

prove the conclusory allegations contained in its proposed counterclaim, Apotex still could not

show that its claimed injury – inability to obtain FDA approval to sell its generic drug until a

later date than it might otherwise had obtained such approval – constitutes antitrust injury,

because it does not flow from the alleged antitrust violation, but instead from the regulatory

scheme imposed by the Hatch-Waxman Act and the application of Article III. Indeed, the

Court of Appeals for the District of Columbia recently told Apotex nearly the same thing in a

slightly different context in *Apotex, Inc. v. FDA*, 449 F.3d 1249 (D.C. Cir. 2006). In that case,

the D.C. Circuit rejected Apotex's challenge to the FDA's interpretation of § 355(j)(5)(B)(iv),

which provides that the trigger for the 180-day exclusivity period is "a decision of a court . . .

holding the [challenged] patent . . . to be invalid or not infringed." The court's analysis aptly demonstrates that the purported "injury" Apotex claims here (deprivation of a chance in court) is caused by Article III and the Hatch-Waxman Act, and not any alleged act by Merck (*id.* at 1253, emphasis added):

> Apotex contends that FDA's interpretation "nullifies" the declaratory judgment mechanism underlying the Hatch-Waxman Act. **As Apotex observes, no generic manufacturer can maintain an action against a patent holder who has promised never to sue for infringement since, under settled Federal Circuit case law, any such promise would relieve the challenger of a reasonable apprehension of suit and moot a declaratory judgment action.** *See Super Sack Mfg. Corp. v. Chase Packing Corp.*, 57 F.3d 1054, 1058 (Fed. Cir. 1995). According to Apotex, this creates an anomalous situation: although a patent might be unenforceable because of a patent holder's representations, no court would have jurisdiction to render a holding to that effect. This arguable anomaly, however, nullifies nothing in the Hatch-Waxman Act. **Congress knew that federal courts lack jurisdiction where no case or controversy exists,** yet it nonetheless chose to make the exclusivity trigger "a decision of a court . . . holding the [challenged] patent . . . to be invalid or not infringed." 21 U.S.C. § 355(j)(5)(B)(iv)(2000)(amended 2003). **Congress's regulatory scheme thus depends in large measure on whether courts can maintain jurisdiction over patent suits.** If a court cannot constitutionally assert jurisdiction, then certainly one reasonable view is that it cannot issue a "decision" that "holds" anything. This is FDA's position, and while it may not reflect the only possible interpretation of the court decision trigger . . . it is in no way inconsistent with the plain language of the statute. . .

As the court of appeals stated (and as Apotex apparently conceded), "no generic manufacturer can maintain an action against a patent holder who has promised never to sue for infringement." *See id.* As the court further stated, "Congress knew that federal courts lack jurisdiction where no case or controversy exists," yet Congress chose to create a regulatory scheme – in that case, subsection (j)(5)(B)(iv), while in this case, subsection (j)(5)(B)(iii) – that "depends in large measure on whether courts can maintain jurisdiction over patent suits." *See id.* Thus, it is clear that Congress did not provide jurisdiction to federal courts for Apotex to "force" a judicial decision in a patent dispute that does not exist. *See id.; Teva v. Pfizer*, 395

F.3d at 1337-38.  Nor did Congress provide any statutory rights or remedies for the purported

"injury" that Apotex claims in this case.  *See id.; Teva v. Pfizer*, 395 F.3d at 1337-38.

>           **f.**       ***Merck v. Watson Labs.* (D. Del. 2006)**

This Court came to a similar conclusion earlier this year when, pursuant to *Super Sack,*

it dismissed as moot Merck's patent suit against Watson Laboratories, Inc. ("Watson").  *Merck*

*& Co., Inc. v. Watson Labs., Inc.*, 2006 U.S. Dist. LEXIS 36026, at *2-4.  The rationale this

Court stated in rejecting Watson's claim of "prejudice" under Fed. R. Civ. P. 41 applies with

equal force to the lack of Article III jurisdiction here (*id.* at *10):

> Watson's final argument is that permitting Merck to withdraw its claims at this
> stage would be improperly prejudicial under Fed. R. Civ. P. 41(a)(2) because
> such a withdrawal would require Watson to wait until both the expiration of
> Merck's patents and the expiration of the 180-day exclusivity period before
> marketing its generic.  Watson's argument is flawed for at least two obvious
> reasons.  First, dismissal of this case is required under Article III of the United
> States Constitution, which trumps the Federal Rules of Civil Procedure.
> Second, it is not clear that Watson will be prejudiced because not all of the
> patent claims asserted by Merck have been invalidated.  Thus, even if the case
> were to proceed, Watson may not succeed in freeing itself from the reach
> Merck's intellectual property rights.  Therefore, this argument does not warrant
> denying Merck's motion.

For the same reasons, Apotex cannot show Article III injury, let alone antitrust injury, as

required to establish standing to bring its proposed counterclaim.  Consequently, Apotex's

motion for leave to amend must be denied.

>           **3.**       **Apotex Cannot Establish Injury in Fact**

In addition to antitrust injury, Apotex also must show injury in fact.  Since both

concepts require scrutiny of the causation of an antitrust plaintiff's claimed injury, the analyses

overlap in many respects and can be difficult to tease apart.  *See West Penn Power*, 147 F.3d at

264 n.14, 265; *Glaberson v. Comcast Corp.*, 2006 U.S. Dist. LEXIS 62672, at *15-16 (E.D. Pa.

Aug. 31, 2006).  For injury in fact, however, the focus is not on whether Apotex's claimed

injury flows from the alleged antirust violation (as in the antitrust injury analysis above), but rather whether Apotex has sufficiently alleged that it has been injured at all. If the alleged injury is too remote, indirect or uncertain to satisfy common law concept of proximate cause, injury in fact is not met. *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 921 (3d Cir. 1999) (citing *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 477 (1982)); *Associated General*, 459 U.S. at 540-543 & n.44. Under such circumstances, "[t]he injury is not only 'speculative' because it is difficult to measure; rather, it is speculative because the injury claimed may never occur." *West Penn Power*, 147 F.3d at 268.

Apotex's claimed injury depends on assuming that in the absence of the alleged anti-competitive scheme, several big "ifs" all would turn in Apotex's favor: (1) *if* Apotex can get tentative approval, which takes on average 16.3 months;[17] (2) *if* this Court would render a decision finding Merck's patents invalid or not infringed (were it not deprived of Article III jurisdiction by Merck's covenant not to sue); (3) *if* the FDA would then give final approval to Apotex's ANDA; and (4) *if* all this would occur before February 5, 2008; only then would it be possible that Apotex would be able to enter the market on that date. Consequently, only then would it be possible that Apotex would have been injured if the alleged anti-competitive scheme were to have succeeded by allegedly depriving Apotex of the *chance* for all these "ifs" to become "whens".

These considerable "ifs" defeat Apotex's allegation that it will be injured by the alleged anti-competitive scheme. Apotex admits that it is currently precluded by the Hatch-Waxman regulatory scheme from selling its generic alendronate sodium tablets in the United States. *Id.*

---

[17] *Hearings Before Special Comm. on Aging, U.S.* 109th Cong., (July 20, 2006) (testimony of Gary Buehler, R.Ph, Director of the Office of Generic Drugs, Center for Drug Evaluation and Research, Food and Drug Administration).

¶¶ 25-27.  Apotex admits that it does not even have tentative approval from the FDA to sell its generic tablets.  *Id.* ¶ 113.  Apotex admits that absent a future court ruling finding *all* of Merck's patents invalid or not infringed, Apotex cannot enter the market at least until the conclusion of Teva's 180-day exclusivity period.  *Id.* ¶¶ 89, 116.  Accordingly, at the time Apotex filed its proposed counterclaim, Apotex had suffered no injury-in-fact, and its claimed injury is too remote at this point for the Court to find that it ever will.

Both this Court and the Third Circuit have found that a plaintiff that is not able to enter a market at the time it files a complaint cannot claim that it has been wrongfully prevented from entering that same market.  In *Joint Stock Soc'y v. UDV N. Am., Inc.*, 53 F. Supp. 2d 692 (D. Del. 1999), this Court dismissed the plaintiffs' complaint that defendants had restricted plaintiffs' entry into the United States market for vodka for lack of Article III standing on grounds that plaintiffs had not demonstrated their ability to enter that market.  Among other facts, the Court found that the plaintiffs had not taken sufficient preparatory steps to enter the market and had not obtained necessary regulatory approvals.  *Id.* at 702-705.  The Third Circuit affirmed, holding that since the appellant was neither selling vodka in the United States nor prepared to do so at the time it filed its complaint, it lacked Article III standing because it had not shown it had suffered an injury causally related to the defendant's allegedly anti-competitive acts.  *Joint Stock Soc'y v. UDV N. Am., Inc.*, 266 F.3d 164, 176 (3d Cir. 2001).  The same principles apply here:  at the time Apotex filed its proposed counterclaim, Apotex was unable to enter the market and unable even to state with certainty when it would be able to enter the market.  Consequently, Apotex has not shown injury in fact as necessary to establish standing for its purported antitrust claims.  *See id.*

Moreover, the United States Supreme Court has held that where claimed injury in fact is based on predicting the outcome of a lawsuit, that injury is too speculative to support standing under Article III. *See Whitmore v. Arkansas*, 495 U.S. 149, 159-160 (holding that plaintiff lacked standing where his claimed injury depended on receiving habeas corpus review, retrial and conviction; stating, "It is just not possible for a litigant to prove in advance that the judicial system will lead any particular result in his case. Thus, . . . there is no amount of evidence that potentially could establish that [plaintiff's] asserted future injury is 'real and immediate.'") (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)). Here, Apotex's claimed injury is contingent at least on obtaining a decision from the FDA of bioequivalence and acceptance of its proposed generic product, and further on obtaining a decision in this Court (and any appeals) that all nine of Merck's patents in suit are invalid or not infringed. Consequently, Apotex's alleged injury is too speculative to support federal court standing. *See Joint Stock*, 266 F.3d at 176; *see also Lujan*, 504 U.S. at 560-561.

