**Potter**
**Anderson**
**& Corroon** LLP

1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
302 984-6000

www.potteranderson.com

**Richard L. Horwitz**
Partner
Attorney at Law
rhorwitz@potteranderson.com
302 984-6027  Direct Phone
302 658-1192  Fax

January 10, 2007

**VIA ELECTRONIC FILING**

The Honorable Gregory M. Sleet
United States District Judge
J. Caleb Boggs Federal Building
844 N. King Street, Lockbox 18
Wilmington, DE 19801

> Re:   **Merck & Co. Inc. v. Apotex, Inc.**
>        **C. A. No. 06-230-GMS**

Dear Judge Sleet:

Pursuant to Local Rule 7.1.2(c), attached please find the Supreme Court's opinion in *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. ___ (2007), issued yesterday, wherein the Court implicitly rejected the Federal Circuit's "reasonable apprehension" test in determining whether there was subject matter jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §2201(a). *See* slip op. at 13 n. 11. This decision is relevant to Merck's Motion To Dismiss For Lack Of Subject Matter Jurisdiction In Light Of Merck's Covenant Not To Sue (D.I. 15), which is presently undecided. In light of *MedImmune*, Merck's motion to dismiss for lack of subject matter jurisdiction because there is no "reasonable apprehension of suit" should be denied.

In its motion to dismiss, Merck contends that its covenant not to sue renders the action moot, and that the Court therefore lacks subject matter jurisdiction. Merck relied principally on *Super Sack v. Chase*. 57 F.3d 1054 (Fed. Cir. 1995), which applied the "reasonable apprehension of suit" test. Merck contends that, as in *Super Sack*, the covenant not to sue has removed any cause for concern that Apotex could be held liable for infringement of the patents in suit.

In its response, Apotex argues that there is a real controversy under the traditional three-part test of Article III of the Constitution, and that is the proper test. *See* Apotex's response at pp. 14-17. (D.I. 19) More specifically, Apotex argues that the controversy over whether Merck's patents are invalid or not infringed is not mooted by Merck's covenant not to sue because without a court decision finding the patents invalid or not infringed, Apotex is prevented from entering the market for generic Fosamax® until the first generic enters the market. Apotex further advised that the Federal Circuit's reasonable apprehension test, which ignores the injury to Apotex created by this bottleneck, was under review in the *MedImmune* case.

In *MedImmune*, the Supreme Court held "that [a licensee] was not required, insofar as Article III is concerned, to break or terminate its 1997 license agreement before seeking a

The Honorable Gregory M. Sleet
January 10, 2007
Page 2

declaratory judgment that the underlying patent is invalid, unenforceable or not infringed." Slip op. at 18. The Federal Circuit erred in affirming the dismissal of the action for lack of subject matter jurisdiction. The district court had dismissed the action because there was no "reasonable apprehension of suit" since the licensee had not ceased paying royalties under the license agreement. The Supreme Court noted that the Federal Circuit's "reasonable apprehension of suit" test "contradict[ed]" or "conflicts with" prior Supreme Court authority. *See* Slip op. at 13 n.11.

While the Supreme Court did not enunciate a bright line test for determining whether a declaratory judgment action satisfies the case or controversy requirements of Article III, its prior cases have required that the dispute be "definite and concrete, touching the legal relations of parties having adverse legal interests;" and that it be "real and substantial" and "admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *See* Slip op. at 7-8. Also, citing *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941), the Court summarized the test as follows: "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Slip op. at 8.

In its briefs in connection with Merck's motion to dismiss, Apotex contends that there is a substantial and immediate controversy between the parties. The controversy is over a court decision on the invalidity or noninfringement of Merck's patents that, if in Apotex's favor, would then trigger the first generic filer's 180-day exclusivity period and allow Apotex to enter the market with a generic version of Merck's Fosamax® drug. On the other hand, Merck has relied exclusively on its covenant not to sue and the Federal Circuit's "reasonable apprehension test," which has now been rejected by the Supreme Court. Merck's covenant not to sue, which explicitly refuses to admit noninfringement or invalidity, does not eliminate the controversy that exists between Apotex and Merck. In light of *MedImmune*, Merck's motion to dismiss should therefore be denied.

Respectfully,

*/s/ Richard L. Horwitz*

Richard L. Horwitz

RLH:nmt/771110
cc:   Clerk of the Court (via hand delivery)
      Mary Graham (via hand delivery)
      John Lynch (via electronic mail)
      Nicolas G. Barzoukas (via electronic mail)

# EXHIBIT A

OCTOBER TERM, 2006                    1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MEDIMMUNE, INC. *v.* GENENTECH, INC., ET AL.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
THE FEDERAL CIRCUIT

No. 05–608.   Argued October 4, 2006—Decided January 9, 2007

After the parties entered into a patent license agreement covering, *inter alia,* respondents' then-pending patent application, the application matured into the "Cabilly II" patent.  Respondent Genentech, Inc., sent petitioner a letter stating that Synagis, a drug petitioner manufactured, was covered by the Cabilly II patent and that petitioner owed royalties under the agreement.  Although petitioner believed no royalties were due because the patent was invalid and unenforceable and because Synagis did not infringe the patent's claims, petitioner considered the letter a clear threat to enforce the patent, terminate the license agreement, and bring a patent infringement action if petitioner did not pay.  Because such an action could have resulted in petitioner's being ordered to pay treble damages and attorney's fees and enjoined from selling Synagis, which accounts for more than 80 percent of its sales revenue, petitioner paid the royalties under protest and filed this action for declaratory and other relief.  The District Court dismissed the declaratory-judgment claims for lack of subject-matter jurisdiction because, under Federal Circuit precedent, a patent licensee in good standing cannot establish an Article III case or controversy with regard to the patent's validity, enforceability, or scope.  The Federal Circuit affirmed.

*Held:*

1. Contrary to respondents' assertion that only a freestanding patent-invalidity claim is at issue, the record establishes that petitioner has raised and preserved the contract claim that, because of patent invalidity, unenforceability, and noninfringement, no royalties are owing.  Pp. 3–6.

2. The Federal Circuit erred in affirming the dismissal of this action for lack of subject-matter jurisdiction.  The standards for deter-

2                 MEDIMMUNE, INC. *v.* GENENTECH, INC.

Syllabus

mining whether a particular declaratory-judgment action satisfies
the case-or-controversy requirement—*i.e.,* "whether the facts alleged,
under all the circumstances, show that there is a substantial contro-
versy, between parties having adverse legal interests, of sufficient
immediacy and reality to warrant" relief, *Maryland Casualty Co.* v.
*Pacific Coal & Oil Co.,* 312 U. S. 270, 273—are satisfied here even
though petitioner did not refuse to make royalty payments under the
license agreement.    Where threatened *government* action is con-
cerned, a plaintiff is not required to expose himself to liability before
bringing suit to challenge the basis for the threat. His own action (or
inaction) in failing to violate the law eliminates the imminent threat
of prosecution, but nonetheless does not eliminate Article III jurisdic-
tion because the threat-eliminating behavior was effectively coerced.
Similarly, where the plaintiff's self-avoidance of imminent injury is
coerced by the threatened enforcement action of *a private party*
rather than the government, lower federal and state courts have long
accepted jurisdiction. In its only decision in point, this Court held
that a licensee's failure to cease its royalty payments did not render
nonjusticiable a dispute over the patent's validity. *Altvater* v. *Free-
man,* 319 U. S. 359, 364. Though *Altvater* involved an injunction, it
acknowledged that the licensees had the option of stopping payments
in defiance of the injunction, but that the *consequence* of doing so
would be to risk "actual [and] treble damages in infringement suits"
by the patentees, a consequence also threatened in this case. *Id.,* at
365.    Respondents' assertion that the parties in effect settled this
dispute when they entered into their license agreement is mistaken.
Their appeal to the common-law rule that a party to a contract can-
not both challenge its validity and continue to reap its benefits is also
unpersuasive.    Lastly, because it was raised for the first time here,
this Court does not decide respondents' request to affirm the dis-
missal of the declaratory-judgment claims on discretionary grounds.
That question and any merits-based arguments for denial of declara-
tory relief are left for the lower courts on remand. Pp. 7–18.