### B.     Apotex Fails to Allege Facts Sufficient to Overcome *Noerr-Pennington* Immunity

Under the *Noerr-Pennington* doctrine, a party that petitions the government for redress generally is immune from antitrust liability. *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 122 (3d Cir. 1999) (citing *Eastern R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Works v. Pennington*, 381 U.S. 657 (1965)). To strip a plaintiff of *Noerr-Pennington* immunity, the defendant must show that the suit is a "sham". *Id.* at 122 (citing *Noerr*, 365 U.S. at 144; *Professional Real Estate Investors v. Columbia Pictures Indus.*, 508 U.S. 49, 62-63 (1993) ("*PRE*")). In *PRE*, the Supreme Court set forth a two-part test for the sham exception to *Noerr-Pennington* immunity:  (1) "the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on

the merits"; and (2) "the baseless lawsuit conceals an attempt to interfere directly with the

business relationships of a competitor, through the use of governmental process – as opposed to

the outcome of that process – as an anti-competitive weapon." *Id.* at 122-23 (quoting *PRE*, 508

U.S. at 60-61). "[O]nly if challenged litigation is objectively meritless may a court examine

the litigant's subjective motivation." *Id.*

Apotex fails to allege competent facts (as opposed to mere legal conclusions)[18] to show

that Merck's suit was allegedly "objectively baseless." As more fully discussed in the

following sections, a patentee has the right to enforce its presumptively valid patents and to test

an alleged infringer's contentions that that the patents are invalid or not infringed. *First

Graphics, Inc. v. M.E.P. Cad, Inc.*, 2002 U.S. Dist. LEXIS 14914, at *8 (N.D. Ill. Aug. 13,

2002) (patentee need not accept opponent's unsupported assertion that patentee's case lacks

merit); 35 U.S.C. § 282 ("A patent shall be presumed valid"). Prior to filing suit, Merck

requested access to confidential information in the ANDA in order to determine whether

Apotex's generic version of FOSAMAX® will infringe the patents in suit, but Apotex failed to

provide that information or any other information to establish the composition of its generic

tablets. Accordingly, Merck was entitled to test Apotex's unsupported assertions by filing suit

and seeking discovery. As set forth more fully below, absent allegations that Merck had such

---

[18] A party attempting to invoke the "sham" exception bears a heavy burden. *See Estee Lauder, Inc. v. Fragrance Counter, Inc.*, 189 F.R.D. 269, 273 (S.D.N.Y. 1999) (in *PRE*, "the Supreme Court established a stringent test for 'sham' litigation); *Miller Pipeline Corp. v. British Gas PLC*, 69 F. Supp. 2d 1129, 1142 (S.D. Ind. 1999) ("objective baselessness is very difficult to prove, for a litigant's reasonable belief in its chance to achieve success on the merits is a very low threshold"). A plaintiff alleging "sham litigation" cannot simply rely on "talismanic phraseology" to invoke the "sham" exception. *Spanish International Communs. Corp., SIN, Inc. v. Leibowitz*, 608 F. Supp. 178, 184 (S.D. Fla. 1985). Merely labeling litigation "objectively baseless," for example, is not sufficient properly to allege a "sham." *Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 749 (D. Md. 1997). Rather, a plaintiff must set forth specific factual allegations. *Caplan v. American Baby, Inc.*, 582 F. Supp. 869, 871 (S.D.N.Y. 1984) ("the danger than the mere pendency of the claim will have a chilling effect on the exercise of First Amendment rights requires a greater degree of specificity in the complaint than would otherwise be the case").

information prior to filing suit, Merck's infringement claims were not objectively baseless as a

matter of law. Since Apotex does not and cannot make such allegations, its attempt to strip

Merck of *Noerr-Pennington* immunity must fail.

> **1.      Communications Between Apotex and Merck on Which Apotex Relies in its Counterclaim Show that Apotex's Allegations Are False and Made in Bad Faith**

Apotex alleges in its proposed counterclaim that before Merck filed suit, Apotex sent a

letter to Merck offering to provide confidential information from its ANDA showing that

Apotex's generic tablets do not infringe Merck's patents; *that Merck declined Apotex's offer to*

*view the information and did not otherwise request any such information*; and that had Merck

accepted the offer and considered the information, Merck would have known that its patent

infringement allegations against Apotex were objectively baseless. Counterclaim, ¶¶ 38, 39,

43. What Apotex fails to reveal to the Court is that, as Apotex is well aware, and as evidenced

in Exhibits B, C and D, *Merck not only did not refuse Apotex's offer, Merck twice specifically*

*asked to see the information referenced in Apotex's letter*.[19]  Apotex goes beyond failing to

acknowledge this correspondence; Apotex affirmatively misrepresents the facts evidenced in

these letters, facts that clearly were in its possession when it drafted its proposed counterclaim.

Under these circumstances, it is appropriate under Rule 12(b)(6) and Rule 15(e) for the Court

to consider these documents in ruling on Apotex's motion for leave to amend.[20]

---

[19]  As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings. "However, an exception to the general rule is that a document integral to or explicitly relied upon in the complaint may be considered without converting the motion [to dismiss] into one for summary judgment." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 2000) (internal quotations omitted). "The rationale underlying this exception is that the primary problem raised by looking to documents outside the complaint – lack of notice to the plaintiff – is dissipated where plaintiff has actual notice . . . and has relied upon these documents in framing the complaint." *Id.* (internal quotations omitted).

[20]  *See Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a

These documents show that Merck acted reasonably as a matter of law.  Apotex's

paragraph IV certification constitutes an act of infringement.  *See supra* n.2.  Merck's pre-suit

investigation was constrained by the Hatch-Waxman Act's requirement that Merck file suit

within 45 days of receipt of Apotex's paragraph IV letter or lose the right to challenge

Apotex's ANDA and obtain a stay of FDA approval.  *See supra* n.3; *see also Garr v. U.S.*

*Healthcare*, 22 F.3d 1274, 1279 (3d Cir. 1994) ("a factor in ascertaining reasonableness . . . is

the amount of time available to investigate the facts and law involved").  Merck's pre-suit

investigation was further constrained by Apotex's failure to make good on its offer to provide

information regarding the composition of its generic tablets pursuant to 21 U.S.C.

§ 355(j)(5)(C)(i)(III).  Under these circumstances, Merck's pre-suit inquiry was reasonable as a

matter of law.  *See Hoffmann La Roche, Inc. v. Invamed Inc.*, 213 F.3d 1359, 1363-65 (Fed.

Cir. 2000) (patentee conducted reasonable pre-suit inquiry and did not violate Rule 11 where

before filing suit patentee attempted to ascertain whether defendant generic drug maker's

manufacturing processes were infringing but could not do so because defendant refused to

disclose its processes); *First Graphics*, 2002 U.S. Dist. LEXIS 14914, at *5-7 (patentee

conducted reasonable pre-suit inquiry where defendant refused to provide a fully-functioning

copy of the accused product until compelled in discovery).

In view of the indisputable fact that Apotex failed before suit to provide information

from its ANDA despite Merck's requests, it is Apotex's proposed counterclaim, not Merck's

since-mooted patent suit, which is a sham.  As Apotex has sought leave to amend with

---

motion to dismiss if the plaintiff's claims are based on the document."); *Billy Baxter, Inc. v. Coca-Cola Co.*, 47 F.R.D. 345, 347-50 (S.D.N.Y. 1969), *aff'd*, 431 F.2d 183 (2d Cir. 1970) (denying motion to amend in view of the actual record evidence; to constitute a good faith motion there must be at least a *prima facie* showing of a possibility of the amender's ability to establish factual support for the new matters sought to be pleaded).

allegations that cannot be lodged in good faith, and as leave to amend would in any event be futile, the Court should deny it.

>            2.       **Apotex's Remaining Allegations Are Insufficient to Show That**
>                     **Merck's Suit Was Objectively Baseless.**

Objective baselessness means a lack of probable cause to institute civil proceedings. "Probable cause to institute civil proceedings requires no more than a reasonable belief that there is a chance that a claim may be held valid upon adjudication." *PRE*, 508 U.S. at 60-61. Patent litigation will not be considered a sham so long as a "reasonable litigant" could believe that "at least one claim in the lawsuit has objective merit." *Dentsply Int'l v. New Tech. Co.*, 1996 U.S. Dist. LEXIS 19846, at *7-9 (D. Del. Dec. 19, 1996).[21]  Apotex's assertion that Merck's claims were objectively baseless is premised on several allegations that are insufficient as a matter of law.

First, Apotex alleges that it told Merck that other than the '077, all of the nine patents listed by Merck for alendronate sodium were either invalid, unenforceable, or not infringed. Complaint, ¶ 32.  As stated above, however, a potential infringer's assertion that patents are invalid, unenforceable, or not infringed would not lead a reasonable litigant to conclude that none of its asserted patent claims have objective merit. *First Graphics*, 2002 U.S. Dist. LEXIS 14914, at *8 (patentee need not accept opponent's assertion that case lacks merit); 35 U.S.C. § 282 ("A patent shall be presumed valid").

Second, Apotex alleges that it told Merck that the ANDA did not infringe the '941, '590, '410, '004, '726 or '294 patents because the claims are limited to certain ingredients and

---

[21]  *See also Hoffmann La Roche*, 213 F.3d at 1364 (court did not err to reject Rule 11 challenge; plaintiff's pre-suit investigation was reasonable where "at the end of [such] it had neither evidence of infringement nor non-infringement"); *cf. Brubaker v. City of Richmond*, 943 F.2d 1363, 1377 (4th Cir. 1991) ("It cannot be said that, when filed, appellants had 'absolutely no chance of success under the existing precedent.'") (quoting *Cleveland Demolition Co. v. Azcon Scrap Corp.*, 827 F.2d 984, 988 n.16 (4th Cir. 1987)).

Apotex's tablets will not contain those ingredients. Counterclaim, ¶¶ 34-36. Apotex does not allege (and cannot allege) that before Merck filed suit, Apotex showed information to Merck establishing the composition of the tablets it described in its ANDA. A reasonable person would not conclude that patent infringement claims are objectively baseless based on nothing more than the alleged infringer's unsupported, out-of-court statement that its product does not include something required by the patent, and consequently, a litigant does not violate Rule 11 by filing suit where the alleged infringer fails to provide information demonstrating non-infringement. *See Hoffman La Roche*, 213 F.3d at 1363-65; *First Graphics*, 2002 U.S. Dist. LEXIS 14914, at *5-7.

Third, Apotex alleges that it told Merck that the '329 and '801 patents were invalid based on the *Teva* ruling that certain claims of the '329 were invalid (and meant to also say so regarding the '294 patent). Counterclaim, ¶¶ 33, 36 n.1. Relatedly, Apotex alleges that Merck knew that as a continuation-in-part of the same application of which the '329 is a continuation, the '801 is invalid, and that as a continuation of the application that led to the '329 patent, the '294 is invalid. *Id.* ¶¶ 43-46. These allegations ignore basic patent law principles[22] and fail as a matter of law to show objective baselessness. A patent is presumed valid. 35 U.S.C. § 282. Obviousness "must be evaluate[d] . . . on a claim-by-claim basis." *Dystar Textilfarben GmbH v. C.H. Patrick Co.*, 464 F.3d 1356, 2006 U.S. App. LEXIS 24642, at *44 (Fed. Cir. 2006)

---

[22] Apotex's attempt to "lump together" all the claims of one patent with all the claims of other patents that derive from continuation applications related to the first patent ignores fundamental patent law concepts. A continuation-in-part application adds matter not disclosed in the earlier application and may include new matter developed since the filing date of the parent application. *Transco Prods. v. Performance Contracting*, 38 F.3d 551, 555 (Fed. Cir. 1994); *Augustine Med., Inc. v. Gaymar Indus.*, 181 F.3d 1291, 1302 (Fed. Cir. 1999). A continuation-in-part is not invalid simply because old matter in a parent may be. *Bristol-Myers Squibb Co. v. Pharmachemie B.V.*, 361 F.3d 1343, 1348 (Fed. Cir. 2004) (reversing district court ruling that all restrictions from a parent application carry over to a continuation application, stating the "continuation application . . . began a new proceeding in which all of the original claims . . . were once again presented for examination").