427 F. 3d 958, reversed and remanded.

SCALIA, J., delivered the opinion of the Court, in which ROBERTS,
C. J., and STEVENS, KENNEDY, SOUTER, GINSBURG, BREYER, and ALITO,
JJ., joined. THOMAS, J., filed a dissenting opinion.

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 05–608

## MEDIMMUNE, INC., PETITIONER v. GENENTECH, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

[January 9, 2007]

JUSTICE SCALIA delivered the opinion of the Court.

We must decide whether Article III's limitation of federal courts' jurisdiction to "Cases" and "Controversies," reflected in the "actual controversy" requirement of the Declaratory Judgment Act, 28 U. S. C. §2201(a), requires a patent licensee to terminate or be in breach of its license agreement before it can seek a declaratory judgment that the underlying patent is invalid, unenforceable, or not infringed.

I

Because the declaratory-judgment claims in this case were disposed of at the motion-to-dismiss stage, we take the following facts from the allegations in petitioner's amended complaint and the unopposed declarations that petitioner submitted in response to the motion to dismiss. Petitioner MedImmune, Inc., manufactures Synagis, a drug used to prevent respiratory tract disease in infants and young children. In 1997, petitioner entered into a patent license agreement with respondent Genentech, Inc. (which acted on behalf of itself as patent assignee and on behalf of the coassignee, respondent City of Hope). The

license covered an existing patent relating to the production of "chimeric antibodies" and a then-pending patent application relating to "the coexpression of immunoglobulin chains in recombinant host cells." Petitioner agreed to pay royalties on sales of "Licensed Products," and respondents granted petitioner the right to make, use, and sell them. The agreement defined "Licensed Products" as a specified antibody, "the manufacture, use or sale of which . . . would, if not licensed under th[e] Agreement, infringe one or more claims of either or both of [the covered patents,] which have neither expired nor been held invalid by a court or other body of competent jurisdiction from which no appeal has been or may be taken." App. 399. The license agreement gave petitioner the right to terminate upon six months' written notice.

In December 2001, the "coexpression" application covered by the 1997 license agreement matured into the "Cabilly II" patent. Soon thereafter, respondent Genentech delivered petitioner a letter expressing its belief that Synagis was covered by the Cabilly II patent and its expectation that petitioner would pay royalties beginning March 1, 2002. Petitioner did not think royalties were owing, believing that the Cabilly II patent was invalid and unenforceable,[1] and that its claims were in any event not infringed by Synagis. Nevertheless, petitioner considered the letter to be a clear threat to enforce the Cabilly II patent, terminate the 1997 license agreement, and sue for patent infringement if petitioner did not make royalty payments as demanded. If respondents were to prevail in a patent infringement action, petitioner could be ordered to pay treble damages and attorney's fees, and could be enjoined from selling Synagis, a product that has ac-

---

[1] Hereinafter, invalidity and unenforceability will be referred to simply as invalidity, with similar abbreviation of positive (validity and enforceability) and adjectival (valid and invalid, enforceable and unenforceable) forms.

Opinion of the Court

counted for more than 80 percent of its revenue from sales since 1999. Unwilling to risk such serious consequences, petitioner paid the demanded royalties "under protest and with reservation of all of [its] rights." *Id.*, at 426. This declaratory-judgment action followed.

Petitioner sought the declaratory relief discussed in detail in Part II below. Petitioner also requested damages and an injunction with respect to other federal and state claims not relevant here. The District Court granted respondents' motion to dismiss the declaratory-judgment claims for lack of subject-matter jurisdiction, relying on the decision of the United States Court of Appeals for the Federal Circuit in *Gen-Probe Inc.* v. *Vysis, Inc.*, 359 F. 3d 1376 (2004). *Gen-Probe* had held that a patent licensee in good standing cannot establish an Article III case or controversy with regard to validity, enforceability, or scope of the patent because the license agreement "obliterate[s] any reasonable apprehension" that the licensee will be sued for infringement. *Id.*, at 1381. The Federal Circuit affirmed the District Court, also relying on *Gen-Probe.* 427 F. 3d 958 (2005). We granted certiorari. 546 U. S. 1169 (2006).

II

At the outset, we address a disagreement concerning the nature of the dispute at issue here—whether it involves only a freestanding claim of patent invalidity or rather a claim that, both because of patent invalidity and because of noninfringement, no royalties are owing under the license agreement.[2] That probably makes no difference to the ultimate issue of subject-matter jurisdiction, but it is

---

[2]The dissent contends that the question on which we granted certiorari does not reach the contract claim. *Post*, at 5 (opinion of THOMAS, J.). We think otherwise. The question specifically refers to the "license agreement" and to the contention that the patent is "not infringed." Pet. for Cert. (i). The unmistakable meaning is that royalties are not owing under the contract.

Opinion of the Court

well to be clear about the nature of the case before us.

Respondents contend that petitioner "is not seeking an interpretation of its present contractual obligations." Brief for Respondent Genentech 37; see also Brief for Respondent City of Hope 48–49. They claim this for two reasons: (1) because there is no dispute that Synagis infringes the Cabilly II patent, thereby making royalties payable; and (2) because while there is a dispute over patent validity, the contract calls for royalties on an infringing product whether or not the underlying patent is valid. See Brief for Respondent Genentech 7, 37. The first point simply does not comport with the allegations of petitioner's amended complaint. The very first count requested a *"DECLARATORY JUDGMENT ON CONTRACTUAL RIGHTS AND OBLIGATIONS,"* and stated that petitioner "disputes its obligation to make payments under the 1997 License Agreement because [petitioner's] sale of its Synagis® product does not infringe any valid claim of the [Cabilly II] Patent." App. 136. These contentions were repeated throughout the complaint. *Id.*, at 104, 105, 108, 147.[3] And the phrase "does not infringe any *valid* claim" (emphasis added) cannot be thought to be no more than a challenge to the patent's validity, since elsewhere the amended complaint states with unmistakable clarity that "the patent is . . . not infringed by [petitioner's] Synagis product and that [petitioner] owes no payments under license agreements with [respondents]." *Id.*, at 104.[4]

---

[3] In addition to agreeing with respondents that (despite the face of the complaint) this case does not involve a contract claim, *post*, at 4–5, the dissent evidently thinks the contract claim is weak. That, however, goes to the merits of the claim, not to its existence or the courts' jurisdiction over it. Nor is the alleged "lack of specificity in the complaint," *post*, at 4, a jurisdictional matter.