(citing *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1370 (Fed. Cir. 2003)

("dependent or multiple dependent claims shall be presumed valid even though dependent

upon an invalid claim"). Indeed, "the Federal Circuit has rejected, in no uncertain terms, the

argument that the claims of a continuation patent are obvious in light of its parent." *Datamize,*

*Inc. v. Fid. Brokerage Servs., LLC*, 2004 U.S. Dist. LEXIS 29100 (E.D. Tex. Apr. 22, 2004)

(citing *Ortho Pharmaceutical Corp. v. Smith*, 959 F.2d 936, 941 (Fed. Cir. 1992)).

Consequently, a reasonable litigant would not conclude that all of the claims of the '801 and

'294 patents are obvious based on the fact that a court found certain claims of the '329 patent

to be obvious.[23]

      Finally, absent proof of objective baselessness, a determination of subjective

knowledge or intent is unnecessary and irrelevant. *See Cheminor Drugs*, 168 F.3d at 122-23;

*PRE*, 508 U.S. at 60-61. Accordingly, Apotex's allegation that discovery will show that Merck

allegedly knew it was within the ability of one of ordinary skill in formulating and making

medications to make generic tablets without the ingredients claimed in the asserted patents

(Counterclaim, ¶¶ 40-41), and Apotex's other allegations regarding Merck's subjective

knowledge and intent (*see, e.g., id.* ¶¶ 48, 54-56, 70-73, 98) cannot save Apotex's

insufficiently pleaded counterclaim.

## III.      APOTEX'S PROPOSED AFFIRMATIVE DEFENSE IS MOOT

      In light of Merck's covenant not to sue, there is no longer any case or controversy

regarding the patents in suit. Consequently, Apotex's proposed affirmative defense to those

abandoned patent infringement claims is likewise moot. Since the issue of mootness has been

---

[23] Nowhere in the decision finding two claims of the '329 patent invalid did the Federal Circuit mention the '801 or '294 patent. *See Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364 (Fed. Cir. 2005).

briefed in connection with Merck's motion to dismiss for lack of subject matter jurisdiction,

Merck does not repeat those arguments and authorities here.

## **CONCLUSION**

For the foregoing reasons, Merck respectfully requests that the Court deny Apotex's

motion for leave to amend.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Mary B. Graham*

_____

Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
302.658.9200

*Attorneys for Plaintiff Merck & Co., Inc.*

OF COUNSEL:

John DeQ. Briggs
John F. Lynch
Kenneth W. Donnelly
Aaron Myers
HOWREY, LLP
1299 Pennsylvania Ave. NW
Washington, D.C.  20004
202.783.0800

Nicolas G. Barzoukas
Suzy S. Harbison
Jason C. Abair
WEIL, GOTSHAL & MANGES
700 Louisiana, Suite 1600
Houston, TX  77002
713.546.5000

Paul D. Matukaitis
Edward W. Murray
Gerard M. Devlin
MERCK & CO., INC.
126 E. Lincoln Avenue RY28-320
Rahway, NJ  07065-0907
732.594.4000

Dated:   November 7, 2006
544692

## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2006, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to the following:

> Richard L. Horwitz, Esquire
> POTTER ANDERSON & CORROON LLP
> Hercules Plaza, 6th Floor
> 1313 North Market Street
> Wilmington, DE  19899

Additionally, I hereby certify that true and correct copies of the foregoing were caused to be served on November 7, 2006 upon the following individuals in the manner indicated:

**BY E-MAIL AND HAND DELIVERY**

Richard L. Horwitz, Esquire
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE  19899

**BY E-MAIL**

Louise Walsh, Esquire
WELSH & KATZ, LTD.
120 South Riverside Plaza; 22nd Floor
Chicago, IL  60606

*/s/ Mary B. Graham*
_____
Mary B. Graham (#2256)

EXHIBIT A



PATENT DEPARTMENT

FEB 28 2006

JOANNE M. GIESSER

February 24, 2006

Merck & Co. Inc.
126 East Lincoln Ave.
P.O. Box 2000, Ry 60-30
Rahway, NJ 07065-0907

Attention: Ms. Joanne M. Giesser
Patent Dept.

Dear Sirs:

Re: Notification of Certification Pursuant to § 505(j)(2)(B)(iv) of the Federal Food,
    Drug, and Cosmetic Act

Apotex Inc. ("Apotex"), pursuant to § 505(j)(2)(B)(iv) of the Federal Food, Drug,
and Cosmetic Act and 21 C.F.R. § 314.95, provides notice of the following
information:

I.      Pursuant to 21 U.S.C. § 355(j)(2)(B)(iv)(I) and 21 C.F.R. § 314.95(c)(1),
        we advise you that FDA has received an Abbreviated New Drug
        Application ("ANDA") from Apotex for Alendronic Acid Tablets USP 5, 10,
        35 and 70 mg. The ANDA contains the required bioequivalence data.
        The ANDA was submitted under 21 U.S.C. § 355(j)(I) and (2)(A), and
        contains a paragraph IV certification to obtain approval to engage in the
        commercial manufacture, use or sale of Alendronic Acid Tablets USP 5,
        10, 35 and 70 mg, before the expiration of the patents referred to below.

II.     Pursuant to 21 C.F.R. § 314.95(c)(2), we advise you that FDA has
        assigned Apotex's ANDA the number 077-982.

III.    Pursuant to 21 C.F.R. § 314.95(c)(3), we advise you that the established
        name of the drug product that is the subject of Apotex's ANDA is
        Alendronic Acid Tablets USP 5, 10, 35 and 70 mg.

IV.     Pursuant to 21 C.F.R. § 314.95(c)(4), we advise you that the active
        ingredient in the proposed drug product is Alendronate Sodium; the
        strength of the proposed drug product is in amounts of Alendronate
        sodium equivalent to alendronic acid 5, 10, 35 and 70 mg; and the dosage
        form of the proposed drug product is tablets.



2



V.     Pursuant to 21 C.F.R. § 314.95(c)(5), we advise you that the patents
       alleged to be invalid, unenforceable, and/or not infringed in the paragraph
       IV certification are patents nos. 5358941, 5681590, 5849726, 5994329,
       6008207, 6090410, 6015801, 6194004, and 6225294.

VI.    Apotex alleges, and has certified to FDA, that in Apotex's opinion and to
       the best of its knowledge, these patents are invalid, unenforceable, and/or
       will not be infringed by the commercial manufacture, use or sale of the
       drug product described in Apotex's ANDA. Therefore, pursuant to 21
       U.S.C. § 355(j)(2)(B)(iv)(II) and 21 C.F.R. § 314.95(c)(6), Apotex's
       detailed statement of the legal and factual basis for the paragraph IV
       certification set forth in Apotex's ANDA as follows:

       Patent 5358941

       The claims of this patent are limited to a composition comprising
       excipients consisting essentially of anhydrous lactose, microcrystalline
       cellulose, croscarmellose sodium, and magnesium stearate.

       Our tablets will not infringe because they will not comprise lactose (either
       anhydrous or hydrous) or croscarmellose sodium, but will comprise as
       excipients only mannitol, microcrystalline cellulose and magnesium
       stearate.

       Patents 5681590, 6090410 and 6194004

       The claims are limited to a tablet comprising a diluent selected from
       anhydrous lactose and hydrous fast flow lactose. Our tablets will not
       infringe as they will not comprise anhydrous lactose or hydrous fast flow
       lactose.

       Patents 5849726, 6008207 and 6225294

       The claims are limited to anhydrous Alendronate sodium. Our tablets will
       not infringe as they will not contain anhydrous Alendronate sodium.

       Patent 5994329 and 6015801

       These patents are invalid for the reasons given by the U.S. Court of
       Appeals for the Federal Circuit in Merck & Co. Inc. v Teva
       Pharmaceuticals USA, Inc. by decision dated January 28, 2005.

VII.   Pursuant to 21 U.S.C. § 355(j)(5)(C), this notice letter includes an Offer of
       Confidential Access to Application. As required by § 355(j)(5)(C)(i)(III),



3

Apotex offers to provide confidential access to certain information from its ANDA NO. 077-982 for the sole and exclusive purpose of determining whether an infringement action referred to in § 355(j)(5)(B)(iii) can be brought.

Section 355(j)(5)(C)(i)(III) allows Apotex to impose restrictions "as to persons entitled to access, and on the use and disposition of any information accessed, as would apply had a protective order been entered for the purpose of protecting trade secrets and other confidential business information." That provision also grants Apotex the right to redact its ANDA in response to a request for Confidential Access under this offer.

As permitted by statute, Apotex imposes the following terms and restrictions on its Offer of Confidential Access:

1.  Apotex will permit confidential access to certain information from its proprietary ANDA to attorneys from one outside law firm representing Merck 7 Co. Inc. ("Merck"); provided, however, that such attorneys do not engage, formally or informally, in any patent prosecution for Merck or any FDA counseling, litigation or other work before or involving FDA. Such information (hereinafter, "Confidential Information") shall be marked with the legend "CONFIDENTIAL".

2.  The attorneys from the outside law firm representing Merck shall not disclose any Confidential Apotex Information to any other person or entity, including Merck employees, outside scientific consultants, and/or other outside counsel retained by Merck, without our prior written consent.

3.  As provided by § 355(j)(5)(C)(i)(III), Merck's outside law firm shall make use of the Confidential Apotex Information for the sole and exclusive purpose of determining whether an action referred to in § 355(j)(5)(B)(iii) can be brought and for no other purpose. By way of example only, the Confidential Information shall not be used to prepare or prosecute any future or pending patent application by Merck, in connection with any filing to, or communication with, FDA relating to Apotex's ANDA or in connection with any submission to, or communication with, the United States Pharmacopoeia. Merck's outside law firm agrees to take all measures necessary to prevent unauthorized disclosure or use of the Confidential Information, and that all Confidential Information shall be kept confidential and not disclosed in any manner inconsistent with this Offer of Confidential Access.

4.  The Confidential Information disclosed is, and remains, the property of Apotex. By providing the Confidential Information, Apotex does not grant

4

Merck and/or its outside law firm any interest in or license for the Confidential Information.

5.  Merck's outside law firm shall, within thirty-five (35) days from the date that it first receives the Confidential Information, return to Apotex, all Confidential Information and any copies thereof. Merck's outside law firm shall return all Confidential Information to Apotex before any infringement suit is filed by Merck, if suit is commenced before this 35-day period expires. In the event that Merck opts to file suit, none of the information contained in or obtained from any Confidential Information that Apotex provides shall be included in any publicly-available complaint or other pleading.