[4] The dissent observes that the District Court assumed that Synagis was "'covered by the patents at issue.'" *Post*, at 5 (quoting App. 349–350). But the quoted statement is taken from the District Court's separate opinion granting summary judgment *on petitioner's antitrust*

Opinion of the Court

As to the second point, petitioner assuredly did contend that it had no obligation under the license to pay royalties on an invalid patent. *Id.*, at 104, 136, 147. Nor is that contention frivolous. True, the license requires petitioner to pay royalties *until* a patent claim has been held invalid by a competent body, and the Cabilly II patent has not. But the license at issue in *Lear, Inc.* v. *Adkins*, 395 U. S. 653, 673 (1969), similarly provided that "royalties are to be paid until such time as the 'patent . . . is held invalid,'" and we rejected the argument that a repudiating licensee must comply with its contract and pay royalties until its claim is vindicated in court. We express no opinion on whether a *nonrepudiating licensee* is similarly relieved of its contract obligation during a successful challenge to a patent's validity—that is, on the applicability of licensee estoppel under these circumstances. Cf. *Studiengesell-schaft Kohle, M. B. H.* v. *Shell Oil Co.*, 112 F. 3d 1561, 1568 (CA Fed. 1997) ("[A] licensee . . . cannot invoke the protection of the *Lear* doctrine until it (i) actually ceases payment of royalties, and (ii) provides notice to the licensor that the reason for ceasing payment of royalties is because it has deemed the relevant claims to be invalid"). All we need determine is whether petitioner has alleged a contractual dispute. It has done so.

Respondents further argue that petitioner waived its contract claim by failing to argue it below. Brief for Respondent Genentech 10–11; Tr. of Oral Arg. 30–31. The record reveals, however, that petitioner raised the contract point before the Federal Circuit. See Brief for Plantiff-Appellant MedImmune, Inc. in Nos. 04–1300, 04–1384

---

*claims.* For purposes of that earlier ruling, whether Synagis infringed the patent was irrelevant, and there was no harm in accepting respondents' contention on the point. This tells us nothing, however, about petitioner's contract claim or the District Court's later jurisdictional holding with respect to it.

Opinion of the Court

(CA Fed.), p. 38 ("Here, MedImmune is seeking to define
its rights and obligations under its contract with Genen-
tech—precisely the type of action the Declaratory Judg-
ment Act contemplates").    That petitioner limited its
contract argument to a few pages of its appellate brief
does not suggest a waiver; it merely reflects counsel's
sound assessment that the argument would be futile.  The
Federal Circuit's *Gen-Probe* precedent precluded jurisdic-
tion over petitioner's contract claims, and the panel
below had no authority to overrule *Gen-Probe*.[5]  Having deter-
mined that petitioner has raised and preserved a contract
claim,[6] we turn to the jurisdictional question.

_____

[5] Respondents obviously agree. They said in the District Court: "The
facts of this case are, for purposes of this motion, identical to the facts
in *Gen-Probe*. . . . Like Gen-Probe, MedImmune filed an action seeking
a declaratory judgment that: (a) it owes nothing under its license
agreement with Genentech because its sales of Synagis® allegedly do
not infringe any valid claim of the [Cabilly II] patent; (b) the [Cabilly II]
patent is invalid; (c) the [Cabilly II] patent is unenforceable; and (d)
Synagis® does not infringe the [Cabilly II] patent." App. in Nos. 04–
1300, 04–1384 (CA Fed.), p. A2829 (record citations omitted).

[6] The dissent asserts that petitioner did not allege a contract claim in
its opening brief or at oral argument. *Post*, at 5. This is demonstrably
false. See, *e.g.*, Brief for Petitioner 8 (the Cabilly II patent was "not
infringed by Synagis®, so that royalties were not due under the li-
cense"); *id.*, at 12 (Summary of Argument: "[The purpose] of the De-
claratory Judgment Act . . . was to allow contracting parties to resolve
their disputes in court without breach and without risking economic
destruction and multiplying damages. . . . The holding [below] . . .
would . . . disrupt the law of licenses and contracts throughout the
economy, essentially undoing the achievement of the reformers of
1934"); Tr. of Oral Arg. 15 ("We're saying this is a contract dispute");
*id.*, at 16 ("[T]he purpose of this [the Declaratory Judgment Act] is so
that contracts can be resolved without breach"); *id.*, at 57 ("The con-
tract claim is clear in the record. It's at page 136 of the joint appendix.
I don't think more needs to be said about it").

The dissent also asserts that the validity of the contract claim
"hinges entirely upon a determination of the patent's validity," since
"'the license requires [MedImmune] to pay royalties *until* a patent
claim has been held invalid by a competent body,'" *post*, at 5, quoting

Opinion of the Court

## III

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U. S. C. §2201(a). There was a time when this Court harbored doubts about the compatibility of declaratory-judgment actions with Article III's case-or-controversy requirement. See *Willing* v. *Chicago Auditorium Assn.*, 277 U. S. 274, 289 (1928); *Liberty Warehouse Co.* v. *Grannis*, 273 U. S. 70 (1927); see also *Gordon* v. *United States*, 117 U. S. Appx. 697, 702 (1864) (the last opinion of Taney, C. J., published posthumously) ("The award of execution is . . . an essential part of every judgment passed by a court exercising judicial power"). We dispelled those doubts, however, in *Nashville, C. & St. L. R. Co.* v. *Wallace*, 288 U. S. 249 (1933), holding (in a case involving a declaratory judgment rendered in state court) that an appropriate action for declaratory relief *can* be a case or controversy under Article III. The federal Declaratory Judgment Act was signed into law the following year, and we upheld its constitutionality in *Aetna Life Ins. Co.* v. *Haworth*, 300 U. S. 227 (1937). Our opinion explained that the phrase "case of actual controversy" in the Act refers to the type of "Cases" and "Controversies" that are justiciable under Article III. *Id.*, at 240.

*Aetna* and the cases following it do not draw the brightest of lines between those declaratory-judgment actions that satisfy the case-or-controversy requirement and those that do not. Our decisions have required that the dispute be "definite and concrete, touching the legal relations of

─────────

*infra*, at 5. This would be true only if the license required royalties on all products under the sun, and not just those that practice the patent. Of course it does not.

MEDIMMUNE, INC. *v.* GENENTECH, INC.

parties having adverse legal interests"; and that it be "real and substantial" and "admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id.*, at 240–241. In *Maryland Casualty Co.* v. *Pacific Coal & Oil Co.*, 312 U. S. 270, 273 (1941), we summarized as follows: "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."[7]

There is no dispute that these standards would have been satisfied if petitioner had taken the final step of refusing to make royalty payments under the 1997 license agreement. Respondents claim a right to royalties under the licensing agreement. Petitioner asserts that no royal-

---

[7]The dissent asserts, *post*, at 1, that "the declaratory judgment procedure cannot be used to obtain advanced rulings on matters that would be addressed in a future case of actual controversy." As our preceding discussion shows, that is not so. If the dissent's point is simply that a defense cannot be raised by means of a declaratory-judgment action where there is no "actual controversy" or where it would be "premature," phrasing that argument as the dissent has done begs the question: whether this is an actual, ripe controversy.