6.  Nothing in this Offer of Confidential Access shall be construed as an admission by Apotex regarding the validity, enforceability, and/or infringement of any U.S. patent. Further, nothing herein shall be construed as an agreement or admission by Apotex with respect to the competency, relevance, or materiality of any such Confidential Information, document, or thing. The fact that Apotex provides Confidential Information upon request of Merck shall not be construed as an admission by Apotex that such Confidential Information is relevant to the disposition of any issue relating to any alleged infringement of any patent, or to the validity or enforceability of any patent.

7.  The attorneys from Merck's outside law firm shall acknowledge in writing their receipt of a copy of these terms and restrictions prior to production of any Confidential Information.

Section 355(j)(5)(C)(i)(III) provides that any request for access that Merck makes under this Offer of Confidential Access "shall be considered acceptance of the offer of confidential access with the restrictions as to persons entitled to access, and on the use and disposition of any information accessed, contained in [this] offer of confidential access" and that the "restrictions and other terms of [this] offer of confidential access shall be considered terms of an enforceable contract." Thus, to the extent that Merck requests access to Confidential Information, it necessarily accepts the terms and restrictions outlined above. Written notice requesting access under this Offer of Confidential Access should be made to:

Ms. Tammy McIntire
Apotex Corp.
2400 N. Commerce Parkway
Suite 400
Weston, FLA 33326
Tel: (954)384-8007
Fax: (954)385-8518

5



By providing this Offer of Confidential Access to Application, Apotex maintain the right and ability to bring and maintain a Declaratory Judgment action under 28 U.S.C. § 2201 *et seq.*, pursuant to 21 U.S.C. § 355(j)(5)(C).

The name and address of the agent in the United States authorized to accept service of process for Apotex, limited to commencement of a patent infringement suit based on this notification of certification, is:

> Ms. Tammy McIntire
> Apotex Corp.
> 2400 N. Commerce Parkway
> Suite 400
> Weston, FLA 33326
> Tel: (954)384-8007
> Fax: (954)385-8518

Yours very truly,

APOTEX INC.

Bernard C. Sherman, Ph.D.,P.Eng.
Chairman and C.E.O.

BCS/jm

EXHIBIT B

# WEIL, GOTSHAL & MANGES LLP

700 LOUISIANA
SUITE 1600
HOUSTON, TEXAS 77002

(713) 546-5000
FAX: (713) 224-9511

AUSTIN
BOSTON
BRUSSELS
BUDAPEST
DALLAS
FRANKFURT
LONDON
MIAMI
MUNICH
NEW YORK
PARIS
PRAGUE
SHANGHAI
SILICON VALLEY
SINGAPORE
WARSAW
WASHINGTON, D.C.

March 21, 2006

WRITER'S DIRECT LINE
(713) 546-5058
nicolas.barzoukas@weil.com

*Via Fax (954) 385-8518 and*
*CMRRR 7002 2410 0003 7561 5223*
Ms. Tammy McIntire
Apotex Corp.
2400 N. Commerce Parkway,
Suite 400
Weston, FL 33326

Dear Ms. McIntire:

    We seek access to all relevant information from Apotex's ANDA referenced in the February 24, 2006 letter from Bernard Sherman to Joanne Giesser of Merck & Co., Inc. We also acknowledge that we have received a copy of terms and restrictions that Apotex wishes to place on any Confidential Information produced pursuant to that letter.

    You should, however, consider that for the proper processing and assessment of the Confidential Information in order to determine whether Merck should institute a suit against Apotex, at least two in-house litigation counsel should be allowed to view the Confidential Information. Therefore, we ask that Messrs. Edward Murray and Gerard Devlin also have access to this Confidential Information. You may find it useful to know that numerous other ANDA filers have allowed such access.

    Should you have any questions, please feel free to call me.

Yours truly,

Nicolas Barzoukas

NB/pv

cc:    Edward Murray, Esq.
       Gerard Devlin, Esq.
          Merck & Co., Inc.

EXHIBIT C

| 2400 N. Commerce Pkwy. Suite 400 Weston, FL 33326<br>954-384-8007 XT # 2418 Fax # 954-349-4233<br>jvega@apotex.com | **Apotex Corp.** |
| --- | --- |

# Fax

| **To:** | Nicolas Barzoukas | **From:** | Jessica Vega |
| --- | --- | --- | --- |
| **Fax:** | 713 224-9511 | **Pages** | Including Fax Cover: |
| **Phone:** | 718 546-5000 | **Date:** | 3/27/2006 |
| **Re:** | | **CC:** | |

☐ **Urgent**   √ **For Review**   ☐ **Please Comment**   ☐ **Please Reply**   ☐ **Please Recycle**

● **Comments:**

Mr. Barzoukas, we are in receipt of your letter of March 21, 2006 (attached) in which you request relevant information from Apotex's ANDA referenced in the February 24, 2006 letter from Bernard Sherman to Joanne Giesser of Merck & Co.  We need clarification as to what product was referred to in that letter so that we can respond to your request.  There is no mention of the product name in your March 21st letter.

You may respond directly to Tammy McIntire via fax or to Sharon Cease her assistant.  You may reach Sharon tomorrow at 954-349-4204.

Thank you,

Jessica Vega

03/27/06  11:23 FAX 18007065576          APOTEX CORP                                    ☑002

# WEIL, GOTSHAL & MANGES LLP

700 LOUISIANA
SUITE 1600
HOUSTON, TEXAS 77002

(713) 546-5000
FAX: (713) 224-9511

March 21, 2006

WRITER'S DIRECT LINE
(713) 546-5058
nicolas.barzoukas@weil.com

AUSTIN
BOSTON
BRUSSELS
BUDAPEST
DALLAS
FRANKFURT
LONDON
MIAMI
MUNICH
NEW YORK
PARIS
PRAGUE
SHANGHAI
SILICON VALLEY
SINGAPORE
WARSAW
WASHINGTON, D.C.

*Via Fax (954) 385-8518 and*
*CMRRR 7002 2410 0003 7561 5223*
Ms. Tammy McIntire
Apotex Corp.
2400 N. Commerce Parkway,
Suite 400
Weston, FL 33326

Dear Ms. McIntire:

We seek access to all relevant information from Apotex's ANDA referenced in the February 24, 2006 letter from Bernard Sherman to Joanne Giesser of Merck & Co., Inc. We also acknowledge that we have received a copy of terms and restrictions that Apotex wishes to place on any Confidential Information produced pursuant to that letter.

You should, however, consider that for the proper processing and assessment of the Confidential Information in order to determine whether Merck should institute a suit against Apotex, at least two in-house litigation counsel should be allowed to view the Confidential Information. Therefore, we ask that Messrs. Edward Murray and Gerard Devlin also have access to this Confidential Information. You may find it useful to know that numerous other ANDA filers have allowed such access.

Should you have any questions, please feel free to call me.

Yours truly,

Nicolas Barzoukas

NB/pv

cc:    Edward Murray, Esq.
       Gerard Devlin, Esq.
       Merck & Co., Inc.

EXHIBIT D

# WEIL, GOTSHAL & MANGES LLP

700 LOUISIANA
SUITE 1600
HOUSTON, TEXAS 77002

(713) 546-5000
FAX: (713) 224-9511

AUSTIN
BOSTON
BRUSSELS
BUDAPEST
DALLAS
FRANKFURT
LONDON
MIAMI
MUNICH
NEW YORK
PARIS
PRAGUE
SHANGHAI
SILICON VALLEY
SINGAPORE
WARSAW
WASHINGTON, D.C.

WRITER'S DIRECT LINE

*(713) 546-5062*
jason.abair@weil.com

March 27, 2006

*Via Facsimile (954) 349-4233 and*
*CMRRR 7002 2410 0003 7563 7973*

Tammy McIntire
Apotex Corp.
2400 N. Commerce Parkway, Suite 400
Weston, FL 33326

Dear Tammy:

 This letter responds to your March 27, 2006, fax to Nicolas Barzoukas.

 According to the February 24, 2006, letter from Bernard Sherman to Joanne Giesser of Merck & Co., Inc., Apotex's ANDA No. 077-982 is for "Alendronic Acid Tablets USP 5, 10, 35 and 70 mg."

 Please contact me should you have any questions.

Regards,

Jason Abair

JA/elc

HO1:\329599\01\72BJ01!.DOC\99980.0001

EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

NOVARTIS AG, NOVARTIS : *JUDGE CASTEL*
PHARMACEUTICALS CORPORATION, :
NOVARTIS OPHTHALMICS INC., : **ECF**
NOVARTIS PHARMA AG and NOVARTIS :
INTERNATIONAL PHARMACEUTICALS :
LTD., :

**05 CV 3855**

               Plaintiffs, :

            : CIVIL ACTION NO.

     v. :

APOTEX INC. and APOTEX :
CORPORATION, :

             Defendants. X

-------------------------------------------------------

RECEIVED
APR 15 2005
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT FOR PATENT INFRINGEMENT

     Plaintiffs Novartis AG, Novartis Pharmaceuticals Corporation, Novartis

Ophthalmics Inc., Novartis Pharma AG and Novartis International Pharmaceuticals Ltd.

(hereinafter "Plaintiffs"), for their Complaint herein against defendants Apotex Inc. and Apotex

Corporation allege as follows:

## NATURE OF ACTION

1.    This is an action for patent infringement.

**PARTIES**

2.    Plaintiff Novartis AG ("Novartis AG") is a corporation organized and existing under the laws of Switzerland, having an office and place of business at Lichtstrasse 35, CH-4056 Basel, Switzerland.

3.    Plaintiff Novartis Pharmaceuticals Corporation ("NPC") is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 59 Route 10, East Hanover, New Jersey 07936.

4.    Plaintiff Novartis Ophthalmics Inc. ("NOI") is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 11460 Johns Creek Parkway, Duluth, Georgia 30097.

5.    Plaintiff Novartis Pharma AG ("Pharma AG") is a corporation organized and existing under the laws of Switzerland, having an office and place of business at Lichtstrasse 35, CH-4056 Basel, Switzerland.

6.    Plaintiff Novartis International Pharmaceuticals Ltd. ("NIP") is a corporation organized and existing under the laws of Bermuda, having an office and place of business at Hurst Holme, 12 Trott Road, Hamilton HM LX, Bermuda.

7.    On information and belief, Apotex Inc. is a Canadian corporation having an office and place of business in Richmond Hill, Ontario, Canada.

8.    On information and belief, Apotex Corporation ("Apotex Corp.") is a corporation incorporated under the laws of the State of Delaware, having an office and place of business in Weston, Florida.

- 2 -

9.      On information and belief, Apotex Corp. is a wholly owned subsidiary of Apotex Inc., and the acts of Apotex Inc. complained of herein were aided and abetted by and done with the cooperation, participation, and assistance of Apotex Corp.

10.     Apotex Corp. and Apotex Inc. are hereinafter collectively referred to as "Apotex."

## JURISDICTION AND VENUE

11.     This action arises under the patent laws of the United States of America. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a).

12.     Apotex sells various products and does business throughout the United States, including within this judicial district.

13.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b), (c) and (d) and 28 U.S.C. § 1400(b).