*Coffman* v. *Breeze Corps.*, 323 U. S. 316, 323–324 (1945), cited *post*, at 3, does not support the dissent's view (which is why none of the parties cited it). There, a patent owner sued to enjoin his licensee from paying accrued royalties to the Government under the Royalty Adjustment Act of 1942, and sought to attack the constitutionality of the Act. The Court held the request for declaratory judgment and injunction nonjusticiable because the patent owner asserted no right to recover the royalties and there was no indication that the licensee would even raise the Act as a defense to suit for the royalties. The other case the dissent cites for the point, *Calderon* v. *Ashmus*, 523 U. S. 740, 749 (1998), simply holds that a litigant may not use a declaratory-judgment action to obtain piecemeal adjudication of defenses that *would not finally and conclusively resolve* the underlying controversy. That is, of course, not the case here.

ties are owing because the Cabilly II patent is invalid and not infringed; and alleges (without contradiction) a threat by respondents to enjoin sales if royalties are not forthcoming. The factual and legal dimensions of the dispute are well defined and, but for petitioner's continuing to make royalty payments, nothing about the dispute would render it unfit for judicial resolution. Assuming (without deciding) that respondents here could not claim an anticipatory breach and repudiate the license, the continuation of royalty payments makes what would otherwise be an imminent threat at least remote, if not nonexistent. As long as those payments are made, there is no risk that respondents will seek to enjoin petitioner's sales. Petitioner's own acts, in other words, eliminate the imminent threat of harm.[8] The question before us is whether this causes the dispute no longer to be a case or controversy within the meaning of Article III.

Our analysis must begin with the recognition that, where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced. The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction. For example, in *Terrace* v. *Thompson*, 263

---

[8]The justiciability problem that arises, when the party seeking declaratory relief is himself preventing the complained-of injury from occurring, can be described in terms of standing (whether plaintiff is threatened with "imminent" injury in fact "'fairly . . . trace[able] to the challenged action of the defendant,'" *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560 (1992)), or in terms of ripeness (whether there is sufficient "hardship to the parties [in] withholding court consideration" until there is enforcement action, *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 149 (1967)). As respondents acknowledge, standing and ripeness boil down to the same question in this case. Brief for Respondent Genentech 24; Brief for Respondent City of Hope 30–31.

10          MEDIMMUNE, INC. *v.* GENENTECH, INC.

U. S. 197 (1923), the State threatened the plaintiff with
forfeiture of his farm, fines, and penalties if he entered
into a lease with an alien in violation of the State's anti-
alien land law. Given this genuine threat of enforcement,
we did not require, as a prerequisite to testing the validity
of the law in a suit for injunction, that the plaintiff bet the
farm, so to speak, by taking the violative action. *Id.,* at
216. See also, *e.g., Village of Euclid* v. *Ambler Realty Co.,*
272 U. S. 365 (1926); *Ex parte Young,* 209 U. S. 123 (1908).
Likewise, in *Steffel* v. *Thompson,* 415 U. S. 452 (1974), we
did not require the plaintiff to proceed to distribute hand-
bills and risk actual prosecution before he could seek a
declaratory judgment regarding the constitutionality of a
state statute prohibiting such distribution. *Id.,* at 458–
460. As then-Justice Rehnquist put it in his concurrence,
"the declaratory judgment procedure is an alternative to
pursuit of the arguably illegal activity." *Id.,* at 480. In
each of these cases, the plaintiff had eliminated the immi-
nent threat of harm by simply not doing what he claimed
the right to do (enter into a lease, or distribute handbills
at the shopping center). That did not preclude subject-
matter jurisdiction because the threat-eliminating behav-
ior was effectively coerced. See *Terrace, supra,* at 215–
216; *Steffel, supra,* at 459. The dilemma posed by that
coercion—putting the challenger to the choice between
abandoning his rights or risking prosecution—is "a di-
lemma that it was the very purpose of the Declaratory
Judgment Act to ameliorate." *Abbott Laboratories* v.
*Gardner,* 387 U. S. 136, 152 (1967).

Supreme Court jurisprudence is more rare regarding
application of the Declaratory Judgment Act to situations
in which the plaintiff's self-avoidance of imminent injury
is coerced by threatened enforcement action of *a private
party* rather than the government. Lower federal courts,
however (and state courts interpreting declaratory judg-
ment Acts requiring "actual controversy"), have long ac-

Opinion of the Court

cepted jurisdiction in such cases. See, *e.g., Keener Oil & Gas Co.* v. *Consolidated Gas Utilities Corp.*, 190 F. 2d 985, 989 (CA10 1951); *American Machine & Metals, Inc.* v. *De Bothezat Impeller Co.*, 166 F. 2d 535 (CA2 1948); *Hess* v. *Country Club Park*, 213 Cal. 613, 614, 2 P. 2d 782, 783 (1931) (in bank); *Washington-Detroit Theater Co.* v. *Moore*, 249 Mich. 673, 675, 229 N. W. 618, 618–619 (1930); see also Advisory Committee's Note on Fed. Rule Civ. Proc. 57.[9]

The only Supreme Court decision in point is, fortuitously, close on its facts to the case before us. *Altvater* v. *Freeman*, 319 U. S. 359 (1943), held that a licensee's failure to cease its payment of royalties did not render nonjusticiable a dispute over the validity of the patent. In that litigation, several patentees had sued their licensees to enforce territorial restrictions in the license. The licensees filed a counterclaim for declaratory judgment that the underlying patents were invalid, in the meantime paying "under protest" royalties required by an injunction the patentees had obtained in an earlier case. The patentees argued that "so long as [licensees] continue to pay royalties, there is only an academic, not a real controversy, between the parties." *Id.*, at 364. We rejected that argument and held that the declaratory-judgment claim presented a justiciable case or controversy: "The fact that royalties were being paid did not make this a 'difference or dispute of a hypothetical or abstract character.'" *Ibid.*

---

[9]The dissent claims the cited cases do not "rely on the coercion inherent in making contractual payments." *Post*, at 9, n. 3. That is true; they relied on (to put the matter as the dissent puts it) the coercion inherent in complying with *other* claimed contractual obligations. The dissent fails to explain why a contractual obligation of payment is magically different. It obviously is not. In our view, of course, the relevant coercion is not compliance with the claimed contractual obligation, but rather the consequences of failure to do so.