## CLAIM FOR RELIEF - PATENT INFRINGEMENT

14.     Plaintiff NPC holds an approved new drug application ("NDA") No. 21-066 for ZADITOR Ketotifen Fumarate Ophthalmic Solution 0.025%, a pharmaceutical composition containing the active ingredient ketotifen fumarate. ZADITOR Ophthalmic Solution was approved by the United States Food and Drug Administration ("FDA") for temporary prevention of itching of the eye due to allergic conjunctivitis, and is sold in the United States by Plaintiff NPC.

15.     Novartis AG is the owner of United States Letters Patent No. 6,776,982 ("the '982 patent"). The '982 patent was duly and legally issued on August 17, 2004.

- 3 -

16.     The '982 patent describes and claims, among other things, an ophthalmic pharmaceutical composition of ketotifen hydrogen fumarate, glycerol, benzalkonium chloride and water. A true copy of the '982 patent is attached hereto as Exhibit A.

17.     On information and belief, Apotex submitted to the FDA an abbreviated new drug application ("ANDA") under the provisions of 21 U.S.C. § 355(j), seeking approval to engage in the commercial manufacture, use, and sale of a Ketotifen Fumarate Ophthalmic Solution 0.025%.

18.     On information and belief, Apotex submitted its ANDA to the FDA for the purpose of obtaining approval to engage in the commercial manufacture, use, or sale of its Ketotifen Fumarate Ophthalmic Solution 0.025% product before the expiration of the '982 patent.

19.     By filing the ANDA under 21 U.S.C. § 355(j) for the purpose of obtaining approval to engage in the commercial manufacture, use, or sale of its proposed drug product before the expiration of the '982 patent, Apotex has committed an act of infringement under 35 U.S.C. § 271(e)(2). Further, on information and belief, the commercial manufacture, use, offer for sale, sale and/or importation of the generic Ketotifen Fumarate Ophthalmic Solution 0.025% for which Apotex seeks approval in its ANDA will also infringe one or more claims of the '982 patent.

20.     On information and belief, Apotex made, and included in its ANDA, a certification under 21 U.S.C. § 355(j)(2)(vii)(IV) that, in its opinion and to the best of its knowledge, the '982 patent is invalid and unenforceable, and that the product and method for producing the product described in Apotex's ANDA will not infringe the '982 patent.

- 4 -

21.    On information and belief, Apotex's ANDA seeks approval to manufacture and sell its Ketotifen Fumarate Ophthalmic Solution 0.025% product, a pharmaceutical composition which is claimed in the '982 patent.

22.    Plaintiffs are entitled to the relief provided by 35 U.S.C. § 271(e)(4), including an order of this Court that the effective date of any approval of the aforementioned ANDA relating to Apotex's Ketotifen Fumarate Ophthalmic Solution 0.025% be a date which is not earlier than the January 13, 2019 expiration date of the '982 patent, and an award of damages for any commercial sale or use of Ketotifen Fumarate Ophthalmic Solution 0.025%, and any act committed by Apotex with respect to the subject matter claimed in the '982 patent, which act is not within the limited exclusions of 35 U.S.C. § 271(e)(1).

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request the following relief:

A.    Judgment that Apotex has infringed one or more claims of the '982 patent by filing the aforesaid ANDA relating to Apotex's Ketotifen Fumarate Ophthalmic Solution 0.025%;

B.    A permanent injunction restraining and enjoining Apotex and its officers, agents, attorneys and employees, and those acting in privity or concert with it, from engaging in the commercial manufacture, use, offer to sell, or sale within the United States, or importation into the United States, of Ketotifen Fumarate Ophthalmic Solution 0.025% as claimed in the '982 patent;

- 5 -

C.    An order that the effective date of any approval of the aforementioned ANDA relating to Apotex's Ketotifen Fumarate Ophthalmic Solution 0.025% be a date which is not earlier than the expiration of the right of exclusivity under the '982 patent;

D.    Damages from Apotex for the infringement of the '982 patent; and

E.    Such other and further relief as the Court may deem just and proper.

Dated:  April 15, 2005

Robert L. Baechtold (RB 6866)
Nicholas N. Kallas (NK 1084)
Nina Shreve (NS 4731)
FITZPATRICK, CELLA, HARPER & SCINTO
30 Rockefeller Plaza
New York, NY 10112-3801
Phone: (212) 218-2100
Facsimile: (212) 218-2200

NY_MAIN 494512v1

- 6 -



US006776982B2

Exhibit A

(12) **United States Patent**
Kis et al.

(10) Patent No.: **US 6,776,982 B2**
(45) Date of Patent: **\*Aug. 17, 2004**

(54) **AUTOCLAVABLE PHARMACEUTICAL COMPOSITIONS CONTAINING A CHELATING AGENT**

(75) Inventors: **Gyorgy Lajos Kis**, Triboltingen (CH); **Marcia Johanna Adam**, Gisikon (CH); **Andrea Fetz**, Wetzikon (CH)

(73) Assignee: **Novartis AG**, Basel (CH)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/016,361**

(22) Filed: **Dec. 10, 2001**

(65) **Prior Publication Data**

US 2002/0165254 A1 Nov. 7, 2002

**Related U.S. Application Data**

(62) Division of application No. 09/616,151, filed on Jul. 14, 2000, now Pat. No. 6,468,548, which is a continuation of application No. PCT/EP99/00160, filed on Jan. 13, 1999.

(30) **Foreign Application Priority Data**

Jan. 15, 1998 (EP) ............................................. 98810016

(51) Int. Cl.[7] ................................................. A61K 31/74
(52) U.S. Cl. ......................................... 424/78.04
(58) Field of Search ............................... 424/400, 78.04

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,165,918 A | 11/1992 | Heyl et al. | |
| 5,576,311 A | 11/1996 | Guy | |
| 5,624,893 A | * 4/1997 | Yanni | 514/12 |
| 5,679,665 A | 10/1997 | Bergamini et al. | |
| 6,395,756 B2 | * 5/2002 | Trimming et al. | 514/324 |
| 6,455,547 B1 | * 9/2002 | Kis | 514/324 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 0 258 865 | 9/1987 | |
| EP | 0 719 545 | 7/1991 | |
| GB | 1 399 834 | 7/1975 | |
| GB | 2 001 529 | 2/1979 | |
| JP | 62 277323 | 12/1987 | |
| JP | 62277323 A | * 12/1987 | ......... A61K/31/445 |

| | | |
|---|---|---|
| JP | 73 324034 | 12/1995 |
| JP | 62277323 | 12/1998 |
| WO | WO 97/00669 | 1/1997 |

OTHER PUBLICATIONS

International Search Report PCT/EP 99/00160, filed Jan. 13, 1999.
Search Report EP 01124282.
Abstract, JP 7324034, Published Dec. 12, 1995.
European Search Report.
Fujita et al., Rinsho Iyaku [Journal of Clinical Therapeutic and Medicines], vol. 5(4), "Clinical Efficacy and Optimal Concentration of Ketotifen Ophthalmic on allergic Conjunctivitus and Vernal Conjunctivitus", pp. 709–721, (1989) [English translation].
Kawasaki et al., Iyakuhin Kenkyu, vol. 19(5), "Eye Irritation Study on Ketotifen Fumarate–Containing Eye Drops in Rabbits (I) Eye Irritability on Single or Frequent Topical Instillation", pp. 821–826, (1988) [English Translation].
Kawasaki et al., Iyakuhin Kenkyu, vol. 19(5), "Eye Irritation study on Ketotifen Fumarate–Containing Eye Drops in Rabbits (II) Eye Irritability on Successive Four–Week or Thirteen Week Instillations", pp. 827–838, (1988) [English translation].
Mikuni et al., Ringan [Japanese Journal of Clinical Ophthalmology], vol. 36(6), "Quantitative Therapeutic Efficacy of Ketotifen Eye Drops for Allergic Conjunctivitis", pp. 573–576, (1982) [English translation].
Mikuni et al., Rinsho Iyaku [Journal of Clinical Therapeutic and Medicines], vol. 4(12), "Evaluation of Ketotifen Ophthalmic Solution on Efficacy and Safety on Allergic Conjunctivitis and Vernal Conjunctivitis—Result on Multiclinic Open Trial—", pp. 2371–2383, (1988) [English translation].
Mikuni et al., Tokai J Exp Clin Med., vol. 9, No. 1, "A Quantitative Tear Fluids Determination of Therapeutic Efficacy for Allergic Conjunctivitis", pp. 35–41, (1984).
Nakayasu et al., Rinsho Iyaku Journal of Clinical Therapeutic and Medicines, vol. 4(12), "Safety of Ketotifen Ophthalmic Solution on Ocular External and Front Region", pp. 2357–2369, (1988) [English translation].

\* cited by examiner

Primary Examiner—Thurman K. Page
Assistant Examiner—Robert M. Joynes
(74) Attorney, Agent, or Firm—Susan Hess

(57) **ABSTRACT**

Disclosed are ophthalmic compositions comprising ketotifen and pharmaceutically acceptable salts thereof, as well as methods for making such compositions.

**11 Claims, No Drawings**

US 6,776,982 B2

1

# AUTOCLAVABLE PHARMACEUTICAL COMPOSITIONS CONTAINING A CHELATING AGENT

The present invention describes an autoclavable ophthalmic composition comprising an ophthalmic drug and in particular an ophthalmic drug. The invention further describes a method for stabilizing such compositions and the use of said stabilizers.

Drug safety is a permanent issue in drug regulatory affairs. A recent European regulation requires that a final ophthalmic composition must be autoclaved before use, and consequently, before sale. Autoclaving improves drug safety since the pathogenic germs are killed thereby.

JP 62/277323 describes for example a method for producing eye drops containing ketotifen fumarate, which eye drops might further contain a preservative such as benzalkonium chloride. In order to stabilize such a composition, JP 62/277323 proposes to add a polyvalent alcohol such as a saccharide and other alcohols such as glycerol or propylene glycol. The composition described is not stable if autoclaved.

Therefore the problem to be solved consists of providing in particular an aqueous ophthalmic composition comprising an ophthalmic drug, in particular selected from ketotifen and dexamethasone, which substantially prohibits decomposition when subjected to standard autoclaving conditions.

This problem had unexpectedly been solved by the addition of a stabilizer which is selected from the group consisting of EDTA, Dequest and Desferal. Preference is given to EDTA and Dequest and more particular to EDTA.

Another unexpected finding of the present invention is a synergistic effect, namely the effect of improved preservative efficacy if a preservative is added to said stabilized composition. This means that the amount preservative necessary to ensure shelf life and muti-dose sterility may be reduced very significantly, which in turn may strongly improve ocular tolerability of an addressed ophthalmic composition.

Consequently, the invention relates to an ophthalmic composition in accordance to the main claim. It further relates to the objects of all dependent and independent claims disclosed infra, in particular to a method of stabilizing an ophthalmic drug by adding a particular stabilizer during autoclavation.