Opinion of the Court

(quoting *Aetna*, 300 U. S., at 240). The royalties "were being paid under protest and under the compulsion of an injunction decree," and "[u]nless the injunction decree were modified, the only other course [of action] was to defy it, and to risk not only actual but treble damages in infringement suits." 319 U. S., at 365. We concluded that "the requirements of [a] case or controversy are met where payment of a claim is demanded as of right and where payment is made, but where the involuntary or coercive nature of the exaction preserves the right to recover the sums paid or to challenge the legality of the claim." *Ibid.*[10]

---

[10] The dissent incorrectly asserts that *Altvater* required actual infringement, quoting wildly out of context (and twice, for emphasis) *Altvater*'s statement that " '[t]o hold a patent valid if it is not infringed is to decide a hypothetical case.' " *Post*, at 3, 7 (quoting 319 U. S., at 363). In the passage from which the quotation was plucked, the *Altvater* Court was distinguishing the Court's earlier decision in *Electrical Fittings Corp.* v. *Thomas & Betts Co.*, 307 U. S. 241 (1939), which involved an affirmative defense of patent invalidity that had become moot in light of a finding of no infringement. Here is the full quotation:

"The District Court [in *Electrical Fittings*] adjudged a claim of a patent valid although it dismissed the bill for failure to prove infringement. We held that the finding of validity was immaterial to the disposition of the cause and that the winning party might appeal to obtain a reformation of the decree. To hold a patent valid if it is not infringed is to decide a hypothetical case. But the situation in the present case is quite different. We have here not only bill and answer but a counterclaim. Though the decision of non-infringement disposes of the bill and answer, it does not dispose of the counterclaim which raises the question of validity." *Altvater*, *supra*, at 363 (footnote omitted).

As the full quotation makes clear, the snippet quoted by the dissent has nothing to do with whether infringement must be actual or merely threatened. Indeed, it makes clear that in appropriate cases to hold a noninfringed patent valid is *not* to decide a hypothetical case.

Though the dissent acknowledges the central lesson of *Altvater*, *post*, at 8—that payment of royalties under "coercive" circumstances does not eliminate jurisdiction—it attempts to limit that rationale to the particular facts of *Altvater*. But none of *Altvater*'s "unique facts," *post*, at 8,

Opinion of the Court

The Federal Circuit's *Gen-Probe* decision distinguished *Altvater* on the ground that it involved the compulsion of an injunction. But *Altvater* cannot be so readily dismissed. Never mind that the injunction had been privately obtained and was ultimately within the control of the patentees, who could permit its modification. More fundamentally, and contrary to the Federal Circuit's conclusion, *Altvater* did not say that the coercion dispositive of the case was governmental, but suggested just the opposite. The opinion acknowledged that the licensees had the option of stopping payments in defiance of the injunction, but explained that the *consequence* of doing so would be to risk "actual [and] treble damages in infringement suits" by the patentees. 319 U. S., at 365. It significantly did not mention the threat of prosecution for contempt, or any other sort of governmental sanction. Moreover, it cited approvingly a treatise which said that an "actual or threatened serious injury to business or employment" by a private party can be as coercive as other forms of coercion supporting restitution actions at common law; and that "[t]o imperil a man's livelihood, his business enterprises, or his solvency, [was] ordinarily quite as coercive" as, for example, "detaining his property." F. Woodward, The Law of Quasi Contracts §218 (1913), cited in *Altvater, supra,* at 365.[11]

---

suggests that a different test applies to the royalty payments here. Other than a conclusory assertion that the payments here were "voluntarily made," *post,* at 10, the dissent never explains why the threat of treble damages and the loss of 80 percent of petitioner's business does not fall within *Altvater*'s coercion rationale.

[11] Even if *Altvater* could be distinguished as an "injunction" case, it would still contradict the Federal Circuit's "reasonable apprehension of suit" test (or, in its evolved form, the "reasonable apprehension of *imminent* suit" test, *Teva Pharm. USA, Inc.* v. *Pfizer, Inc.,* 395 F. 3d 1324, 1333 (2005)). A licensee who pays royalties under compulsion of an injunction has no more apprehension of imminent harm than a licensee who pays royalties for fear of treble damages and an injunction

14          MEDIMMUNE, INC. *v.* GENENTECH, INC.

Opinion of the Court

Jurisdiction over the present case is not contradicted by *Willing* v. *Chicago Auditorium Association*, 277 U. S. 274. There a ground lessee wanted to demolish an antiquated auditorium and replace it with a modern commercial building. The lessee believed it had the right to do this without the lessors' consent, but was unwilling to drop the wrecking ball first and test its belief later. Because there was no declaratory judgment act at the time under federal or applicable state law, the lessee filed an action to remove a "cloud" on its lease. This Court held that an Article III case or controversy had not arisen because "[n]o defendant ha[d] wronged the plaintiff or ha[d] threatened to do so." *Id.,* at 288, 290. It was true that one of the colessors had disagreed with the lessee's interpretation of the lease, but that happened in an "informal, friendly, private conversation," *id.,* at 286, a year before the lawsuit was filed; and the lessee never even bothered to approach the other colessors. The Court went on to remark that "[w]hat the plaintiff seeks is simply a declaratory judgment," and "[t]o grant that relief is beyond the power conferred upon the federal judiciary." *Id.,* at 289. Had *Willing* been decided after the enactment (and our upholding) of the Declaratory Judgment Act, and had the legal disagreement between the parties been as lively as this one, we are confi-

---

fatal to his business. The reasonable-apprehension-of-suit test also conflicts with our decisions in *Maryland Casualty Co.* v. *Pacific Coal & Oil Co.,* 312 U. S. 270, 273 (1941), where jurisdiction obtained even though the collision-victim defendant could not have sued the declaratory-judgment plaintiff-insurer without first obtaining a judgment against the insured; and *Aetna Life Ins. Co.* v. *Haworth,* 300 U. S. 227, 239 (1937), where jurisdiction obtained even though the very reason the insurer sought declaratory relief was that the insured had given no indication that he would file suit. It is also in tension with *Cardinal Chemical Co.* v. *Morton Int'l, Inc.,* 508 U. S. 83, 98 (1993), which held that appellate affirmance of a judgment of noninfringement, eliminating any apprehension of suit, does not moot a declaratory judgment counterclaim of patent invalidity.

Opinion of the Court

dent a different result would have obtained. The rule that a plaintiff must destroy a large building, bet the farm, or (as here) risk treble damages and the loss of 80 percent of its business, before seeking a declaration of its actively contested legal rights finds no support in Article III.[12]

Respondents assert that the parties in effect settled this dispute when they entered into the 1997 license agreement. When a licensee enters such an agreement, they contend, it essentially purchases an insurance policy, immunizing it from suits for infringement so long as it continues to pay royalties and does not challenge the

---

[12] The dissent objects to our supposed "extension of *Steffel* [v. *Thompson*] . . . to apply to voluntarily accepted contractual obligations between private parties." *Post*, at 9. The criticism is misdirected in several respects. The coercion principle upon which we rely today did not originate with *Steffel* v. *Thompson*, 415 U. S. 452 (1974), see *supra*, at 9–10, and we have no opportunity to *extend* it to private litigation, because *Altvater* v. *Freeman*, 319 U. S. 359 (1943) already did so, see *supra*, at 12. Moreover, even if today's decision could be described as an "extension of *Steffel*" to private litigation, the dissent identifies no principled reason why that extension is not appropriate. Article III does not favor litigants challenging threatened *government* enforcement action over litigants challenging threatened *private* enforcement action. Indeed, the latter is perhaps the easier category of cases, for it presents none of the difficult issues of federalism and comity with which we wrestled in *Steffel*. See 415 U. S., at 460–475.