According to the invention an ophthalmic composition is advantageously applied topically to the eye, especially in the form of a solution, a suspension or a gel. Such compositions comprise an ophthalmically effective ingredient and in particular ketotifen or dexamethasone, for example, in a range of from approximately 0.000001 to approximately 10.0% by weight, preferably from approximately 0.00001 to approximately 1.0% by weight, or more preferably in the range of from approximately 0.0001 to approximately 0.1% by weight and most preferably in the range of from 0.001 to 0.1% by weight. The dose of the active ingredient may depend on various factors, such as mode of administration, requirement, age and/or individual condition.

Other customary pharmaceutically acceptable excipients and additives known to the person skilled in the art are used in corresponding ophthalmic composition. Such compositions are prepared in a manner known per se, for example by mixing an active ingredient with the corresponding excipients and/or additives to form corresponding ophthalmic compositions.

Carriers used in accordance to the present invention are typically suitable for topical or general administration, and

2

are for example water, mixtures of water and water-miscible solvents, such as $C_1$- to $C_7$-alkanols, vegetable oils or mineral oils comprising from 0.5 to 5% by weight hydroxyethylcellulose, ethyl oleate, carboxymethylcellulose, polyvinyl-pyrrolidone and other non-toxic water-soluble polymers for ophthalmic uses, such as, for example, cellulose derivatives, such as methylcellulose, alkali metal salts of carboxy-methylcellulose, hydroxymethylcellulose, hydroxyethylcellulose, methylhydroxypropyl-cellulose, hydroxypropylcellulose, chitosan and scleroglucan, acrylates or methacrylates, such as salts of polyacrylic acid or ethyl acrylate, polyacrylamides, natural products, such as gelatin, alginates, pectins, tragacanth, karaya gum, xanthan gum, carrageenin, agar and acacia, starch derivatives, such as starch acetate and hydroxypropyl starch, and also other synthetic products, such as poloxamers, e.g. Poloxamer F127, polyvinyl alcohol, polyvinylpyrrolidone, polyvinyl methyl ether, polyethylene oxide, preferably cross-linked polyacrylic acid, such as neutral Carbopol, or mixtures of those polymers. Preferred carriers are water, cellulose derivatives, such as methylcellulose, alkali metal salts of carboxymethylcellulose, hydroxymethylcellulose, hydroxyethylcellulose, methylhydroxypropylcellulose and hydroxypropylcellulose, neutral Carbopol, or mixtures thereof. The concentration of the carrier is, for example, from 0.1 to 100000 times the concentration of the active ingredient.

Solubilizers may be used for an ophthalmic composition of the present invention as well and are, for example, tyloxapol, fatty acid glycerol polyethylene glycol esters, fatty acid polyethylene glycol esters, polyethylene glycols, glycerol ethers, polysorbate 20, polysorbate 80 or mixtures of those compounds. A specific example of an especially preferred solubilizer is a reaction product of castor oil and ethylene oxide, for example the commercial products Cremophor EL® or Cremophor RH40®. Reaction products of castor oil and ethylene oxide have proved to be particularly good solubilizers that are tolerated extremely well by the eye. Another preferred solubilizer is tyloxapol. The concentration used depends especially on the concentration of the active ingredient. The amount added is typically sufficient to solubilize the active ingredient. For example, the concentration of the solubilizer is from 0.1 to 5000 times the concentration of the active ingredient.

Buffers, tonicity enhancing agents and preservatives different from quaternary ammonium salts may be used in an ophthalmic composition of the present invention too.

Examples of buffer substances are acetate, ascorbate, borate, hydrogen carbonate/carbonate, citrate, gluconate, lactate, phosphate, propionate and TRIS (tromethamine) buffers. Tromethamine and borate buffer are preferred buffers. The amount of buffer substance added is, for example, that necessary to ensure and maintain a physiologically tolerable pH range. The pH range is typically in the range of from 4 to 9, preferably from 4.5 to 8.5 and more preferably from 5.0 to 8.2.

Tonicity enhancing agents may also be present in an above composition and are, for example of ionic and/or non-ionic type. Examples of ionic tonicity enhancers are e.g. alkali metal or earth metal halides, such as, for example, $CaCl_2$, KBr, KCl, LiCl, NaI, NaBr or NaCl, $Na_2SO_4$ or boric acid. Non-ionic tonicity enhancing agents are, for example, urea, glycerol, sorbitol, mannitol, propylene glycol, or dextrose. Typically, a sufficient amount of tonicity enhancing agent may be added to impart to an above ophthalmic composition an osmolality of approximately from 50 to 1000 mOsmol, preferred from 100 to 400 mOsmol, more

US 6,776,982 B2

3

preferred from 200 to 400 mOsmol and even more preferred from 250 to 350 mOsmol.

Preservatives may be present in an above composition too. A preservative may typically be selected from a quaternary ammonium compound such as benzalkonium chloride, benzoxonium chloride or the like. Benzalkonium chloride is better described as: N-benzyl-N—(C$_8$–C$_{18}$alkyl)-N,N-dimethylammonium chloride. Examples of preservatives different from quaternary ammonium salts are alkylmercury salts of thiosalicylic acid, such as, for example, thiomersal, phenylmercuric nitrate, phenylmercuric acetate or phenylmercuric borate, parabens, such as, for example, methylparaben or propylparaben, alcohols, such as, for example, chlorobutanol, benzyl alcohol or phenyl ethanol, guanidine derivatives, such as, for example, chlorohexidine or polyhexamethylene biguanide, sodium perborate, Germall®II or sorbic acid. Preferred preservatives are quaternary ammonium compounds, in particular benzalkonium chloride, alkyl-mercury salts and parabens. Where appropriate, a sufficient amount of preservative is added to the ophthalmic composition to ensure protection against secondary contaminations during use caused by bacteria and fungi.

Another object of the present invention are autoclavable ophthalmic compositions in accordance to the specification and the claims, but with the proviso that the preservative is absent. Such compositions in particular useful for the so called unidose forms.

An above ophthalmic composition may comprise further non-toxic excipients, such as, for example, emulsifiers, wetting agents or fillers, such as, for example, the polyethylene glycols designated 200, 300, 400 and 600, or Carbowax designated 1000, 1500, 4000, 6000 and 10000. Other excipients that may be used if desired are listed below but they are not intended to limit in any way the scope of the possible excipients. Such excipients are especially antioxidants, such as ascorbic acid, acetylcysteine, cysteine, sodium hydrogen sulfite, butyl-hydroxyanisole, butylhydroxytoluene or alpha-tocopherol acetate. The amount and type of excipient added is in accordance with the particular requirements and is generally in the range of from approximately 0.0001 to approximately 90% by weight.

Further excipients may be comprised in an above concerned ophthalmic composition, which may in particular function as a combined stabilizer/solubilizer. Such a combined additional stabilizer/solubilizer is for example a cyclodextrin. A preferred cyclodextrin is in particular selected from the group of α-cyclodextrin, β-cyclodextrin, γ-cyclodextrin, hydroxypropyl-β-cyclodextrin, hydroxypropyl-γ-cyclodextrin, dimethyl-β-cyclodextrin and dimethyl-γ-cyclodextrin. The amount is generally in the range of from approximately 0.01 to approximately 90% by weight, more preferably in the range of from 0.1–20% by weight.

Alkyl means throughout this invention an alkyl group having up to and including 18, more preferably 12 and even more preferably 7 C-atoms, and is either a linear or a branched alkyl group.

Examples for alkyl are methyl, ethyl, propyl, butyl, iso-propyl, t-butyl, neo-pentyl, octyl or dodecyl.

The term weight % used herein refers to the weight % of the total weight of an addressed composition or object.

The above is in particular useful for ophthalmic drugs. Examples of such ophthalmic drugs are antazolin, betaxolol, bupivacaine, carbachol, carteolol, chloramphenicol, chlortetracycline, cromolyn sodium, dexamethasone, dichlorphenamide, dipivefrin, ephedrine, erythromycin,

4

fluoromethalone, indomethacin, ketotifen, levobunolol, levocabastine, lidocaine, lignocaine, lomefloxacin, medrysone, methazolamide, naphazoline, natamycin, neomycin, noradrenaline, ofloxacin, oxybuprocaine, physostigmine, pilocarpine, polymyxin B, prednisolone, scopolamine, sorbinil, sulfacetamide, tamoxifen, tetracaine, tetracycline, timolol, trifluridine, tropicamide, vidarabine, and ophthalmically acceptable salts, and mixtures thereof.

More preferred ophthalmic drug are selected from antazolin, betaxolol, chloramphenicol, dexamethasone, fluoromethalone, ketotifen, lomefloxacin, ofloxacin, pilocarpine, timolol and ophthalmically acceptable salts, and mixtures thereof.

Strongly preferred are ketotifen and dexamethasone.

The term ketotifen relates to the basic compound itself as well to any pharmaceutically acceptable salt thereof. A preferred pharmaceutically acceptable salt of ketotifen is for example a hydrochloride, a hydrobromide, a hydrogen maleate, a hydrogen sulfate and a hydrogen fumarate. A more preferred example is a hydrochloride and a hydrogen fumarate. Most preferred is a hydrogen fumarate.

Similarly, the term dexamethasone relates also e.g. to dexamethasone-21-acetate, dexamethasone-21-phosphate disodium salt, dexamethasone-21-dihydrogen phosphate disodium salt and the like. All these are known to the skilled person in the art and are specifically disclosed in Merck Index, 12th edition, page 498, No. 2986.

The term autoclaving relates to a standardized thermal heating procedure characterized by the following parameters:

Heating a test composition to 120° C. or more for a period of 15 minutes or more, wherein said composition is aqueous. Said aqueous composition is kept in a closed vessel, which vessel is typically a plastic or glass bottle. A preferred bottle material is polypropylene (PP). The pressure during autoclaving is typically 1 bar or more.

The autoclaving (autoclavation) may preferably range from 120–150° C., more preferably from 120–140° C.; the time needed may preferably range from 15–120 minutes, more preferably from 15–60 minutes; and the pressure applied may preferably range from 1–20 bar, more preferably from 1–10 bar, and even more preferably form 1–5 bar.

The term Dequest as used within the present invention relates to chelating agents having phosphonic acid or phosphonate groups. A preferred group of such chelating agents are organophosphonates, particularly amino tri(lower alkylene phosphonic acids). A variety of such chelating agents are commercially available from Monsanto Company, St. Louis, Mo., and are sold under the trademark DEQUEST®. Examples of such compounds include, without limitation, diethylene triamine penta(methylene phosphonic acid); hexamethylene-diaminetetra (methylenephosphonic acid); ethylenediaminetetra (methylenephosphonic acid); and aminotrimethylene phosphonates. A particularly preferred chelating agent is diethylene triamine penta(methylene phosphonic acid), sold under the trademark DEQUEST® 2060. Mixtures of such Requests mentioned above may be comprised too.

Within the terms of the present invention, EDTA relates to ethylendiamine tetraacetic acid itself as well to its various salts, namely e.g. to monosodium, disodium and/or potassium salts. EDTA may also be referred to as edetate. Mixtures of EDTA's may be comprised too.