The dissent accuses the Court of misapplying *Steffel*'s rationale. *Post*, at 10. It contends that *Steffel* would apply here only if respondents had threatened petitioner with a patent infringement suit *in the absence of a license agreement*, because only then would petitioner be put to the choice of selling its product or facing suit. *Post*, at 10. Here, the dissent argues, the license payments are "voluntarily made." *Ibid.* If one uses the word "voluntarily" so loosely, it could be applied with equal justification (or lack thereof) to the *Steffel* plaintiff's "voluntary" refusal to distribute handbills. We find the threat of treble damages and loss of 80 percent of petitioner's business every bit as coercive as the modest penalties for misdemeanor trespass threatened in *Steffel*. Only by ignoring the consequences of the threatened action in this case can the dissent claim that today's opinion "contains no limiting principle whatsoever," *post*, at 10.

covered patents. Permitting it to challenge the validity of
the patent without terminating or breaking the agreement
alters the deal, allowing the licensee to continue enjoying
its immunity while bringing a suit, the elimination of
which was part of the patentee's *quid pro quo*. Of course
even if it were valid, this argument would have no force
with regard to petitioner's claim that the agreement does
not call for royalties because their product does not in-
fringe the patent. But even as to the patent invalidity
claim, the point seems to us mistaken. To begin with, it is
not clear where the prohibition against challenging the
validity of the patents is to be found. It can hardly be
implied from the mere promise to pay royalties on patents
"which have neither expired nor been held invalid by a
court or other body of competent jurisdiction from which
no appeal has been or may be taken," App. 399. Promising
to pay royalties on patents that have not been held invalid
does not amount to a promise *not to seek* a holding of their
invalidity.

Respondents appeal to the common-law rule that a
party to a contract cannot at one and the same time chal-
lenge its validity and continue to reap its benefits, citing
*Commodity Credit Corp.* v. *Rosenberg Bros. & Co.*, 243
F. 2d 504, 512 (CA9 1957), and *Kingman & Co.* v.
*Stoddard*, 85 F. 740, 745 (CA7 1898). *Lear,* they contend,
did not suspend that rule for patent licensing agreements,
since the plaintiff in that case had already repudiated the
contract. Even if *Lear*'s repudiation of the doctrine of
licensee estoppel was so limited (a point on which, as we
have said earlier, we do not opine), it is hard to see how
the common-law rule has any application here. Petitioner
is not repudiating or impugning the contract while con-
tinuing to reap its benefits. Rather, it is asserting that the
contract, properly interpreted, does not prevent it from
challenging the patents, and does not require the payment
of royalties because the patents do not cover its products

and are invalid. Of course even if respondents were correct that the licensing agreement or the common-law rule precludes this suit, the consequence would be that respondents win this case *on the merits—not* that the very genuine contract dispute disappears, so that Article III jurisdiction is somehow defeated. In short, Article III jurisdiction has nothing to do with this "insurance-policy" contention.

Lastly, respondents urge us to affirm the dismissal of the declaratory-judgment claims on discretionary grounds. The Declaratory Judgment Act provides that a court "*may* declare the rights and other legal relations of any interested party," 28 U. S. C. §2201(a) (emphasis added), not that it *must* do so. This text has long been understood "to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton* v. *Seven Falls Co.*, 515 U. S. 277, 286 (1995); see also *Cardinal Chemical Co.* v. *Morton Int'l, Inc.*, 508 U. S. 83, 95, n. 17 (1993); *Brillhart* v. *Excess Ins. Co. of America*, 316 U. S. 491, 494–496 (1942). We have found it "more consistent with the statute," however, "to vest district courts with discretion in the first instance, because facts bearing on the usefulness of the declaratory judgment remedy, and the fitness of the case for resolution, are peculiarly within their grasp." *Wilton, supra,* at 289. The District Court here gave no consideration to discretionary dismissal, since, despite its "serious misgivings" about the Federal Circuit's rule, it considered itself bound to dismiss by *Gen-Probe.* App. to Pet. for Cert. 31a. Discretionary dismissal was irrelevant to the Federal Circuit for the same reason. Respondents have raised the issue for the first time before this Court, exchanging competing accusations of inequitable conduct with petitioner. See, *e.g.,* Brief for Respondent Genentech 42–44; Reply Brief for Petitioner 17, and n. 15. Under these circumstances, it would be imprudent for us to decide whether the District

18          MEDIMMUNE, INC. *v.* GENENTECH, INC.

Court should, or must, decline to issue the requested declaratory relief. We leave the equitable, prudential, and policy arguments in favor of such a discretionary dismissal for the lower courts' consideration on remand. Similarly available for consideration on remand are any merits-based arguments for denial of declaratory relief.

\*          \*          \*

We hold that petitioner was not required, insofar as Article III is concerned, to break or terminate its 1997 license agreement before seeking a declaratory judgment in federal court that the underlying patent is invalid, unenforceable, or not infringed. The Court of Appeals erred in affirming the dismissal of this action for lack of subject-matter jurisdiction.

The judgment of the Court of Appeals is reversed, and the cause is remanded for proceedings consistent with this opinion.

*It is so ordered.*

Cite as: 549 U. S. ____ (2007)     1

THOMAS, J., dissenting

# SUPREME COURT OF THE UNITED STATES

No. 05–608

## MEDIMMUNE, INC., PETITIONER *v.* GENENTECH, INC., ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

[January 9, 2007]

JUSTICE THOMAS, dissenting.

We granted certiorari in this case to determine whether a patent licensee in good standing must breach its license prior to challenging the validity of the underlying patent pursuant to the Declaratory Judgment Act, 28 U. S. C. §2201. 546 U. S. 1169 (2006). The answer to that question is yes. We have consistently held that parties do not have standing to obtain rulings on matters that remain hypothetical or conjectural. We have also held that the declaratory judgment procedure cannot be used to obtain advanced rulings on matters that would be addressed in a future case of actual controversy. MedImmune has sought a declaratory judgment for precisely that purpose, and I would therefore affirm the Court of Appeals' holding that there is no Article III jurisdiction over MedImmune's claim. The Court reaches the opposite result by extending the holding of *Steffel* v. *Thompson*, 415 U. S. 452 (1974), to private contractual obligations. I respectfully dissent.

I

Article III of the Constitution limits the judicial power to the adjudication of "Cases" or "Controversies." §2. We have held that the Declaratory Judgment Act extends "to controversies which are such in the constitutional sense." *Aetna Life Ins. Co.* v. *Haworth*, 300 U. S. 227, 240 (1937).

2        MEDIMMUNE, INC. *v.* GENENTECH, INC.

THOMAS, J., dissenting

In the context of declaratory judgment actions, this Court's cases have provided a uniform framework for assessing whether an Article III case or controversy exists. In the constitutional sense, a "Controversy" is "distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot." *Ibid.* (citing *United States* v. *Alaska S. S. Co.*, 253 U. S. 113, 116 (1920)). "The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests." 300 U. S., at 240–241. Finally, "[i]t must be a real and substantial controversy . . . , as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id.*, at 241.