Desferal relates within the present invention to deferoxamine itself (see Merck Index 12th edition, page 483, No. 2914) as well to its salts, e.g. hydrochloride, methanesulfonate and the like. Derivatives thereof, such as N-acetyldeferoxamine

US 6,776,982 B2

5

may also be comprised. Mixtures of such deferoxamines may be comprised too.

Typical examples which illustrate the present invention, but are not intended to limit it in any way, are described below.

## EXAMPLE 1

### Eye Drop Formulations

| eye drop formulations | | | | |
|---|---|---|---|---|
| ketotifen hydrogen fumarate | 0.069 mg | 0.069 mg | 0.069 mg | 0.069 mg |
| random methyl-β-cyclodextrin, | 2.000 g | 10.000 g | | |
| hydroxypropyl-γ-cyclodextrin, | | | 2.000 g | 10.000 g |
| propylene glycol | 1.900 g | 1.900 g | 1.900 g | 1.900 g |
| disodium edetate | 0.050 g | 0.050 g | 0.050 g | 0.050 g |
| benzalkonium chloride | 0.010 g | 0.010 g | 0.010 g | 0.010 g |
| sodium hydroxide 1 N | q.s. | q.s. | q.s. | q.s. |
| water for injections ad | 100 ml | 100 ml | 100 ml | 100 ml |
| pH | 5.91 | 5.85 | 5.76 | 5.80 |
| Osmolality (mOsmol) | 287 | 292 | 292 | 295 |

## EXAMPLE 2

### Eye Drop Formulations

| eye drop formulations | | | | |
|---|---|---|---|---|
| ketotifen hydrogen fumarate | 0.069 mg | 0.069 mg | 0.069 mg | 0.069 mg |
| random methyl-β-cyclodextrin, | 2.000 g | 10.000 g | | |
| hydroxypropyl-γ-cyclodextrin, | | | 2.000 g | 10.000 g |
| propylene glycol | 1.900 g | 1.900 g | 1.900 g | 1.900 g |
| disodium edetate | 0.050 g | 0.050 g | | |
| benzalkonium chloride | 0.010 g | 0.010 g | 0.010 g | 0.010 g |
| sodium hydroxide 1 N | q.s. | q.s. | q.s. | q.s. |
| water for injections ad | 100 ml | 100 ml | 100 ml | 100 ml |
| pH | 7.19 | 7.25 | 7.16 | 7.22 |
| Osmolality (mOsmol) | 277 | 285 | 283 | 290 |

## EXAMPLE 3

### Ketotifen 0.25% Eye Drops
### Samples in 10 ml White-Colored PP-Bottles

| Composition (%) | A | B | Comparative |
|---|---|---|---|
| ketotifen hydrogen fumarate | 0.0345 | 0.0345 | 0.0345 |
| glycerol, pure compound | 2.550 | 2.125 | 2.125 |
| disodium edetate | 0.05 | 0.05 | — |
| benzalkonium chloride | 0.01 | 0.01 | 0.01 |
| sodium hydroxide 1 N | 0.083 | 0.080 | 0.074 |
| water for injection ad | 100 ml | 100 ml | 100 ml |
| | | 0-Value | |
| content of ketotifen hydrogen | 100.1 | 100.5 | 101.5 |

6

| -continued | | | |
|---|---|---|---|
| Composition (%) | A | B | Comparative |
| fumarate in % | | | |
| pH | 5.31 | 5.29 | 5.32 |
| Osmolality (mOsmol) | 300 | 244 | 240 |
| Stresstest 15 hrs 80° C. | | | |
| content of ketotifen hydrogen fumarate in % | 100.4 | 98.7 | 99.4 |
| degradation products in % | n.d. | n.d. | 0.03 |
| pH | 5.28 | 5.24 | 5.27 |
| Osmolality (mOsmol) | 300 | 251 | 238 |
| Autoclaved, 120° C., 20 min., 1.5 bar pressure | | | |
| content of ketotifen hydrogen fumarate in % | 98.2 | | 96.5 |
| degradation products in % | n.d. | | 0.23 |
| pH | 5.31 | | 5.18 |
| Osmolality (mOsmol) | 299 | | 238 |

n.d. = not detectable

## EXAMPLE 4

Spersadex 0.1% Eye Drops

| Sample (Ingredients in g unless indicated differently) | A | B | C |
|---|---|---|---|
| dexamethasone sodium phosphate | 0.100 | 0.100 | 0.100 |
| boric acid | 1.800 | 1.800 | 1.800 |
| sodium borate | 0.250 | 0.250 | 0.250 |
| BAK (benzalkonium chloride) | 0.010 | 0.010 | 0.010 |
| Cremophor EL | 1.000 | 1.000 | 1.000 |
| HPMC (hydroxypropyl methylcellulose) | 0.200 | 0.200 | 0.200 |
| disodium edetate | — | — | 0.050 |
| Dequest 2060 | — | — | 0.013 |
| water for injection ad | 100 ml | 100 ml | 100 ml |
| | | 0-Value | |
| % dexamethasone sodium phosphate | 101.4 | 101.7 | 101.5 |
| pH | 7.14 | 7.10 | 7.11 |
| Osmolality (mOsmol) | 313 | 323 | 316 |
| Autoclaved (10 ml PP-bottles, 120° C., 20 minutes, 1.5 bar) | | | |
| % dexamethasone sodium phosphate | 89.3 | 93.6 | 92.2 |
| pH | 7.15 | 7.13 | 7.14 |
| Osmolality (mOsmol) | 314 | 319 | 320 |
| Autoclaved (10 ml glass-bottles, 120° C., 20 minutes, 1.5 bar) | | | |
| % dexamethasone sodium phosphate | 88.4 | 93.3 | 92.0 |
| pH | 7.15 | 7.15 | 7.12 |
| Osmolality (mOsmol) | 317 | 321 | 317 |

## EXAMPLE 5

Ketotifen 0.025% Eye Drops. Samples in 5 ml white-colored PP-bottles

| Composition (%) | |
|---|---|
| ketotifen hydrogen fumarate | 0.0345 |
| glycerol, pure compound | 2.125 |
| disodium edetate | 0.05 |
| benzalkonium chloride | 0.01 |
| sodium hydroxide 1 N | 0.080 |
| water for injection ad | 100 ml |

US 6,776,982 B2

7

8

| Stresstest | | |
|---|---|---|
| | 0-Value | (1): 120° C., 15 bar, 20 min. and (2): 30° C., 3 month |
| ketotifen hydrogen fumarate | 99.5% | 98.3% |
| degradation products | n.d. | n.d. |
| pH | 5.25 | 5.27 |
| Osmolality | 238 mOsmol | 239 mOsmol |

The values before [0-value] and after the stresstest [(1): 120° C., 15 bar, 20 min. and (2): 30° C., 3 month] are within the standard deviation of the analytical method. This demonstrates the stability of the above ketotifen eye drops.

What is claimed is:

1. An ophthalmic pharmaceutical composition consisting essentially of 0.0345% ketotifen hydrogen fumarate, 2.125% glycerol, 0.01% benzalkonium chloride and water.

2. The composition according to claim 1 wherein the pH is between about 5.18 and about 5.32.

3. The composition according to claim 1 wherein the osmolality is about 240 milliosmoles.

4. The composition according to claim 2 wherein the osmolality is about 240 milliosmoles.

5. A method for making an ophthalmic pharmaceutical composition, comprising admixing the non-aqueous components ketotifen hydrogen fumarate, glycerol, and benzalkonium chloride with water such that a final concentration of the non-aqueous components is 0.0345% ketotifen hydrogen fumarate, 2.125% glycerol, and 0.01% benzalkonium chloride.

6. The method according to claim 5 wherein the pH of the composition is between about 5.18 and about 5.32.

7. The method according to claim 5 wherein the osmolality of the composition is about 240 milliosmoles.

8. The method according to claim 6 wherein the osmolality is about 240 milliosmoles.

9. The method according to claim 5 wherein the amount of degradation products in said composition is about 0.03%.

10. The composition according to claim 1 wherein the amount of degradation products in said composition is about 0.23%.

11. The composition according to claim 1 wherein the amount of degradation products in said composition is about 0.03%.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.     : 6,776,982 B2                                           Page 1 of  1
DATED          : August 17, 2004
INVENTOR(S)    : Kis et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

<u>Title page,</u>
Item [*] Notice, should read:
-- This patent is subject to terminal disclaimers. --

Signed and Sealed this

Fourteenth Day of December, 2004

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------ X
NOVARTIS AG, NOVARTIS                            :
PHARMACEUTICALS CORPORATION,                     :
NOVARTIS OPHTHALMICS INC.,                       :
NOVARTIS PHARMA AG and NOVARTIS                  :
INTERNATIONAL PHARMACEUTICALS                    :
LTD.,                                            :
                                                 :
                       Plaintiffs,               :
                                                 :  CIVIL ACTION NO.: 05-CV-3855 (PKC)
            v.                                   :
                                                 :
APOTEX INC. and APOTEX                           :
CORPORATION,                                     :
                                                 :
                       Defendants.               X
------------------------------------------------
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _8/18/05_

## NOTICE OF DISMISSAL

Plaintiffs Novartis AG, Novartis Pharmaceuticals Corporation, Novartis

Ophthalmics Inc., Novartis Pharma AG and Novartis International Pharmaceuticals Ltd.

("Novartis") and defendants Apotex Inc. and Apotex Corporation ("Apotex"), by and through

their undersigned counsel, respectfully file this notice of dismissal with prejudice of the

Amended Complaint as against Apotex and of the counterclaims against Novartis pursuant to

Federal Rules of Civil Procedure 41(a)(1)(ii) and 41(c). This stipulation is signed by all parties

who have appeared in this action. Each party shall bear its own costs and attorneys fees.

Respectfully submitted,

Dated: August 8, 2005

By: *Nicholas N. Kallas*
Robert L. Baechtold (RB 6866)
Nicholas N. Kallas (NK 1084)
Nina Shreve (NS 4731)
Diego Scambia (DS 0296)
FITZPATRICK, CELLA, HARPER
& SCINTO
30 Rockefeller Plaza
New York, NY 10112-3801
Phone: (212) 218-2100
Facsimile: (212) 218-2200

Attorneys for Plaintiffs
Novartis AG,
Novartis Pharmaceuticals Corporation,
Novartis Ophthalmics Inc.,
Novartis Pharma AG and
Novartis International Pharmaceuticals Ltd.