The Declaratory Judgment Act did not (and could not) alter the constitutional definition of "case or controversy" or relax Article III's command that an actual case or controversy exist before federal courts may adjudicate a question. See *Maryland Casualty Co.* v. *Pacific Coal & Oil Co.*, 312 U. S. 270, 272–273 (1941). Thus, this Court has held that "the operation of the Declaratory Judgment Act is procedural only." *Aetna Life Ins.*, 300 U. S., at 240. In other words, the Act merely provides a different procedure for bringing an actual case or controversy before a federal court. The Court applied that principle in *Aetna Life Ins.*, where an insurance company brought a declaratory judgment action against an insured who claimed he had become disabled, had formally presented his claims, and had refused to make any more insurance payments. *Id.*, at 242. In the course of deciding that it could entertain the insurer's declaratory judgment action, the Court specifically noted that, had the insured filed his traditional cause of action first, "there would have been no question that the controversy was of a justiciable nature . . . ." *Id.*, at 243. Accordingly, the Act merely provided a different procedural tool that allowed the insurance company to bring an otherwise justiciable controversy before a federal court.

THOMAS, J., dissenting

We have also held that no controversy exists when a declaratory judgment plaintiff attempts to obtain a premature ruling on potential defenses that would typically be adjudicated in a later actual controversy. In *Coffman* v. *Breeze Corps.*, 323 U. S. 316 (1945), a patent owner brought a declaratory judgment action against his licensees seeking to have the Royalty Adjustment Act of 1942 declared unconstitutional and to enjoin his licensees from paying accrued royalties to the Government. This Court held that no case or controversy existed because the validity of the Royalty Adjustment Act would properly arise only as a defense in a suit by the patentholder against the licensees to recover royalties. *Id.*, at 323–324. Accordingly, the complaint at issue was "but a request for an advisory opinion as to the validity of a defense to a suit for recovery of the royalties." *Id.*, at 324. And the Court noted that "[t]he declaratory judgment procedure . . . may not be made the medium for securing an advisory opinion in a controversy which has not arisen." *Ibid.; see also Calderon* v. *Ashmus*, 523 U. S. 740, 747 (1998) (holding that a prisoner may not use a declaratory judgment action to determine the validity of a defense that a State might raise in a future habeas proceeding).

These principles apply with equal force in the patent licensing context. In *Altvater* v. *Freeman*, 319 U. S. 359, 365–366 (1943), the Court, quite unremarkably, held that a "licensee" had standing to bring a declaratory judgment counterclaim asserting the affirmative defense of patent invalidity in response to a patent infringement suit. But not to be mistaken, the *Altvater* Court expressly stated that "[t]o hold a patent valid if it is not infringed is to decide a hypothetical case." *Id.*, at 363. So too, in *Cardinal Chemical Co.* v. *Morton Int'l, Inc.*, 508 U. S. 83, 86 (1993), the affirmative defense of patent invalidity was raised as a counterclaim to a patent infringement suit. Although we held that a finding of noninfringement on

4          MEDIMMUNE, INC. *v.* GENENTECH, INC.

appeal did not moot a counterclaim alleging invalidity, *id.,* at 102–103, we stated that our holding was limited to the jurisdiction of an appellate court and reiterated that "[i]n the trial court, of course, a party seeking a declaratory judgment has the burden of establishing the existence of an actual case or controversy," *id.,* at 95.

## II

Against the foregoing background, the case before us is not a justiciable case or controversy under Article III.

### A

As a threshold matter, I disagree with the Court's characterization of this case as including a "contractual dispute." *Ante,* at 5. To substantiate this characterization, the Court points to a three-paragraph count in MedImmune's complaint entitled "*'DECLARATORY JUDGMENT ON CONTACTUAL RIGHTS AND OBLIGATIONS'*" and to MedImmune's broad allegations that "'its Synagis® product does not infringe any valid claim of the [Cabilly II] Patent.'" *Ante,* at 4. Nowhere in its complaint did MedImmune state why "sale[s] of its Synagis® product d[o] not infringe any valid claim of the [Cabilly II] Patent." App. 136.[1] Given the lack of specificity in the complaint, it is hardly surprising that the Court never explains what the supposed contract dispute is actually about. A fair reading of the amended complaint (and a review of the litigation thus far) shows that MedImmune's "contract count" simply posits that because the patent is invalid and unenforceable (as alleged in counts II and III), MedImmune is not bound by its contractual obligations. As the

---

[1] In addition, the fact that MedImmune did not identify anywhere in the record which provision of the contract was at issue suggests that there is no contractual provision to "be construed before or after breach." Advisory Committee's Notes on Fed. Rule Civ. Proc. 57, 28 U. S. C. App., pp. 790–791.

THOMAS, J., dissenting

Court admits, "the license requires [MedImmune] to pay royalties *until* a patent claim has been held invalid by a competent body . . . ." *Ante*, at 5 (emphasis in original). Thus, even assuming the existence of a cognizable contract claim, the validity of that claim hinges entirely upon a determination of the patent's validity, independent of any contractual question. As such, MedImmune's "contract claim" simply repackages its patent invalidity claim.

Probably for this reason, MedImmune has not pursued a contract claim at any level of the litigation. The District Court stated that the product that was the subject of the license, Synagis, was "covered by the patents at issue," App. 349–350, and MedImmune has never challenged that characterization. The Federal Circuit decided this case on the sole ground that a licensee in good standing may not bring a declaratory judgment action to challenge the validity of the underlying patent without some threat or apprehension of a patent infringement suit. See 427 F. 3d 958, 965 (2005). The question MedImmune presented in its petition for certiorari, which we accepted without alteration, says nothing about a contract claim. Neither does MedImmune's opening brief allege a contractual dispute. Even at oral argument, it was not MedImmune, but an *amicus*, that alleged there was a contract dispute at issue in this case. Tr. of Oral Arg. 21–22.

In short, MedImmune did not "rais[e] and preserv[e] a contract claim." *Ante*, at 6. In reaching a contrary conclusion, the Court states that its identification of a contract claim "probably makes no difference to the ultimate" outcome of this case. *Ante*, at 3. This may very well be true, if only because of the broad scope of the Court's holding.

### B

The facts before us present no case or controversy under Article III. When MedImmune filed this declaratory

6          MEDIMMUNE, INC. *v.* GENENTECH, INC.

THOMAS, J., dissenting

judgment action challenging the validity of the Cabilly II patent, it was under no threat of being sued by Genentech for patent infringement. This was so because MedImmune was a licensee in good standing that had made all necessary royalty payments. Thus, by voluntarily entering into and abiding by a license agreement with Genentech, MedImmune removed any threat of suit. See *ante,* at 9 (stating the threat of suit was "remote, if not nonexistent"). MedImmune's actions in entering into and continuing to comply with the license agreement deprived Genentech of any cause of action against MedImmune. Additionally, MedImmune had no cause of action against Genentech. Patent invalidity is an affirmative defense to patent infringement, not a freestanding cause of action. See 35 U. S. C. §§282(2)–(3). Therefore, here, the Declaratory Judgment Act must be something more than an alternative procedure for bringing on otherwise actual case or controversy before a federal court. But see *Aetna Life Ins.,* 300 U. S., at 240 ("[T]he operation of the Declaratory Judgment Act is procedural only").