By: _____
Robert S. Silver
Alan H. Bernstein
William J. Castillo (WC 6786)
Lynn M. Terrebonne (LT 2370)
William C. Youngblood (WY 2594)
CAESAR, RIVISE, BERNSTEIN, COHEN
& POKOTILOW, LTD.
11th Floor, 1635 Market Street
Philadelphia, Pennsylvania 19103
Phone: (215) 567-2010
Facsimile: (215) 751-1142

Attorneys for Plaintiffs
Apotex Inc. and Apotex Corporation

SO ORDERED
USDJ
8-16-06

-2-

EXHIBIT G

**Search results from the "OB_Rx" table for query on "077354."**

| | |
|---|---|
| Active Ingredient: | KETOTIFEN FUMARATE |
| Dosage Form;Route: | SOLUTION/DROPS; OPHTHALMIC |
| Proprietary Name: | KETOTIFEN FUMARATE |
| Applicant: | APOTEX INC |
| Strength: | EQ 0.025% BASE |
| Application Number: | 077354 |
| Product Number: | 001 |
| Approval Date: | May 9, 2006 |
| Reference Listed Drug | No |
| RX/OTC/DISCN: | RX |
| TE Code: | **AT** |
| Patent and Exclusivity Info for this product: | <u>View</u> |

<u>Return to Electronic Orange Book Home Page</u>

FDA/Center for Drug Evaluation and Research
Office of Generic Drugs
Division of Labeling and Program Support
Update Frequency:
    Orange Book Data - **Monthly**
    Generic Drug Product Information & Patent Information - **Daily**
    Orange Book Data Updated Through September, 2006
    Patent and Generic Drug Product Data Last Updated: October 25, 2006

EXHIBIT H



*Product Listing*

» Complete Product Listing
» Sort by Brand Name
» Medications (solid)
» Medications (liquid)
» Inhalation Solutions
» Injectables
» Nasal Sprays
» Ophthalmic Solutions

## OPHTHALMIC SOLUTIONS

| Carteolol HCl<br>Ocupress® is a registered trademark of Novartis Pharmaceuticals | Size | NDC# 60505 | Color | Flavor | AT Rated to: | Package Insert |
|---|---|---|---|---|---|---|
| Carteolol HCl Ophthalmic Solution 1% | 5 mL | 1001-1 | Clear, colorless | Not Applicable | Ocupress® | |
| Carteolol HCl Ophthalmic Solution 1% | 10 mL | 1001-2 | Clear, colorless | Not Applicable | Ocupress® | |
| Carteolol HCl Ophthalmic Solution 1% | 15 mL | 1001-3 | Clear, colorless | Not Applicable | Ocupress® | |

| Ciprofloxacin HCl<br>Ciloxan® is a registered trademark of Alcon | Size | NDC# 60505 | Color | Flavor | AT Rated to: | Package Insert |
|---|---|---|---|---|---|---|
| Ciprofloxacin HCL Ophthalmic Solution 0.3% | 5 mL | 1000-1 | Clear, colorless | Not Applicable | Ciloxan® | |

| Cromolyn Sodium<br>Opticrom® is a registered trademark of Allergan | Size | NDC# 60505 | Color | Flavor | AT Rated to: | Package Insert |
|---|---|---|---|---|---|---|
| Cromolyn Sodium Ophthalmic Solution 4% | 10 mL | 0811-2 | Clear, colorless | Not Applicable | Opticrom® | |

| Ketotifen Fumarate Ophthalmic Solution<br>Zaditor® is a registered trademark of Novartis | Size | NDC# 60505 | Color | Flavor | AT Rated to: | Package Insert |
|---|---|---|---|---|---|---|
| → Ketotifen Fumarate 0.025% | 5 mL | 0569-1 | Clear, colorless | Not Applicable | Zaditor® | |

| Levobunolol HCl<br>Betagen® is a registered trademark of Allergan | Size | NDC# 60505 | Color | Flavor | AT Rated to: | Package Insert |
|---|---|---|---|---|---|---|
| Levobunolol HCl Ophthalmic Solution 0.5% | 5 mL | 0553-1 | Clear, colorless | Not Applicable | Betagan® | |
| Levobunolol HCl Ophthalmic Solution 0.5% | 10 mL | 0553-2 | Clear, colorless | Not Applicable | Betagan® | |
| Levobunolol HCl Ophthalmic Solution 0.5% | 15 mL | 0553-3 | Clear, colorless | Not Applicable | Betagan® | |

| Ofloxacin<br>Ocuflox® is a registered trademark under exclusive license from Fison plc and marketed by of Allergan, Inc. | Size | NDC# 60505 | Color | Flavor | AT Rated to: | Package Insert |
|---|---|---|---|---|---|---|
| Ofloxacin Ophthalmic Solution, 0.3% | 5 mL | 0560-0 | Clear, colorless | Not Applicable | Ocuflox® | |
| Ofloxacin Ophthalmic Solution, 0.3% | 10 mL | 0560-1 | Clear, colorless | Not Applicable | Ocuflox® | |

| Timolol Maleate<br>Timoptic® is a registered trademark of Merck & Co. | Size | NDC# 60505 | Color | Flavor | AT Rated to: | Package Insert |
|---|---|---|---|---|---|---|
| Timolol Maleate Ophthalmic Solution 0.25% | 5 mL | 0552-2 | Clear, colorless | Not Applicable | Timoptic® | |
| Timolol Maleate Ophthalmic Solution 0.25% | 10 mL | 0552-3 | Clear, colorless | Not Applicable | Timoptic® | |
| Timolol Maleate Ophthalmic Solution 0.25% | 15 mL | 0552-4 | Clear, colorless | Not Applicable | Timoptic® | |
| Timolol Maleate Ophthalmic Solution 0.5% | 5 mL | 0551-2 | Clear, colorless | Not Applicable | Timoptic® | |
| Timolol Maleate Ophthalmic Solution 0.5% | 10 mL | 0551-3 | Clear, colorless | Not Applicable | Timoptic® | |
| Timolol Maleate Ophthalmic Solution 0.5% | 15 mL | 0551-4 | Clear, colorless | Not Applicable | Timoptic® | |

EXHIBIT I

Walgreens | Pharmacy | Drug Information & Prices | Zaditor    http://www.walgreens.com/library/finddrug/druginfo1.jsp?bid=15389&...

*Walgreens*.com®
▸ **Back to Home**

Sign In:
User name
Password
[GO]
Not registered?

🛒 **Shopping Cart** (0 items)
🔲 **Your Account**  ☑ **Help**
✉ **Mailbox**

**New Photo**
calendar designs
Create a look that's
uniquely yours

| Electronics | Health Care | Household | Personal | Toys | Baby |
| **Pharmacy** | **Health Library** | **Photo** | **Shop** | Vitamins & Nutrition | Beauty & Spa | Sexual Wellness | NEW Contact Lenses | Fitness & Diet | Home Medical | *view more*▸ |

Search: [        ] [GO]    ◇ Refill Rx   ◇ Drug Information   ◇ Store Locator   ◇ Customize these links

## Pharmacy

**Your Tools**
▸ Order Prescriptions
▸ View Rx History
▸ Print Rx Records
▸ Update Health History
▸ E-mail Reminders
▸ Free Medicare Report
·······························
▸ Drug Information
▸ Check Drug Interactions
▸ Ask a Pharmacist
·······························
▸ Medicare Facts
▸ ExpressPay
▸ Health Info Card
▸ Medication Flavoring
▸ Large Print Labels
▸ Multilingual Services
▸ Specialty Pharmacy
▸ Immunizations

Pharmacy > Drug Information & Prices > K > Ketotifen

# KETOTIFEN 0.025% OPTH SOLUTION 5ML

## Brand Name Equivalent:
ZADITOR .025% OPHTH SOLN 5ML



**Generic = Savings**
Find out if you can
save up to 50% with
generic drugs* ◇
·······························

| | 5 ML | 15 ML |
|---|---|---|
| KETOTIFEN 0.025% OPTH SOLUTION 5ML | $71.99 | $215.89 |

◇ Request a prescription now

Prices may vary at store - see details below

**Drug Information For:** KETOTIFEN 0.025% OPTH SOLUTION 5ML

**Ingredient Name:** KETOTIFEN (kee-toe-TYE-fen)

**Drug Manufacturer:** APOTEX

**Common Uses:** This medicine is an antihistamine and mast cell stabilizer used to prevent itching of the eyes due to allergies.

**Before Using This Medicine:** INFORM YOUR DOCTOR OR PHARMACIST of all prescription and over-the-counter medicine that you are taking. Inform your doctor of any other medical conditions, allergies, pregnancy, or breast-feeding.

**How to Use This Medicine:** Follow the directions for using this medicine provided by your doctor. TO USE THIS MEDICINE, wash your hands. Tilt your head back and, with your index finger, pull the lower eyelid away from the eye to form a pouch. Drop the medicine into the pouch and gently close your eyes. Remove excess medicine around your eye with a clean tissue, being careful not to touch your eye. Wash your hands to remove any medicine that may be on them. TO PREVENT GERMS from entering your medicine, do not touch the applicator tip to any surface, including your eye. Do not use this medicine if it is discolored. STORE THIS MEDICINE at room temperature below 77 degrees F (25 degrees C) in a tightly-closed container, away from heat and light. IF YOU MISS A DOSE OF THIS MEDICINE, use it as soon as possible. If it is almost time for your next dose, skip the missed dose and go back to your regular dosing schedule. Do not use 2 doses at once.

**Cautions:** THIS MEDICINE MAY CAUSE mild stinging when you first put it in your eye. Contact your doctor if the stinging continues. DO NOT USE

THIS MEDICINE for future eye problems without first checking with your doctor. DO NOT USE THIS MEDICINE for eye irritation caused by contact lenses. IF YOU WEAR SOFT CONTACT LENSES, wait at least 10 minutes after using this medicine before inserting your lenses. FOR WOMEN: IF YOU PLAN ON BECOMING PREGNANT, discuss with your doctor the benefits and risks of using this medicine during pregnancy. IT IS UNKNOWN IF THIS MEDICINE IS EXCRETED in breast milk. IF YOU ARE OR WILL BE BREAST-FEEDING while you are using this medicine, check with your doctor or pharmacist to discuss the risks to your baby.

**Possible Side Effects:** SIDE EFFECTS that may occur while using this medicine include headache, red eyes, or nasal congestion. If they continue or are bothersome, contact your doctor. CHECK WITH YOUR DOCTOR AS SOON AS POSSIBLE if you experience trouble breathing, rash, or pain or swelling around the eyes. If you notice other effects not listed above, contact your doctor, nurse, or pharmacist.

**Overdose:** If overdose is suspected, contact your local poison control center or emergency room immediately. This medicine may be harmful if swallowed.

**Additional Information:** DO NOT SHARE THIS MEDICINE with others for whom it was not prescribed. DO NOT USE THIS MEDICINE for other health conditions. KEEP THIS MEDICINE out of the reach of children.

Copyright 2006 Wolters Kluwer Health, Inc.

**Disclaimer** - The prices listed reflect the full cash purchase price (excluding shipping) for prescriptions purchased from Walgreens.com and shipped to you. Any savings claims are based on full cash purchase price comparisons. Prices for in-store purchases may vary. Contact your local Walgreens pharmacy for in-store pricing information. The amount you pay and/or save may differ if you are a member of any insurance/third-party plan or drug discount program. If you are a Walgreens Mail Service customer, please contact your appropriate customer service department for pricing. This information is not intended to substitute for professional medical advice. Be sure to contact your physician, pharmacist or other health care provider for more information about this medication. By searching these web site pages, you agree to our terms and conditions of use.

© Copyright 2006 Walgreen Co. All rights reserved.