Because neither Genentech nor MedImmune had a cause of action, MedImmune's prayer for declaratory relief can be reasonably understood only as seeking an advisory opinion about an affirmative defense it might use in some future litigation. MedImmune wants to know whether, if it decides to breach its license agreement with Genentech, and if Genentech sues it for patent infringement, it will have a successful affirmative defense. Presumably, upon a favorable determination, MedImmune would then stop making royalty payments, knowing in advance that the federal courts stand behind its decision. Yet as demonstrated above, the Declaratory Judgment Act does not allow federal courts to give advisory rulings on the potential success of an affirmative defense before a cause of action has even accrued. *Calderon,* 523 U. S., at 747 (dismissing a suit that "attempt[ed] to gain a litigation

THOMAS, J., dissenting

advantage by obtaining an advance ruling on an affirmative defense"); see also *Coffman*, 323 U. S., at 324 (rejecting use of the Declaratory Judgment Act as a "medium for securing an advisory opinion in a controversy which has not arisen"). MedImmune has therefore asked the courts to render "an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Ins.*, *supra*, at 241; see also *Public Serv. Comm'n of Utah* v. *Wycoff Co.*, 344 U. S. 237, 244 (1952) ("The disagreement must not be nebulous or contingent but must have taken on fixed and final shape . . ."). A federal court cannot, consistent with Article III, provide MedImmune with such an opinion.

Finally, as this Court has plainly stated in the context of a counterclaim declaratory judgment action challenging the validity of a patent, "[t]o hold a patent valid if it is not infringed is to decide a hypothetical case." *Altvater*, 319 U. S., at 363. Of course, MedImmune presents exactly that case. Based on a clear reading of our precedent, I would hold that this case presents no actual case or controversy.

### III

To reach today's result, the Court misreads our precedent and expands the concept of coercion from *Steffel*, 415 U. S. 452, to reach voluntarily accepted contractual obligations between private parties.

### A

The Court inappropriately relies on *Altvater*, which is inapplicable to this case for three reasons. First, in *Altvater*, the affirmative defense of patent invalidity arose in a declaratory judgment motion filed as a counterclaim to a patent infringement suit. See 319 U. S., at 360. Second, the opinion in *Altvater* proceeds on the understanding that no license existed. Both the District Court and the Court of Appeals had already held that the underlying license had been terminated prior to the filing of the case. *Id.*, at

365 ("Royalties were being demanded and royalties were being paid. But they were being paid . . . under the compulsion of an injunction decree"). Third, and related, though the one-time licensee continued to pay royalties, it did so under the compulsion of an injunction that had been entered in a prior case. *Ibid. Altvater* simply held that under the unique facts of that case, the Court of Appeals erred in considering the declaratory judgment counterclaim moot because the "involuntary or coercive nature of the exaction preserve[d] the right to recover the sums paid or to challenge the legality of the claim." *Ibid.*

*Cardinal Chemical Co.* v. *Morton Int'l, Inc.,* 508 U. S. 83 (1993), is similarly inapt here. In that case, as in *Altvater*, the defendant raised the affirmative defense of patent invalidity in a counterclaim to a patent infringement suit. 508 U. S., at 86. We specifically held that a finding of noninfringement on appeal did not moot a counterclaim alleging invalidity. *Id.,* at 102–103. But we stressed:

> "[T]he issue before us, therefore[,] concern[s] the jurisdiction of an intermediate appellate court—not the jurisdiction of a trial . . . court . . . . In the trial court, of course, a party seeking a declaratory judgment has the burden of establishing the existence of an actual case or controversy." *Id.,* at 95.

We went on to offer a hypothetical that showed a party could seek a declaratory judgment "[i]n patent litigation . . . even if the patentee has not filed an infringement action." *Ibid.* However, that hypothetical involved a patent-holder that threatened an infringement suit against a competitor (*not* a licensee) that continued to sell the allegedly infringing product and faced growing liability. In doing so, we hypothesized a situation that paralleled the facts in *Aetna Life Ins.:* The patentee had a cause of action against an alleged infringer and could have brought suit at any moment, and the declaratory judg-

THOMAS, J., dissenting

ment procedure simply offered the alleged infringer a
different method of bringing an otherwise justiciable case
or controversy into court.[2]

## B

The Court's more serious error is its extension of *Steffel*,
*supra*, to apply to voluntarily accepted contractual obliga-
tions between private parties. No court has ever taken
such a broad view of *Steffel*.

In *Steffel*, the Court held that in certain limited circum-
stances, a party's anticipatory cause of action qualified as
a case or controversy under Article III. Based expressly
on the coercive nature of governmental power, the Court
found that "it is not necessary that petitioner first expose
himself to *actual arrest* or *prosecution* to be entitled to
challenge a *statute* that he claims deters the exercise of his
constitutional rights." *Id.,* at 459 (emphasis added).
Limited, as it is, to governmental power, particularly the
power of arrest and prosecution, *Steffel* says nothing about
coercion in the context of private contractual obligations.
It is therefore not surprising that, until today, this Court
has never applied *Steffel* and its theory of coercion to
private contractual obligations; indeed, no court has ever
done so.[3]

The majority not only extends *Steffel* to cases that do

---

[2]Additionally, *Lear, Inc.* v. *Adkins*, 395 U. S. 653 (1969), has little to do
with this case. It addressed the propriety and extent of the common-law
doctrine of licensee estoppel, and the licensee in *Lear* had ceased making
payments under the license agreement—a fact that makes the case
singularly inapposite here. *Id.,* at 659–660. *Lear* did not involve the
Declaratory Judgment Act because the case was brought as a breach-of-
contract action for failure to pay royalties.

[3]Admitting that such decisions are "rare," *ante,* at 9, the Court cites
cases predating *Steffel* that hold that a court may construe contractual
provisions prior to breach. Those cases do not rely on the coercion
inherent in making contractual payments. See, *e.g., Keener Oil & Gas
Co.* v. *Consolidated Gas Util. Corp.*, 190 F. 2d 985, 989 (CA10 1951).

10          MEDIMMUNE, INC. *v.* GENENTECH, INC.

THOMAS, J., dissenting

not involve governmental coercion, but also extends *Steffel*'s rationale. If "coercion" were understood as the Court used that term in *Steffel*, it would apply only if Genentech had threatened MedImmune with a patent infringement suit *in the absence of a license agreement*. At that point, MedImmune would have had a choice, as did the declaratory plaintiff in *Steffel*, either to cease the otherwise protected activity (here, selling Synagis) or to continue in that activity and face the threat of a lawsuit. But MedImmune faced no such choice. Here, MedImmune could continue selling its product without threat of suit because it had eliminated any risk of suit by entering into a license agreement. By holding that the voluntary choice to enter an agreement to avoid some other coerced choice is itself coerced, the Court goes far beyond *Steffel*.

The majority explains that the "coercive nature of the exaction preserves the right . . . to challenge the legality of the claim." *Ante*, at 12 (internal quotation marks omitted). The coercive nature of what "exaction"? The answer has to be the voluntarily made license payments because there was no threat of suit here. By holding that contractual obligations are sufficiently coercive to allow a party to bring a declaratory judgment action, the majority has given every patent licensee a cause of action and a free pass around Article III's requirements for challenging the validity of licensed patents. But the reasoning of today's opinion applies not just to patent validity suits. Indeed, today's opinion contains no limiting principle whatsoever, casting aside Justice Stewart's understanding that *Steffel*'s use would "be exceedingly rare." 415 U. S., at 476 (concurring opinion).

For the foregoing reasons, I respectfully dissent.