**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MERCK & CO., INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-230 (GMS) |
| | ) | |
| APOTEX, INC. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |

**APOTEX INC.'S RESPONSE TO MERCK'S MOTION TO STAY
FURTHER PROCEEDINGS PENDING RESOLUTION OF ITS MOTION
TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

OF COUNSEL:

A. Sidney Katz
Robert B. Breisblatt
Louise T. Walsh
Michael Krol
Welsh & Katz, Ltd.
120 S. Riverside Plaza, 22nd Floor
Chicago, Illinois 60606
Tel:    (312) 655-1500
Fax:    (312) 655-1501


Dated: February 8, 2007
776917 / 20234

Richard L. Horwitz (#2246)
Kenneth L. Dorsney (#3726)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P. O. Box 951
Wilmington, DE 19899
Tel:  (302) 984-6000
rhorwitz@potteranderson.com
kdorsney@potteranderson.com

*Attorneys for Defendant Apotex, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

I.     INTRODUCTION ..................................................................................................1

II.    ARGUMENT..........................................................................................................2

       A.    The Standards Regarding Ordering A Stay .................................................2

       B.    Apotex Will Be Severely Prejudiced By A Stay In This
             Case..............................................................................................................3

       C.    The Chances That The Court Will Grant Merck's Motion
             To Dismiss Are Remote In Light Of The Supreme Court's
             Recent Decision In MedImmune .................................................................8

       D.    The Hardship On Merck If A Stay Is Denied Is Minimal..........................11

III.   CONCLUSION......................................................................................................14

i

# TABLE OF AUTHORITIES

## CASES

*Aetna Life Insurance Co. v. Haworth,*
    300 U.S. 227 (1937).............................................................................................9

*Altvater v. Freeman,*
    319 U.S. 359 (1943).............................................................................................9

*Apotex, Inc. v. FDA,*
    449 F.3d 1249 (D.C. Cir. 2006).....................................................................4, 5

*Chavous v. D.C. Finance Responsibility  & Management Assistance Authority,*
    201 F.R.D. 1 (D.D.C. 2001)...............................................................................7

*Coca-Cola Bottling Co. of the Lehigh Valley v. Grol,*
    1993 WL 13139559 (E.D. Pa. Mar. 8, 1993)...............................................3, 8

*Continental Illinois Bank & Trust Co. v. Caton,*
    130 F.R.D. 145 (D. Kan. 1990).........................................................................13

*Conoco, Inc. v. Skinner,*
    1991 WL 317019 (D. Del. Nov. 12, 1991) .....................................................7

*Cost Brothers, Inc. v. Travelers Indemnity Co.,*
    760 F.2d 58 (3d Cir. 1985)................................................................................2

*Feldman v. Flood,*
    176 F.R.D. 651 (M.D. Fla. 1997)..................................................................3, 8

*Maryland Casualty Co. v. Pacific Coal & Oil Co.,*
    312 U.S. 270 (1941).......................................................................................9, 10

*MedicalImmune, Inc. v. Genetech, Inc.,*
    427 F.3d 958 (Fed. Cir. 2005).................................................................. *passim*

*MedicalIumme, Inc. v. Genetech, Inc.,*
    549 U.S. __ (2007)........................................................................................5, 8

*Minnesota Mining and Manufacturing Co. v. Barr Laboratories, Inc.,*
    289 F.3d 775 (Fed. Cir. 2002)...........................................................................4

*Nike Inc. v. Wolverine World Wide, Inc.,*
    43 F.3d 644 (Fed. Cir. 1994).............................................................................12

*Pegasus Development Corp. v. DirecTV, Inc.,*
    2003 WL 21105073 (D. Del. May 14, 2003)..............................................................2

*People With Aids Health Group v. Burroughs Wellcome Co.,*
    1991 WL 221179 (D.D.C. Oct. 11, 1991) ...........................................................3

*SmithKline Beecham Corp. v. Geneva Pharmaceuticals, Inc.,*
    210 F.R.D. 547 (E.D. Pa. 2002)...........................................................................4

*Super Sack v. Chase,*
    57 F.3d 1054 (Fed. Cir. 1995)..................................................................8, 9, 11

*Teva Pharmaceuticals USA, Inc. v. Pfizer, Inc.,*
    395 F.3d 1324 (Fed. Cir. 2005) *reh'g and reh'g en banc denied,*
    405 F.3d 990 (Fed. Cir. 2005), *and cert. denied,* 126 S. Ct. 473 (2005).......................5

*Teva Pharmaceuticals, USA, Inc. v. United States Food and Drug Administration,*
    182 F.3d 1003 (D.D.C. 1999) .............................................................................4

*Twin City Fire Insurance Co. v. Employers Insurance Of Wausau,*
    124 F.R.D. 652 (D. Nev. 1989)...........................................................................3

*United Sweetner USA, Inc. v. Nutrasweet Co.,*
    766 F. Supp. 212 (D. Del. 1991)..........................................................................2

*Wilson Sporting Goods Co. v. David Geoffrey & Associates,*
    904 F.2d 677 (Fed. Cir. 1900).............................................................................12

*Zoetics, Inc. v. Yahoo!, Inc.,*
    2006 WL 1876912 (D. Del. July 6, 2006) ...........................................................2

## FEDERAL STATUTES

21 U.S.C. § 355(j)(5)(B)(iv) ........................................................................................4

35 U.S.C. § 271(e)(5)..................................................................................................6

Fed. R. Civ. P. 30(b)(6)...............................................................................................13

## I.    INTRODUCTION

Apotex, Inc. ("Apotex") opposes Merck & Co., Inc.'s ("Merck's") motion to stay further proceedings pending a ruling on its motion to dismiss for lack of subject matter jurisdiction. Merck's motion to stay the proceedings is really a motion to stay discovery since it is directed mainly to having to respond to Apotex's interrogatories and to producing its witnesses for deposition. It is also virtually identical to the motion to stay discovery that Merck withdrew after filing it in contravention of the Court's discovery dispute procedure. Merck continues to refuse to provide the basis for their infringement claims, the same issue the Court addressed in the November 3, 2006 teleconference and that will be addressed again in the February 9, 2007 teleconference. Instead of answering Apotex's interrogatories, Merck seeks to stay the proceedings. However, Merck has not satisfied its burden to show that a stay is justified.

Contrary to Merck's assertions, Apotex will be severely prejudiced by a stay in this case. The longer Merck can prevent a final decision on the merits in favor of Apotex, the longer Merck can delay Apotex's entry into the market for generic alendronate. On the other hand, if Apotex obtains a final, nonappealable decision of invalidity and/or noninfringement prior to the date that the first generic filer for alendronate enters the market (which can be no earlier than February 6, 2008), then Apotex as well as all other secondary generic filers can enter the market sooner than they would be able to otherwise.

Moreover, Merck's claim that Apotex is merely attempting to manufacture a case or controversy by serving discovery and demanding that Merck provide proper responses is nonsense. Fact discovery in this case is set to close on February 20, 2007. (D.I. 18)

Apotex is simply attempting to complete the discovery it is entitled to before that date. Merck is being obstinate because it wants to delay this case as much as possible.

Apotex has timely served discovery on Merck. Apotex also timely served its expert reports on February 5, 2007, the date set forth in the Scheduling Order for disclosure of initial expert reports (D.I. 18). There is no reason that the current schedule cannot be adhered to. Merck's complaint of inconvenience resulting from the few depositions noticed by Apotex does not constitute a hardship that justifies a stay in these proceedings, especially when weighed against the severe prejudice to Apotex caused by such a delay. Merck's motion to stay the proceedings must therefore be denied.

## II.    ARGUMENT

### A.    The Standards Regarding Ordering A Stay

The decision to stay a case is within the Court's discretion. *See Pegasus Dev. Corp. v. DirecTV, Inc.*, 2003 WL 21105073, at *1 (D. Del. May 14, 2003) (Ex. A hereto) (citing *Cost Bros., Inc. v. Travelers Indem. Co.*, 760 F.2d 58, 60 (3d Cir. 1985)). In determining whether a stay is appropriate, the Court should consider the following factors: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set." *Id.* (quoting *Xerox Corp. v. 3 Comm Corp.*, 69 F. Supp. 2d 404, 406 (W.D.N.Y. 1999)); *see also Zoetics, Inc. v. Yahoo!, Inc.*, 2006 WL 1876912, at *1 (D. Del. July 6, 2006) (using same test) (Ex. B hereto); *United Sweetner USA, Inc. v. Nutrasweet Co.*, 766 F. Supp. 212, 217 (D. Del. 1991) (similarly considering "the possible damage, hardship and inequities to the parties to the lawsuit" in determining whether to grant a stay).

"Motions to stay discovery are not favored because when discovery is delayed or prolonged it can create case management problems which impede the court's responsibility to expedite discovery and cause unnecessary litigation expenses and problems." *Coca-Cola Bottling Co. of the Lehigh Valley v. Grol*, 1993 WL 13139559, at *2 (E.D. Pa. Mar. 8, 1993) (Ex. C hereto). The party seeking to stay discovery has the burden of showing that the stay is justified. *See People With Aids Health Group v. Burroughs Wellcome Co.*, 1991 WL 221179, at *1 (D.D.C. Oct. 11, 1991) (Ex. D hereto); *Twin City Fire Ins. Co. v. Employers Ins. Of Wausau*, 124 F.R.D. 652, 653 (D. Nev. 1989) ("the burden is on the party seeking relief to show some plainly adequate reason for the order…[A] pending motion to dismiss is not ordinarily a situation that in and of itself would warrant a stay of discovery"); *Feldman v. Flood*, 176 F.R.D. 651, 652 (M.D. Fla. 1997) (moving party on a motion to stay discovery bears the burden of showing good cause and reasonableness). In the present case, Merck has not satisfied its burden to show that a stay in the proceedings is warranted.

### B.    Apotex Will Be Severely Prejudiced By A Stay In This Case

Contrary to Merck's assertions, Apotex will be severely prejudiced by a stay in this case. As discussed more fully in Apotex's briefs in connection with Merck's motion to dismiss, the Hatch-Waxman scheme provides an incentive to the first generic to file a Paragraph IV certification by allowing that first filer 180 days of market exclusivity.[1] That exclusivity is not sacrosanct, however, and was never intended by Congress to be inviolate.

---

[1] Apotex understands that it filed its ANDA for alendronate after at least one other generic filed an ANDA for alendronate.

Indeed, the statute provides that the 180-day exclusivity period of the first generic filer can be triggered by the earlier of (1) the first generic's entry into the market; or (2) a decision by the court finding that the patent or patents listed in the Orange Book are either invalid or not infringed. *See* 21 U.S.C. § 355(j)(5)(B)(iv). The "court decision" triggering event can be generated in a lawsuit with any generic filer, not just the first generic filer. *See SmithKline Beecham Corp. v. Geneva Pharms., Inc.*, 210 F.R.D. 547, 554 (E.D. Pa. 2002) (denying first generic filer's attempt to intervene in case to prevent court decision that might have triggered its 180-day exclusivity before it could enter the market; "it is clear that [the first generic filer's] exclusivity period can be triggered by the termination of an action commenced by a subsequent applicant"); *Minn. Mining and Mfg. Co. v. Barr Labs., Inc.*, 289 F.3d 775, 780 (Fed. Cir. 2002); *Teva Pharms., USA, Inc. v. United States Food and Drug Admin.*, 182 F.3d 1003, 1005 n. 3 (D.D.C. 1999) ("As interpreted by the FDA, the statute does not guarantee the first ANDA applicant a 180-day period of exclusivity. The court-decision trigger can be activated by any subsequent ANDA applicant's litigation whether or not the first applicant has enjoyed a period of exclusivity."). Thus, Apotex can trigger the first generic filer's 180-day exclusivity period if it obtains a court decision finding that the patents listed by Merck are either invalid or not infringed. There is nothing illegal or improper in Apotex's doing so; rather, Apotex's attempt to obtain a triggering event is fully provided for in the statute.

Merck's contention that Apotex is engaged in a pattern of "gaming" or circumvention of the Hatch-Waxman Act is false. Merck mischaracterizes the holding in *Apotex, Inc. v. FDA*, 449 F.3d 1249 (D.C. Cir. 2006). The D.C. Circuit did not state that the Hatch-Waxman Act does not entitle Apotex to a "triggering" event against another

generic's 180-day exclusivity, as Merck contends. In *Apotex*, the court held that the FDA's interpretation of a court decision triggering event, which required an actual holding evidenced by language on the face of the court's decision showing that the determination of invalidity, noninfringement, or unenforceability had been made by the court, was not arbitrary and capricious. In so holding, the court rejected Apotex's argument that the "FDA's interpretation 'nullifies' the declaratory judgment mechanism underlying the Hatch-Waxman Act...[because] no generic manufacturer can maintain an action against a patent holder who has promised never to sue for infringement since, under settled Federal Circuit law, any such promise would relieve the challenger of a reasonable apprehension of suit." *Apotex*, 449 F.3d at 1253.

The "settled Federal Circuit law" referred to was the Federal Circuit's "reasonable apprehension of suit" test for determining whether there is subject matter jurisdiction under the Declaratory Judgment Act. However, in light of the Supreme Court's recent decision in *MedIumme, Inc. v. Genetech, Inc.*, 549 U.S. __ (2007) (Ex. E hereto), the Federal Circuit's cases holding that a generic manufacturer who has not been sued cannot maintain a declaratory judgment action because it has no reasonable apprehension of suit, *e.g.*, *Teva Pharmaceuticals USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324 (Fed. Cir. 2005), *reh'g and reh'g en banc denied*, 405 F.3d 990 (Fed. Cir. 2005), *and cert. denied*, 126 S. Ct. 473 (2005), are no longer good law. Now that generic manufacturers are freed from the straight-jacket imposed by the Federal Circuit's "reasonable apprehension of suit" test, the anomalous situation Apotex referred to should not occur. The generic manufacturer should be able to bring a declaratory judgment action as Congress intended when it added 35 U.S.C. § 271(e)(5) to the patent statute, which provided that courts shall

5

have subject matter jurisdiction "to the extent consistent with the Constitution," notwithstanding whether the generic manufacturer has a "reasonable apprehension of suit."[2]

If Apotex can obtain a final, nonappealable court decision prior to the date the first generic filer enters the market, it can cut short the first generic filer's 180 day exclusivity period. The earliest date that the first generic filer can enter the market is February 6, 2008, when Merck's patent on the active ingredient, and its related FDA exclusivity, expires.[3] Thus, if the court decision were to occur by August 6, 2007, Apotex, as well as all other secondary generic filers, could enter the market on February 6, 2008, the same date as the first filers can enter the market. If the court decision occurs after August 6, 2007, the 180-day exclusivity period can still be shortened, as long as the court decision trigger occurs before the first generic enters the market.[4]

---

[2] Notably, Apotex's complaint against Glaxo (attached as Exhibit B to Merck's motion) was filed after the Supreme Court's decision in *MedImmune*. The Federal Circuit undoubtedly will have to reexamine whether a declaratory judgment action by a generic manufacturer who has not been sued within 45 days should be dismissed for lack of subject matter jurisdiction. Furthermore, the allegations cited by Merck in the *Glaxo* complaint are not inconsistent with anything Apotex has said in the present case. The allegations Merck cites (¶¶ 68 and 69) merely imply that without a covenant not to sue, Apotex is at risk of potentially catastrophic infringement damages. A covenant not to sue would still not protect Apotex's customers, nor would it constitute a triggering event.

[3] Merck's patent on alendronate, U.S. Pat. No. 4,621,077 ("the '077 patent"), the active ingredient in Fosamax, is set to expire on August 6, 2007, but Merck has an additional FDA exclusivity until February 6, 2008.

[4] There is no guarantee that the first generic will enter the market on February 6, 2008. Indeed, just last summer Merck filed lawsuits against Teva Pharmaceuticals USA, Inc. ("Teva") (Civil Action No. 2:06-cv-2484 (D.N.J.)) and Barr Laboratories, Inc. ("Barr") (Civil Action No. 2:06-cv-2486 (D.N.J.)), believed to be the first generic filers, and filed a complaint with the ITC (*In the Matter of Certain Alendronate Salts and Products Containing Same*, Inv. No. 337-TA-584) against an entity believed to be Teva's supplier of the active ingredient in alendronate, in order to keep Teva and Barr from entering the

Thus, the timing of this case is imperative to Apotex, and its ability to obtain a court decision trigger will be severely hampered if this case is delayed. Merck, on the other hand, has a strong interest in delaying this case. If Merck is successful in avoiding such a decision on the merits, it will ensure that it will only have to compete against the first generic filers during the entire 180 day exclusivity period and prices for alendronate will be maintained higher than if Apotex and the other secondary generic filers entered the market. And, if Merck is successful in its actions to delay Teva's and Barr's entry into the market, Merck can maintain its monopoly on alendronate well beyond February 6, 2008. Thus, Apotex will be severely prejudiced by a stay because it would delay Apotex's entry into the market.

Apotex will also be at a tactical disadvantage if this case is delayed in terms of its expert disclosures. Apotex served expert reports for two experts on February 5, 2007, pursuant to the scheduling order.[5] These reports pertain to the invalidity of certain of Merck's patents. Merck did not make any expert disclosures on February 5, 2007. Pursuant to the scheduling order, rebuttal expert reports are due on March 5, 2007. If the Court grants Merck's motion to stay the proceedings, Merck will have an extended period in which to respond to Apotex's initial expert reports.

The cases relied on by Merck are distinguishable. In *Conoco, Inc. v. Skinner*, 1991 WL 317019, at *2 (D. Del. Nov. 12, 1991) (Ex. F hereto) and *Chavous v. D.C. Fin.*

---

market. (*See* Apotex's Reply In Support Of Its Motion For Leave To File Surreply, at pp. 8-9, (D.I. 31)).

[5] According to the scheduling order, expert reports by the party that has the burden of proof on an issue were due February 5, 2007 and rebuttal expert reports are due on March 5, 2007. *See* Scheduling Order (D.I. 18).

*Responsibility & Mgmt. Assistance Auth.*, 201 F.R.D. 1, 4 (D.D.C. 2001), for example, the plaintiffs failed to demonstrate any prejudice resulting from staying the case.

> **C.     The Chances That The Court Will Grant Merck's Motion To Dismiss Are Remote In Light Of The Supreme Court's Recent Decision In *MedImmune***

In deciding whether to stay discovery (or the proceedings in general), the Court must balance the harm produced by a delay in discovery against the possibility that the motion will be granted and entirely eliminate the need for such discovery. *See Feldman*, 176 F.R.D. at 652; *see also Coca-Cola Bottling Co. of the Lehigh Valley*, 1993 WL 13139559, at *2. (Ex. C) As discussed above, the harm to Apotex due to a delay is substantial. On the other hand, the chances that the Court will grant Merck's motion to dismiss are remote in light of the Supreme Court's recent decision in *MedIumme, Inc. v. Genetech, Inc.*, 549 U.S. __ (2007).

Merck fails to mention the *MedImmune* decision at all in its motion. Instead, it continues to rely on *Super Sack v. Chase*, 57 F.3d 1054 (Fed. Cir. 1995) in arguing that its covenant not to sue removes any justiciable controversy. Such reliance is misplaced in light of *MedImmune*.

In *Super Sack*, the Federal Circuit applied its "reasonable apprehension of suit" test in affirming the district court's finding that there was no actual controversy under Article III as a result of Super Sack's promise not to sue Chase because Chase "can have no reasonable apprehension that it will face an infringement suit." *Super Sack*, 57 F.3d at 1059.

The Supreme Court rejected the "reasonable apprehension of suit" test in *MedImmune*. In *MedImmune*, the Supreme Court held "that [a licensee] was not required, insofar as Article III is concerned, to break or terminate its 1997 license agreement before

8

seeking a declaratory judgment that the underlying patent is invalid, unenforceable or not infringed." *MedImmune*, slip op. at 18. The Federal Circuit erred in affirming the dismissal of the action for lack of subject matter jurisdiction, which dismissal was based upon the finding that there was no "reasonable apprehension of suit" since the licensee had not ceased paying royalties under the license agreement. *Id.*; *see also MedImmune, Inc. v. Genetech, Inc.*, 427 F.3d 958, 962 (Fed. Cir. 2005) ("MedImmune concedes that it is free of apprehension of suit").

In reversing the Federal Circuit's decision, the Supreme Court necessarily held that a "reasonable apprehension of suit" is not an Article III jurisdictional requirement. The Supreme Court never contradicted the fact that MedImmune could not reasonably expect to be sued as long as it continued to pay the royalties. Nonetheless, the dispute over the validity, infringement or unenforceability was sufficient to satisfy the actual case or controversy requirement for Article III.

The Supreme Court also rejected the "reasonable apprehension" test outright because it was inconsistent with prior Supreme Court authority, including *Altvater v. Freeman*, 319 U.S. 359 (1943), *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941), and *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239 (1937). *See MedImmune*, slip op. at 13 n.11. Accordingly, Merck's reliance on *Super Sack*, which relied on the "reasonable apprehension" test, is misplaced.

While the Supreme Court did not enunciate a bright line test for determining whether a declaratory judgment action satisfies the case or controversy requirements of Article III, its prior cases have required that the dispute be "definite and concrete, touching the legal relations of parties having adverse legal interests;" and that it be "real

9

and substantial" and "admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *MedImmune*, slip op. at 7-8. Also, citing *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941), the Court summarized the test as follows: "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* at 8.

In its briefs in connection with Merck's motion to dismiss, Apotex demonstrated that there is a substantial controversy between the parties, that the parties have adverse legal interests, and that the controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

The controversy is over whether Merck's listed patents are valid and/or infringed. This is a real controversy that is not made moot by Merck's covenant not to sue because as it stands now, the covenant not to sue would not constitute a court decision triggering event. In its covenant not to sue, Merck declined to admit that its patents were invalid and/or not infringed. Additionally, in its responses to Apotex's requests to admit, Merck declined to admit that its patents were invalid and/or not infringed. Thus, there is an actual controversy as to whether Merck's patents are invalid and/or not infringed.

Moreover, the covenant not to sue does not protect Apotex's customers. Merck's assertion that it cannot assert a claim of infringement against Apotex's product that is the subject of its ANDA is false because there is nothing in the covenant not to sue that

10

precludes Merck from suing Apotex's customers, *i.e.*, the wholesalers and retailers of Apotex's alendronate.

There is also a controversy as to whether Apotex is entitled to a court decision finding the patents invalid and/or not infringed. Because this is a Hatch-Waxman case, the validity and/or infringement of Merck's patents have significance beyond simply whether Apotex might be liable for infringement. A decision on the validity and/or infringement of Merck's patents has an impact on when Apotex might enter the market for generic alendronate. Such a consideration is not present in a traditional infringement case, such as *Super Sack*.

In light of the Supreme Court's decision in *MedImmune*, the possibility of the Court granting Merck's motion to dismiss and thus eliminating the need for the discovery Apotex seeks is slight at best and is far outweighed by the harm to Apotex if this case is delayed.

### D.     The Hardship On Merck If A Stay Is Denied Is Minimal

Merck also contends that the discovery sought by Apotex prejudices Merck and would burden the individuals that Apotex seeks to depose. These arguments have no merit.

Merck contends it will be prejudiced if it has to respond to discovery because it will be forced to take affirmative positions on infringement that are precluded by its covenant not to sue. This is nonsense.

In Apotex's first set of requests to admit and first set of interrogatories, Apotex asked Merck to admit that Apotex did not infringe Merck's patents and if it did not so admit, to state why it contended that Apotex's ANDA product infringed Merck's patents. Merck denied Apotex's requests to admit and basically refused to answer Apotex's

interrogatories. During the teleconference with the Court on November 3, 2006, the Court ordered Merck to supplement its response to Apotex's interrogatories. (*See* Transcript from November 3, 2006, at 21-22, Ex. G hereto). Merck did so, identifying the claims it contended were infringed by Apotex's ANDA and stating that the elements in the claims were either directly met or met under the doctrine of equivalents. Merck did not elaborate further.

On December 29, 2006, Apotex served a second set of interrogatories asking Merck, *inter alia*, (1) to provide hypothetical claims as set forth in *Wilson Sporting Goods Co. v. David Geoffrey & Associates*, 904 F.2d 677 (Fed. Cir. 1900) for each claim of each patent asserted under the doctrine of equivalents (No. 13); (2) to explain in detail how Apotex's ANDA product infringes under the doctrine of equivalents (No. 14); and for each claim asserted under the doctrine of equivalents to identify each element and provide Merck's construction of those elements, both for the literal elements and the scope of the allowable equivalents (No. 17).

Apotex is entitled to know why Merck contends that it infringes under the doctrine of equivalents. Merck has offered no real reason for its refusal to answer. The Court should order Merck to answer and if Merck refuses to elaborate on its basis for asserting infringement under the doctrine of equivalents, it should be precluded from asserting it. *See Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 648-49 (Fed. Cir. 1994).

Similarly, Merck has failed to demonstrate any hardship resulting from the depositions Apotex seeks. In a letter to Merck's counsel dated January 23, 2007 (nearly a month prior to the close of fact discovery), Apotex asked Merck for available dates for all

ten inventors of the patents in suit.[6] Merck did not provide any dates in response. In the interest of completing the depositions prior to February 20, 2007, Apotex has only served four deposition notices, one inventor from each of the three categories plus one extra since the '726/'207 patent group has four inventors. Apotex also intends on serving a deposition notice pursuant to Fed. R. Civ. P. 30(b)(6).[7] These depositions can hardly be burdensome to Merck. *See Continental Illinois Bank & Trust Co. v. Caton*, 130 F.R.D. 145, 148 (D. Kan. 1990) ("bare assertions that discovery will be unduly burdensome or that it should be stayed pending dispositive motions that will probably be sustained, are insufficient to justify the entry of an order staying discovery generally.").

Merck has not justified its claimed hardship or prejudice due to having to respond to Apotex's interrogatories or producing its witnesses for deposition.[8] Merck's claim that Apotex has already received substantial discovery is totally false. Merck has provided next to nothing. It contends that Apotex infringes certain elements of certain claims under the doctrine of equivalents but then refuses to explain the basis for its contentions.

---

[6] The nine patents in suit can be grouped into three categories; the inventors are the same for the patents in each category. However, there are also multiple inventors for each category. Thus, there are a total of ten (10) different inventors: three for the '329, '801 and '294 patents; four for the '726 and '207 patents; and three for the '941, '004, '410, and '590 patents.

[7] Merck suggests that Apotex should wait until it reviews the depositions of Merck's witnesses who have been deposed in its prior cases. However, Merck failed to provide copies of such depositions, even though they are responsive to Apotex's first set of document requests that were due on January 29, 2007; instead Merck offered to make its documents available for inspection. Merck has only recently agreed to provide copies of the deposition transcripts but the logistics are still being worked out.

[8] Curiously, Merck has represented that it will proceed with the inspection and production of its documents by Apotex, the volume of which appears to easily exceed 1 million pages.

### III.    CONCLUSION

For the foregoing reasons, Merck's motion to stay further proceedings pending resolution of its motion to dismiss for lack of subject matter jurisdiction should be denied.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

A. Sidney Katz
Robert B. Breisblatt
Louise T. Walsh
Michael Krol
Welsh & Katz, Ltd.
120 S. Riverside Plaza, 22nd Floor
Chicago, Illinois 60606
Tel:    (312) 655-1500
Fax:    (312) 655-1501


Dated: February 8, 2007
776917 / 20234

By:    /s/ Kenneth L. Dorsney
     Richard L. Horwitz (#2246)
     Kenneth L. Dorsney (#3726)
     Hercules Plaza, 6th Floor
     1313 N. Market Street
     P. O. Box 951
     Wilmington, DE 19899
     Tel:  (302) 984-6000
     rhorwitz@potteranderson.com
     kdorsney@potteranderson.com

*Attorneys for Defendant Apotex, Inc.*

14

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

## CERTIFICATE OF SERVICE

I, Kenneth L. Dorsney, hereby certify that on February 8, 2007, the attached document

was hand delivered on the following person and was electronically filed with the Clerk of the

Court using CM/ECF which will send notification to the registered attorney(s) of record that the

document has been filed and is available for viewing and downloading.

Mary B. Graham
James W. Parrett, Jr.
Morris, Nichols, Arsht & Tunnell, LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347


I hereby certify that on February 8, 2007, I have Electronically Mailed the attached

document to the following:

John F. Lynch
Howrey, LLP
750 Bering Drive
Houston, TX  77057-2198
lynchj@howrey.com

Nicolas G. Barzoukas
Suzy S. Harbison
Jason C. Abair
Weil, Gotshal & Manges
700 Louisiana, Suite 1600
Houston, TX  77002
nicolas.barzoukas@weil.com
suzy.harbison@weil.com
jason.abair@weil.com

I hereby certify that on February 8, 2007, I have Federal Expressed the attached

document to the following non-registered participants:

Paul D. Matukaitis
Merck & Co., Inc.
One Merck Drive
Whitehouse Station, NJ  08889-0100

Edward W. Murray
Gerard M. Devlin
Merck & Co., Inc.
126 E. Lincoln Avenue RY28-320
Rahway, NJ  07065-0907


*/s/ Kenneth L. Dorsney*
Richard L. Horwitz
Kenneth L. Dorsney
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE  19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
kdorsney@potteranderson.com

728942/30234

# EXHIBIT A



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21105073 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Pegasus Development Corp. v. Directv, Inc.D.Del.,2003.Only the Westlaw citation is currently available.

United States District Court,D. Delaware.
PEGASUS DEVELOPMENT CORPORATION and
Personalized Media Communications, L.L.C.,
Plaintiffs
v.
DIRECTV, INC., Hughes Electronics Corporation,
Thompson Consumer Electronics, Inc., and Philips
Electronics North America Corporation, Defendants.
**No. Civ.A. 00-1020-GMS.**

May 14, 2003.

*MEMORANDUM AND ORDER*
SLEET, J.
**\*1 AND RELATED COUNTERCLAIMS**

I. INTRODUCTION

On December 4, 2000, Pegasus Development Corporation ("Pegasus") and Personalized Media Communications, L.L.C. ("PMC") filed a complaint against several defendants, alleging infringement of six patents, including U.S. Patent Nos. 4,965,825 ("the '825 patent") and 5,335,277 ("the '277 patent"). Since that time, the original scheduling order has been revised several times. Currently, fact discovery is scheduled to close on August 22, 2003, and a trial is scheduled for February of 2004.

On February 4, 2003 and March 14, 2003, respectively, the defendant Thomson Consumer Electronics, Inc. ("Thomson") filed with the Patent and Trademark Office ("PTO") a request for *ex parte* reexaminations of the '825 and '277 patents. The request for reexamination of the '825 patent was granted on April 10, 2003.$^{FN1}$ Presently before the court is a joint motion by the defendants to stay the litigation pending the completion of the patent reexaminations (D.I.459). After careful consideration of the parties' submissions, and for the reasons detailed below, the court will grant the motion.

FN1. The court is not yet aware of a decision by the PTO regarding reexamination of the '277 patent.

II. DISCUSSION

The decision to stay a case is firmly within the discretion of the court. *Cost Bros., Inc. v. Travelers Indem. Co.,* 760 F.2d 58, 60 (3d Cir.1985). This authority applies equally to patent cases in which a reexamination by the PTO has been requested. *Ethicon, Inc. v. Quigg,* 849 F.2d 1422, 1426-27 (Fed.Cir.1988) ("Courts have inherent power to manage their dockets and stay proceedings, including the authority to order a stay pending conclusion of a PTO reexamination.") (internal citation omitted); *see also Emhart Indus. v. Sankyo Seiki Mfg.,* 3 U.S.P.Q.2d 1889, 1890 (N.D.Ill.1987) ("[I]n passing the legislation establishing the reexamination proceeding, Congress stated its approval of district courts liberally granting stays within their discretion."); *Gould v. Control Laser Corp.,* 705 F.2d 1340, 1342 (Fed.Cir.1983) (citing legislative history of reexamination statute). In determining whether a stay is appropriate, the court is guided by the following factors: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set." *Xerox Corp v. 3 Comm Corp.,* 69 F.Supp.2d 404, 406 (W.D.N.Y.1999) (citing cases); *cf. United Sweetner USA, Inc. v. Nutrasweet Co.,* 766 F.Supp. 212, 217 (D.Del.1991) (stating a similar test).

In this case, there are two plaintiffs, four defendants, and several counter claimants, as well as six patents comprising dozens of claims. In addition, the written submissions in this case have been particularly voluminous; the briefing on claim construction alone, for example, constitutes 576 pages. *See* Report and Recommendation of Special Master Regarding Claim Construction at 2 (citing "copious briefing"). In these ways, the present suit is quite complex, although, perhaps, not extraordinarily so. The greater context of this suit is extraordinary, however: the plaintiffs have

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21105073 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

filed more than 300 related patent applications based upon an original patent application filed in 1981 and supplemented in 1987. Together, these applications contain an estimated 10,000 claims. Furthermore, as observed by the Special Master appointed in this case, the 1987 application alone constitutes over 300 columns of patent text and "is, by any measure, an extremely complex document." *Id.* at 2. These related applications may become relevant to the present case in respect to several issues including claim construction, enablement, adequacy of written description, indefiniteness, and inequitable conduct. *See id.* at 21. Thus, in this case, more than many, the court would benefit from a narrowing of the issues.

**\*2** The reexamination process will serve this purpose. For example, the court will gain the benefit of the PTO's particular expertise, in that all prior art presented to the court will have been first considered by that agency. *See Braintree Laboratories, Inc. v. Nephron-Tech, Inc.,* 1997 WL 94237, at \*9 (D.Kan.1997); *Hamilton Indus., Inc. v. Midwest Folding Products Mfg.,* 1990 WL 37642, at \*1-2 (N.D.Ill.1990). Other potential efficiencies resulting from the reexamination process are numerous: (1) many discovery problems relating to the prior art may be alleviated; (2) the record of the reexamination likely would be entered at trial, reducing the complexity and length of the litigation; (3) the issues, defenses, and evidence will be more easily limited in pre-trial conferences following a reexamination; (4) the outcome of the reexamination process may encourage a settlement without further involvement of the court; and (5) if the patent is declared invalid, the suit likely will be dismissed as to that patent. *Id.* These efficiencies will result in a reduced cost of litigation for the parties and more effective utilization of the limited resources of the court. *Id.*

Thus, a stay may result in a simplification or reduction of issues for the court's consideration, or it may dispense with the litigation entirely. These are considerable economies indeed, particularly in this case. Given the involved prosecution history of the various patents-in-suit and hundreds of related patents, the number of claim terms at issue, the inordinate amount of prior art references, and the PTO's conclusion that all of the challenged claims warrant reexamination,

the court finds particular merit in permitting an additional layer of review by the PTO before expending further judicial resources. *See Digital Magnetic Systems, Inc. v. Ainsley,* 213 U.S.P.Q. 290, 290 (W.D.Okla.1982)* ("Congress enacted the reexamination procedure to provide an inexpensive, expedient means of determining patent validity which, if available and practical, should be deferred to by the courts."); *Softview Computer Products Corp. v. Haworth, Inc.,* 2000 WL 1134471, at \*3 (S.D.N.Y.2000) ("[T]he grant of a stay will maximize the likelihood that neither the Court nor the parties expend their assets addressing invalid claims."). Furthermore, the court notes that discovery is not complete, and the trial, although scheduled, is some nine months in the future. In light of all these factors, and considering that the reexamination process will proceed "with special dispatch," 35 U.S.C. 305, the court concludes that a stay is the most compelling alternative.

The court recognizes that a stay will cause further delay in a case that has suffered several delays already, as well as considerable distress to the plaintiffs. The court is sensitive to the plaintiffs' right to have their day in court. Nonetheless, for the reasons already mentioned, the court is convinced that a stay is appropriate in this particular case. In addition, the court reminds the plaintiffs that they affirmatively invoked the rights of the patent statute; they can hardly be heard now to complain of the rights afforded others by that same statutory framework. Thomson is legally entitled to invoke the reexamination mechanism, and the PTO has determined that reexamination is warranted. There is nothing facially untoward in that. Moreover, the court notes that if, after reexamination, the plaintiffs' patents are again upheld, the plaintiffs' rights will only be strengthened, as the challenger's burden of proof becomes more difficult to sustain. *See Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.,* 807 F.2d 955, 961 (Fed.Cir.1986) (holding that upon reissue, the burden of proving invalidity is 'made heavier') (quoting *Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1139 (Fed.Cir.1985)). In this light, and given the particular circumstances of this case, the court cannot find that the prejudice to the plaintiffs is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21105073 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

undue.

*3 Objecting to a stay, the plaintiffs also have complained of dilatory conduct by the defendants, who, in turn, have accused the plaintiffs of "burying" the PTO in claims and prior art references. *See, e.g.,* Mem. of Plaintiffs in Opp. to Defs.' Joint Motion to Stay (D.I.488) at 5-22 (detailing ways in which the defendants allegedly "have repeatedly acted to complicate and delay the resolution of this litigation"); Defs.' Joint Brief in Support of Motion to Stay (D.I.460) at 4 ("Many of the Harvey patents had vast numbers of cited prior art references of record, effectively burying the most relevant ones.") and 7 ("[I]t appears that PMC sought to 'overwhelm' the PTO and the Courts.").

As a brief response to the accusation of dilatory conduct, the court notes that Thomson's request for reexamination of the '825 patent comprised 2,610 pages; its request regarding the '277 patent totaled 4,736 pages. It is presumed that such an effort requires an enormous expenditure of time and other resources; thus, the timing of Thomson's reexamination requests does not, necessarily, reflect undue delay. Furthermore, as noted above, Thomson was legally entitled to invoke the reexamination procedure when it did. As to the defendants' repeated complaint that the plaintiffs overwhelmed the PTO with prior art references during prosecution of the patents-in-suit, the implications of such alleged conduct will be explored at another time in the litigation, if necessary. At this stage in the process, the court is satisfied that the PTO has found "substantial new questions of patentability" raised by each of the cited references, and has determined that all of the challenged claims of the '825 patent necessitate a reexamination. *See* PTO's Decision Granting Reexamination, Supp. Appendix to Defs.' Joint Brief in Support of Motion to Stay (D.I.467) at 138. Although the court regrets a further delay in the present case, it is confident that the advantages of a stay outweigh the costs.

### III. CONCLUSION

Because the PTO's reexamination of one or more of the patents-in-suit may materially affect the issues in this case, the court will grant the defendants' motion

to stay. The case is stayed pending a disposition of the PTO's reexamination of patent '825, and will be stayed pending reexamination of the '277 patent, if applicable. All pending motions will be denied without prejudice; the parties may refile them following the stay and upon the entry of a new scheduling order, if applicable.

Thus, for the aforementioned reasons, IT IS HEREBY ORDERED that:
1. The defendants' Motion to Stay Pending Reexamination by the U.S. Patent and Trademark Office (D.I.459) is GRANTED. The proceedings are stayed from the date of this order until further notice.
2. The parties shall advise the court of any decision that results from the PTO's reexamination of the '825 patent, and any other decision of the PTO regarding reexamination of any of the other patents-in-suit.
*4 3. The plaintiffs' Motion for Leave to Assert Claim 15 of U.S. Patent 4,965,825 (D.I.399) is DENIED without prejudice.
4. Thomson's Motion to Dismiss or in the Alternative for Summary Judgment (D.I.376) is DENIED without prejudice.
5. Phillips' Motion to Dismiss for Lack of Standing (D.I.396) is DENIED without prejudice.

D.Del.,2003.
Pegasus Development Corp. v. Directv, Inc.
Not Reported in F.Supp.2d, 2003 WL 21105073 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:00cv01020 (Docket) (Dec. 04, 2000)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B



Slip Copy
Slip Copy, 2006 WL 1876912 (D.Del.)
**(Cite as: Slip Copy)**

Page 1

**C**

Briefs and Other Related Documents
Zoetics, Inc. v. Yahoo!, Inc.D.Del.,2006.Only the
Westlaw citation is currently available.
United States District Court,D. Delaware.
ZOETICS, INC. and Zoemail, LLC Plaintiffs,
v.
YAHOO!, INC., Defendant.
**No. Civ.A. 06-108-JJF.**

July 6, 2006.

Josy W. Ingersoll, Karen L. Pascale, and Elena C.
Norman, of Young Conaway Stargatt & Taylor LLP,
Wilmington, Delaware, Paul K. Vickrey, Douglas M.
Hall, and Frederick C. Laney, of Niro, Scavone,
Haller & Niro, Chicago, Illinois, for Plaintiff, of
counsel.
Mary B. Graham, of Morris, Nichols, Arsht & Tun-
nell LLP, Wilmington, Delaware, Michael A. Jacobs,
of Morrison & Foerster LLP, San Francisco, Califor-
nia, Matthew M. D'Amore, and Kyle W.K. Mooney,
of Morrison & Foerster LLP, New York, New York,
for Defendants, of counsel.

*MEMORANDUM OPINION*
FARNAN, J.
**\*1** Pending before the Court is Defendant's Motion
To Stay Action And Transfer Action To The South-
ern District Of New York. (D.I.10.) For the reasons
set forth below, the Court will deny the Motion.

BACKGROUND

Plaintiffs ZoEmail, a Delaware limited liability com-
pany, and Zoetics, a New York corporation, filed this
action seeking damages, attorneys' fees, and injunct-
ive relief from Defendant, a Delaware corporation,
for its alleged infringement of two patents Plaintiffs
recently purchased from AT & T, Inc. (D.I.1.) On
October 20, 2004, sixteen months before filing its
Complaint, Zoetics filed for Chapter 11 bankruptcy
in the United States Bankruptcy Court for the South-
ern District of New York. According to Defendant,
Zoetics' resort to bankruptcy was spurred at least par-
tially by its inability to pay AT & T for the patents it

purchased. (D.I. 11 at 5.) In Bankruptcy Court, Zoet-
ics announced its intention to emerge from bank-
ruptcy by "realizing value from its Intellectual Prop-
erty" by first "seeking a license with certain signific-
ant parties which have infringed upon its intellectual
property" and thereafter retaining counsel to sue for
infringement. (D.I. 13, Ex. 8 at 2-3.) According to
Defendant, it is one of the "significant parties" to
which Zoetics was referring. (D.I. 11 at 7.)

AT & T has filed a secured claim against Zoetics in
Bankruptcy Court based on a purported security in-
terest it retained in the Patents-in-Suit. Plaintiffs dis-
pute the validity of AT & T's secured claim. (D.I. 16
at 4-5.) Meanwhile, the Bankruptcy Court has gran-
ted Zoetics leave to retain counsel to pursue its intel-
lectual property claims. (D.I. 13, Ex. 10 at 4.)

DISCUSSION

I. Motion to Stay Action

Defendant contends that the Court should stay this
action until the ownership of the Patents-in-Suit is re-
solved in the New York Bankruptcy Court because it
will simplify the issues before this Court, it will not
unduly prejudice Plaintiffs, and this proceeding is
still at an early stage. Plaintiffs respond that no litiga-
tion regarding the ownership of the Patents-in-Suit is
pending in the New York Bankruptcy Court, and that
they would be prejudiced by a stay at this time. Be-
cause there is no indication that the issue of patent
ownership will be imminently resolved in the Bank-
ruptcy Court and because granting a stay will preju-
dice Plaintiffs, the Court will deny Defendant's Mo-
tion to Stay.

A. *Legal Standard*

A Court has the "inherent power to conserve judicial
resources by controlling its own docket," *Cost Bros.,
Inc. v. Travelers Indem. Co.,* 760 F.2d 58, 60 (3d
Cir.1985), and the decision to stay a case is firmly
within the discretion of the Court. *Pegasus Develop-
ment Corp. v. DirecTV, Inc.,* 2003 U.S. Dist. LEXIS
8052, at \*3 (D.Del. May 14, 2003). In ruling on a
motion to stay, courts are guided by three factors:

Slip Copy
Slip Copy, 2006 WL 1876912 (D.Del.)
(Cite as: Slip Copy)

"(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set." *Id.* at *3-4 (quoting *Xerox Corp. v. 3Comm Corp.,* 69 F.Supp.2d 404, 406 (W.D.N.Y.1999)).

### B. *Analysis*

*2 Defendant is arguing for a stay pending a decision regarding ownership of the Patents-in-Suit by the Bankruptcy Court. Defendant bases its argument on a claim filed by AT & T, an alleged secured creditor of Zoetics. Leaving aside the fact that Plaintiffs dispute the validity of the secured claim (D.I. 16 at 4-5), Defendant has not pointed to any precedent granting a stay under such circumstances. Furthermore, there is nothing to indicate when the Bankruptcy Court will take up the issue of ownership, or even if it plans to do so at all. In fact, the Bankruptcy Court has allowed Zoetics to retain special intellectual property counsel to "prosecut[e] enforcement actions regarding the Intellectual Property Rights" (D.I. 13, Ex. 9 at 2), though Zoetics ultimately made plain its intention to recover on its intellectual property as part of its emergence strategy. (D.I. 13, Ex. 8 at 2.)

Defendant contends that granting a stay in this case will advance the objective of judicial economy (D.I. 11 at 10) without prejudicing Plaintiffs. (*Id.* at 12.) The Court disagrees. Staying the action pending a non-parallel proceeding in which the issue in question *may* be addressed [FN1] leaves too much uncertainty to substantially advance judicial economy. The Bankruptcy Court has not evidenced an intention to take up the patent ownership issue; rather, it permitted Zoetics to retain patent counsel in order to pursue its claims.

> FN1. Defendant repeatedly insists that the issue of patent ownership *will* be addressed by the Bankruptcy Court (D.I. 20 at 3) but can offer no support for that assertion except to say that Zoetics defaulted on its payment to AT & T and the latter has filed a secured claim in the Bankruptcy Proceeding. (*Id.*) All of the case law Defendant cites, on the

other hand, involves pending proceedings that are either parallel, *Summa Four,* 994 F.Supp. at 581, or directly related to the issue in dispute. *Landis v. N. Am. Co.,* 299 U.S. 248 (1966); *Commissariat a L'Energie Atomique v. Dell Computer Corp.,* 2004 WL 1554382 (D.Del. May 13, 2004).

A secured claim in a bankruptcy proceeding, furthermore, is not tantamount to a challenge to Zoetics' patent ownership. Zoetics has announced its intention to sue on its patents to emerge from bankruptcy (D.I. 13, Ex. 8 at 2), and the Bankruptcy Court has not objected. It is therefore conceivable that, even if AT & T has a genuine secured claim, Zoetics could win a patent infringement suit, pay AT & T from the proceeds, and retain the patents. Granting a stay pending the resolution of the bankruptcy proceedings would prejudice Zoetics by preventing it from carrying its reorganization plan to completion in a timely fashion.

The Court concludes that granting a stay would not simplify the issues in this case with such certainty as to substantially advance judicial economy, and that it would prejudice and disadvantage Plaintiffs. Because neither of these factors weighs in favor of granting a stay, the Court is not persuaded that a stay is warranted because the case is still at an early stage. Accordingly, the Court will deny Defendant's Motion to Stay Action.

### II. Motion to Transfer Action

Defendant argues that substantial practical considerations, as well as other private and public factors, strongly favor transferring the action to the Southern District of New York. Plaintiffs contend that Defendant has not met its burden of clearly showing that transfer is appropriate. Because the Court agrees with Plaintiffs that the factors do not weigh heavily in favor of transfer, it will deny Defendant's Motion to Transfer.

### A. *Standard of Law*

*3 28 U.S.C. § 1404(a) permits a court to transfer a case to any other district where it might have been brought [FN2] "for the convenience of parties and witnesses" or "in the interest of justice." The purpose of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the statute is to "prevent the waste of time, energy, and money and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack,* 376 U.S. 612, 616 (1964). In considering a § 1404(a) transfer, the Court must balance a number of private and public interests. *Reyno v. Piper Aircraft Co.,* 630 F.2d 149, 159 (3d Cir.1980). The relevant private interests are:

> FN2. It is undisputed that this action could have been brought in the Southern District of New York. (D.I. 11 at 13.)

(1) the plaintiff's choice of forum, (2) the defendant's preferred forum, (3) whether the claim arose elsewhere, (4) the convenience of the expected witnesses, but only so far as the witnesses might be unavailable for trial if the trial is conducted in a certain forum, and (5) the location of books and records, to the extent that these books and records could not be produced in a certain forum.
*Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 883 (3d Cir.1995). The relevant public interests are:
(1) the enforceability of the judgment, (2) practical considerations regarding the ease, speed, or expense of the trial, (3) the administrative difficulty due to court congestion, (4) the local interest in deciding local controversies in the home forum, (5) the public policies of the two fora, and (6) the trial judge's familiarity with the applicable state law in diversity cases.

*Id.* When ruling on a motion to transfer, a court must "balance all of the relevant factors and respect that a plaintiff's choice of forum is entitled to substantial deference and should not be lightly disturbed." *Stratos Lightwave, Inc. v. E2O Communications, Inc.,* 2002 U.S. Dist. LEXIS 5653, at *5 (D.Del. Mar. 26, 2002). The moving party has the burden to establish that "the balance of interests strongly weighs in favor of the transfer," and the transfer will be denied if the factors balance evenly or weigh only slightly in favor. *Id.*

### B. *Practical Considerations*

Defendant first contends that the public interests of practical considerations and judicial efficiency

strongly favor transfer because the District Court for the Southern District of New York will be "better positioned to manage the case if and when it is appropriate to proceed." (D.I. 11 at 15.) Defendant also argues that judicial efficiency militates for transfer because Defendant may have to ask the Bankruptcy Court to lift the automatic litigation stay to allow it to pursue counterclaims or file for reexamination of the Patents-in-Suit, a decision that would be reviewed by the District Court for the Southern District of New York. (*Id.* at 15-16.) Finally, Defendant argues that the transferee court would be better positioned to adjudicate any standing disputes with regard to ownership of the patents, since it would have already heard any related appeals from the Bankruptcy Court. (*Id.* at 16.)

*4 The Court concludes that these considerations do not weigh strongly in favor of transfer. As an initial matter, many of Defendant's arguments rely on the proposition that the issue of patent ownership will be imminently resolved by the Bankruptcy Court, which the Court concluded, *supra,* is not the case. Moreover, while this Court has previously transferred an action to a district where a Chapter 11 case was pending, it did so in large part because the case depended on the interpretation of orders already issued by the transferee judge, and because the case involved administrative claims inextricably intertwined with the bankruptcy proceeding. *Bank of America, N.A. v. U.S. Airways, Inc.,* 2005 U.S. Dist. LEXIS 34902, at *8-9 (D.Del. Dec. 21, 2005).

In this case, there are no existing rulings by Defendant's proposed transferee court that are necessary to resolve the issues. Nor are the details of Zoetics' reorganization plan currently relevant, since the plan has not been filed yet. (*See* D.I. 11 at 12.) Ownership of the patents-in-suit has not been challenged in the New York courts, and there is no parallel litigation already in progress. Most importantly, the bankruptcy proceeding is before the Bankruptcy Court, not the District Court, and were a transfer to be granted, the patent infringement case would not be heard by the judge who will be overseeing Zoetics' Chapter 11 case. Defendant attempts to avoid this problem by insisting that judicial efficiency would be advanced because the District Court "would have already heard

any related appeals" (*Id.* at 16), but such speculation does not weigh strongly in favor of transfer. Defendant's argument that Defendant will need to petition the Bankruptcy Court to lift or modify the automatic litigation stay in order to file counterclaims or auxiliary claims runs into the same problem, and the argument that the District Court in the Southern District of New York would hear those appeals is again unpersuasive.

While it may have been marginally more expedient for this case to have been brought in the Southern District of New York, the considerations presented by Defendant do not militate in favor of transfer so as to outweigh Plaintiffs' choice of forum. Simply put, the Court can find no compelling reason why the District of Delaware is not an appropriate venue to resolve the issue of patent ownership. In fact, a resolution of the ownership dispute in this Court could as easily assist the Bankruptcy Court in carrying out its function.

### C. *Convenience and Availability of Non-Party Witnesses*

Defendant argues that the convenience of non-party witnesses weighs strongly in favor of transfer. "Convenience of the expected trial witnesses is the most important factor to consider when determining whether or not transfer is appropriate." *Memminger v. Infocure Corp.,* 2000 U.S. Dist. LEXIS 22077 at *12-13 (D.Del. Nov. 14, 2000). Though the convenience of the nonparty witnesses is only an issue to the extent that the witnesses "may actually be unavailable for trial," *Mentor Graphics Corp. v. Quickturn Design Sys., 77 F.Supp.2d 505, 510 (D.Del.1999),* "it is sufficient for purposes of venue transfer analysis if the witness is not subject to a Court's subpoena power." *Nilssen v. OSRAM Sylvania, Inc.,* 2001 U.S. Dist. LEXIS 25570, at *8 (D.Del. May 1, 2001); *see also Anic v. DVI Fin Servs.,* 2004 U.S. Dist. LEXIS 11562, at *8 (D. Del. June 23, 2004). The Court has the power to subpoena a witness who can be served within its District, or at a place within 100 miles of the courthouse. *Fed.R.Civ.P. 45(b)(2)* .

*5 Most of the witnesses whose convenience Defendant claims strongly favors transfer are located in AT

& T's Florham Park, New Jersey facility or in Berkeley Heights, New Jersey. (D.I. 11 at 18-20.) However, Defendant admits that both of these locations are within 100 miles of Wilmington, Delaware using a straight-line measurement. (*Id.* at 19.) Defendant argues that their presence still militates in favor of transfer because using an "ordinary and usual travel route" measurement puts them outside of the Court's subpoena power while they would be within the subpoena power of the transferee court by any measure. (*Id.*) Thus, transferring would "avoid later disputes." (*Id.* at 21.) There is, however, no genuine dispute that Delaware courts apply the modern approach, which measures "distance by a straight line on a map," as this method is the better construction of Rule 45 and is easier to apply in practice. *Hill v. Equitable Bank, Nat'l Ass'n, 115 F.R.D. 184, 186 (D.Del.1987).* By contrast, the cases cited by Defendant in favor of the "ordinary and usual travel route" approach are more than 50 years old and are from district courts outside of Delaware. (D.I. 11 at 20.) Thus, the Court concludes that these witnesses are within the subpoena power of the Court and considered available to testify for the purposes of venue transfer.

Defendant also asserts that two of the attorneys involved in prosecuting the Patents-in-Suit are outside the subpoena power of this Court, but within the subpoena power of the New York court, weighing heavily in favor of transfer. Defendant claims that these witnesses would testify to issues of claim construction and the validity and enforceability of the Patents-in-Suit.

In response, Plaintiffs argue that Defendant has not shown with sufficient specificity why the witnesses' testimony would be necessary, and that Defendant has not shown that either would be reluctant to travel to Delaware in order to testify. As to the first argument, the Court concludes that Defendant may have its reasons for calling the prosecuting attorneys, given the attorneys' first-hand involvement in prosecuting the patents and their knowledge thereof. (*See* D.I. 13, Ex. 17 and 18.) As to the second, Defendant bears no burden to show that the witnesses it plans to subpoena would be "reluctant" to testify. "It is sufficient ... [that] the witness is not subject to a Court's sub-

poena power." *Nilssen,* 2001 U.S. Dist. LEXIS 25570, at *8. Thus, the Court concludes that the convenience of the prosecuting attorneys is a factor weighing in favor of transfer.

### D. *Convenience of the Parties*

Defendant argues that because Plaintiffs' principal place of business is mere blocks away from the District Court for the Southern District of New York, the convenience of the parties weighs in favor of transfer. However, "a plaintiff's choice of forum is a paramount consideration not to be lightly disturbed." *Mentor Graphics,* 77 F.Supp.2d. at 509. Furthermore, while the plaintiff's choice of forum is generally given less deference where the plaintiff has not chosen his home turf, a defendant's incorporation in the chosen forum is "a rational and legitimate reason for choosing the forum" that cannot be disregarded. *Stratos,* 2002 U.S. Dist. LEXIS 5653, at *6-7. Having incorporated in the forum state, the defendant "should not now complain that another corporation has chosen to sue it here." *Id.* at *7.

*6 Defendant in this case is incorporated in Delaware and admits that "neither Delaware nor the Southern District of New York is significantly more convenient than the other" for itself. (D.I. 11 at 24). Thus, the convenience of Defendant is not a factor weighing in either direction. As for the convenience of Plaintiffs, they have chosen the forum of Defendant's incorporation-a "rational and legitimate" choice that is entitled to deference. *Stratos,* 2002 U.S. Dist. LEXIS 5653, at *7. The Court concludes that the convenience of the parties does not weigh in favor of transfer.

### E. *Local Interest in the Controversy*

Finally, Defendant argues that because Zoetics is in bankruptcy in the Southern District of New York, the local interest in the controversy weighs in favor of transfer. However, as discussed *supra,* the bankruptcy proceeding and the patent infringement suit are neither identical nor parallel controversies. Further, as Defendant acknowledges, "[p]atent rights are not local or state matters and therefore cannot give rise to a local controversy, or implicate local public policy." *Stratos,* 2002 U.S. Dist. LEXIS 5653 at *8;

*see also Trilegiant Loyalty Solutions, Inc. v. Maritz, Inc.,* 2005 U.S. Dist. LEXIS 2825, at *8 (D.Del. Feb. 15, 2005). Therefore, the Court concludes that the Southern District of New York does not have a local interest in the controversy.

### F. *Conclusion*

Although "[c]onvenience of the expected trial witnesses is the most important factor to consider when determining whether or not transfer is appropriate," *Memminger,* 2000 U.S. Dist. LEXIS 22077 at *12-13, the Court concludes that the potential unavailability of the attorneys who prosecuted the patent-the sole factor weighing in favor of transfer-is insufficient to overcome the "paramount" consideration of Plaintiffs' choice of forum. *Mentor Graphics,* 77 F.Supp.2d. at 509. Plaintiffs had a legitimate reason for choosing to sue in Delaware, and Defendant has not carried its burden of negating that choice. Accordingly, the Court will deny Defendant's Motion to Transfer Action to the District Court for the Southern District of New York.

D.Del.,2006.
Zoetics, Inc. v. Yahoo!, Inc.
Slip Copy, 2006 WL 1876912 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1814059 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Defendant Yahoo! Inc.'s Motion to Stay Action and Transfer Action to the Southern District of New York (May 26, 2006) Original Image of this Document (PDF)
• 2006 WL 1814058 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Answering Brief in Opposition to Yahoo!'s Motion to Stay and Transfer (May 12, 2006) Original Image of this Document (PDF)
• 2006 WL 1232485 (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of Defendant Yahoo! Inc.'s Motion to Stay Action and Transfer Action to the Southern District of New York (Apr. 21, 2006)
• 2006 WL 1388628 (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of Defendant Yahoo! Inc.'s Motion to Stay Action and Transfer Action to the Southern District of New York (Apr.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 1876912 (D.Del.)
**(Cite as: Slip Copy)**


21, 2006) Original Image of this Document (PDF)
• 1:06cv00108 (Docket) (Feb. 21, 2006)

END OF DOCUMENT

# EXHIBIT C



Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 13139559 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

**C**

Briefs and Other Related Documents
Coca-Cola Bottling Co. of Lehigh Valley v.
GrolE.D.Pa.,1993.Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
COCA-COLA BOTTLING COMPANY OF THE
LEHIGH VALLEY, Plaintiff,
v.
Joseph F. GROL, Mark W. Kovacs, Peter J. Kearney,
and Stefko Distributing Company, Inc., d/b/a Caty
Beverage Co., Defendants.
**Civ. A. No. 92-7061.**

March 8, 1993.

MEMORANDUM

HUYETT, District Judge.
**\*1** Plaintiff filed a complaint in this action on
December 9, 1992 alleging violations of the Racketeer
Influenced and Corrupt Organizations Act
(RICO), 18 U.S.C. § 1961 et seq. and various state
law causes of action. The complaint essentially alleges
that two of Plaintiff's former managers, Defendant
Joseph F. Grol and Defendant Mark W. Kovacs,
and two of Plaintiff's customers, Defendant Peter J.
Kearney and Defendant Stefko Distributing Company,
engaged in a pattern of racketeering activity
through numerous schemes to siphon off Plaintiff's
assets.

On December 23, 1992 Plaintiff served notices of depositions
and subpoenas for documents on First Lehigh
Bank, Northeastern Bank, Merchants Bank, Meridian
Bank, American Travel Related Services, Inc.,
and First Valley Bank. Plaintiff made the document
subpoenas returnable on February 1-3, 1993 and the
subpoenas state that "no deponent need appear if records
are produced on or before" the return dates of
the subpoenas. Plaintiff also mailed copies of the notices
of depositions and subpoenas to all
Defendants.FN1 On February 1, 1993 Defendant
Kearney filed a motion for a protective order to quash
the subpoenas or to stay discovery until the Court resolves
Defendant Kearney's motion to dismiss
Plaintiff's complaint pursuant to Federal Rule of Civil

Procedure 12(b)(6) for failure to state a claim upon
which relief can be granted. Defendant Kearney
raises five grounds in support of his motion, each of
which the Court rejects, and therefore will deny Defendant
Kearney's motion in its entirety.

Defendant Kearney claims that the notices of depositions
are invalid because Plaintiff served them before
Defendant Kearney was properly served with the
complaint. Plaintiff served Defendant Kearney with
the summons and complaint by mail pursuant to Federal
Rule of Civil Procedure 4(c)(2)(C)(ii) on December
14, 1992. Because Plaintiff did not receive an acknowledgement
of service within twenty days after
the date of mailing, Plaintiff caused Defendant Kearney
to be personally served on December 28, 1992.
Any party may take the deposition of any person after
the commencement of the action. Fed.R.Civ.P. 30(a).
This action commenced on December 9, 1992 when
Plaintiff filed the complaint. Fed.R.Civ.P. 3. The depositions
were scheduled for February 1-3, 1993,
well after the commencement of the action. Plaintiff
did not need to obtain leave of the Court because the
depositions were not scheduled "prior to the expiration
of 30 days after service of the summons and
complaint upon any defendant...." Fed.R.Civ.P.
30(a). The Rules authorized Plaintiff to compel nonparties
to produce documents. Fed.R.Civ.P. 34(c).
Plaintiff properly served Defendant Kearney with notice
of the subpoenas on the nonparties by mail. See
Fed.R.Civ.P. 45(b)(1), 5(b). The notices of depositions
and subpoenas are not invalid. Finally, a party
or person seeking a protective order has the burden of
showing good cause. Fed.R.Civ.P. 26(c). Defendant
Kearney has failed to show good cause because he
has failed to show that he suffered any prejudice from
the fact that Plaintiff served the notices of depositions
before Defendant Kearney was served with the complaint.

**\*2** Defendant Kearney claims that the notices of depositions
are invalid because Plaintiff served them
before making the disclosures required under section
4:01(a) of the Civil Justice Expense and Delay Reduction
Plan (Plan) adopted in this district. Defendant
Kearney claims that the disclosures made by Plaintiff

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                          Page 2
Not Reported in F.Supp., 1993 WL 13139559 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

on January 18, 1993 were incomplete. According to the Plan, "a party may not seek discovery from any source before making the disclosures under subdivision (a)(1)...." Plan § 4:01(b). First, Plaintiff did not violate the Plan because Plaintiff made disclosures on January 18, 1993, before the February 1, 1993 return date on the subpoenas. Second, Defendant fails to provide the Court with a copy of the disclosures provided by Plaintiff. Without seeing the disclosures, the Court will not rely on Defendant's conclusory allegation that the disclosure was "defective in that it gave no meaningful description of the documents, data, compilations and tangible things." Def.Mem. at 1. Third, Defendant Kearney has failed to show that he suffered any prejudice from Plaintiff's alleged noncompliance with section 4:01(a)(1).

Next, Defendant Kearney argues that the Court should stay discovery in this action because he has filed a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). A federal court has broad inherent power "to exercise appropriate control over the discovery process." *Herbert v. Lando,* 441 U.S. 153, 177 (1979). A court should not automatically stay discovery pending a motion to dismiss under Rule 12(b). Had the drafters of the Federal Rules of Civil Procedure wanted an automatic stay of discovery pending a motion to dismiss they could have so provided. *Moran v. Flaherty,* No. 92-3200, 1992 WL 276913 (S.D.N.Y. Sep. 25, 1992); *Gray v. First Winthrop Corp.,* 133 F.R.D. 39, 40 (N.D.Cal.1990). Rather, the decision whether to stay discovery pending a decision on a motion to dismiss is left to the sound discretion of the court. *Chrysler Capital Corp. v. Century Power Corp.,* 137 F.R.D. 209, 211 (S.D.N.Y.1991). Motions to stay discovery are not favored because when discovery is delayed or prolonged it can create case management problems which impede the court's responsibility to expedite discovery and cause unnecessary litigation expenses and problems. Requests to stay discovery are rarely appropriate where resolution of the motion to dismiss will not dispose of the entire case. In deciding whether to stay discovery pending a motion to dismiss a court must balance the harm produced by delay against the possibility that the motion will be granted

and entirely eliminate the need for such discovery. *Simpson v. Specialty Retail Concepts, Inc.,* 121 F.R.D. 261, 263 (M.D.N.C.1988).

Where there is a motion to dismiss for failure to state a claim upon which relief can be granted, the court should take a preliminary look at the allegedly dispositive motion to see whether it is a challenge as a matter of law or to the sufficiency of the allegations. See *Hachette Distribution, Inc. v. Hudson County News Co.,* 136 F.R.D. 356, 358 (E.D.N.Y.1991). Where the motion merely addresses the sufficiency of the complaint, "resolution of the pending motion is not necessarily dispositive because the pleadings may be amended to correct the deficiencies." *Simpson v. Specialty Retail Concepts, Inc.,* 121 F.R.D. 261, 263 (M.D.N.C.1988).

*3 A preliminary look at Defendant Kearney's motion to dismiss reveals that, on the whole, Defendant Kearney challenges the sufficiency of the allegations of the complaint. Plaintiff's response to the motion to dismiss reveals that the dispute is over what a plaintiff must prove in a RICO action compared to what a plaintiff must plead in a complaint. In this situation, the motion may not be dispositive because even if granted, Plaintiff may be able to amend the complaint. In addition, the Court notes that the other defendants do not seek a stay of discovery nor have they made dispositive motions. Thus, even if the Court granted Defendant Kearney's motion, the action would continue. See *Hachette* 136 F.R.D. at 358-9. Moreover, Plaintiff seeks discovery from third parties, not Defendant Kearney, and the discovery sought is limited, not a "fishing expedition" as Defendant Kearney contends. Based upon all of these factors, then, a stay of discovery pending a decision on Defendant Kearney's motion to dismiss is unwarranted.

Defendant Kearney further states that he has been advised that the FBI is conducting an ongoing criminal investigation into the facts relating to "the Coca-Cola situation." Def.Mem. at 3. He argues that a stay of discovery is particularly appropriate where as here, a private litigant may be a "stalking horse" for government prosecutors who are using a civil action to circumvent the discovery limitations of criminal proced-

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 13139559 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Page 3

ure. *Sharjah Inv. Co. (UK) Ltd. v. P.C. Telemart, Inc.,* 107 F.R.D. 81, 83 n. 2 (S.D.N.Y.1985). First, Defendant Kearney has failed to provide the Court with any evidence that the FBI is conducting a criminal investigation. Second, he has failed to show that the government is using Plaintiff's civil action to circumvent any limitations of criminal discovery.

Finally, Defendant Kearney argues that the deposition notices are "overly broad and inquire into matters which are not relevant, and are designed for the purpose of harassing, annoying, embarrassing, or oppressing the defendant." Def.Mem. at 3. A party moving for a protective order under Rule 26(c) must make a strong showing of "good cause" by demonstrating a particular need for protection. *Cippollone v. Ligget Group, Inc.,* 785 F.2d 1108, 1121 (3d Cir.1986). First, Defendant Kearney has failed to provide the Court with copies of the notices of deposition at issue as required by Local Rule 24(b). Second, a party cannot rely on conclusory statements that the discovery is broad, not relevant, and harassing to show good cause under Rule 26(c). Defendant Kearney states that the depositions request the banks to produce documents relating to eleven persons and fail to provide account numbers. Plaintiff's discovery request is directed to third parties, not to Defendant Kearney. Defendant Kearney cannot realistically claim that he needs protection from these notices of depositions and subpoenas directed to the third parties. *See Howard v. Galesi,* 107 F.R.D. 348, 350 (S.D.N.Y.1985). Finally, Defendant Kearney has failed to show that the discovery will harass, annoy, oppress, or embarrass him.

*4 For the foregoing reasons, the Court will deny Defendant Kearney's motion in its entirety. An order follows.

### ORDER

Upon consideration of Defendant Kearney's Motion for Protective Order to Quash Or At Least Stay Notices of Deposition For February 1, 1993, Plaintiff's response, and for the reasons stated in the foregoing memorandum, Defendant Kearney's motion is DENIED in its entirety.

IT IS SO ORDERED.

> FN1. Neither the movant, Defendant Kearney, nor Plaintiff, has complied with Local Rule 24(b) which requires them to set forth verbatim the relevant parts of the notices and subpoenas at issue. The Court is relying on statements made in the motion and Plaintiff's response.

E.D.Pa.,1993.

Coca-Cola Bottling Co. of Lehigh Valley v. Grol

Not Reported in F.Supp., 1993 WL 13139559 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:92cv07061 (Docket) (Dec. 09, 1992)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D



Not Reported in F.Supp.                                    Page 1
Not Reported in F.Supp., 1991 WL 221179 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

▷
Briefs and Other Related Documents
People With Aids Health Group v. Burroughs
Wellcome Co.D.D.C.,1991.Only the Westlaw cita-
tion is currently available.

United States District Court, District of Columbia.
PEOPLE WITH AIDS HEALTH GROUP, *et al.,*
Plaintiffs,
v.
BURROUGHS WELLCOME CO., Defendant.
Civ. A. No. 91-0574.

Oct. 11, 1991.

*ORDER*
JOHN GARRET PENN, District Judge.
**\*1** This matter is before the Court on Defendant's
Motion to Stay Discovery and Defendant's Motion
to Reconsider. Upon consideration of the motions, any
opposition thereto and the entire record, the Court
concludes that defendant's motion to stay discovery
should be denied and that defendant's motion to re-
consider should be granted. The Court further con-
cludes that a status conference is scheduled for Octo-
ber 28, 1991.

I Defendant's Motion To Stay Discovery

Defendant argues that under Fed.R.Civ.P. 26(c) the
Court should exercise it discretion and stay discovery
pending resolution of defendant's motion to dismiss.
Plaintiffs oppose defendant's motion contending that
defendant has failed to meet its burden. *See Twin City
Fire Ins. Co. v. Employers Ins. of Wausau,* 124
F.R.D. 652 (D.Nev.1989) ("the burden is on the party
seeking relief to show some plainly adequate reason
for the order.... [A] pending motion to dismiss is not
ordinarily a situation that in and of itself would war-
rant a stay of discovery"). Relying on *Maljack Pro-
duction, Inc. v. Motion Picture Association of Amer-
ica,* No. 90-1121, *slip op.,* (D.D.C. Oct. 3, 1990), de-
fendant argues that a stay should be granted pending
resolution of its motion to dismiss.

The party seeking to stay discovery has the burden of
justification. However, defendant has failed to

demonstrate beyond mere allegations that resources
will be conserved by granting the stay. Further, de-
fendant makes a bald assertion that its motion to dis-
miss will be granted. These are mere assertions that
have not been substantiated by defendant. However,
"bare assertions that discovery will be unduly bur-
densome or that it should be stayed pending disposit-
ive motions that will probably be sustained, are insuf-
ficient to justify the entry of an order staying discov-
ery generally." *Continental Illinois Bank & Trust Co.
v. Caton,* 130 F.R.D. 145, 148 (D.Kan.1990).

Therefore, the Court concludes that defendant's mo-
tion to stay discovery should be denied.

II Defendant's Motion To Reconsider

By a previous Order, the Court converted Defendant's
Motion to Dismiss to a Motion for Summary Judg-
ment. *See* Order, July 23, 1991. Defendant has filed a
Motion to Reconsider that Order. In defendant's
present motion, defendant has withdrawn its motion
to dismiss based on a failure to state a claim upon
which relief can be granted. *See* Motion to Recon-
sider at 2, n. 1. Therefore, defendant's motion to dis-
miss is based on Fed.R.Civ.P. 12(b)(1) (lack of juris-
diction over the subject matter). Specifically, defend-
ant alleges that jurisdiction is lacking because of the
absence of a justiciable case or controversy as re-
quired to support an action for declaratory judgment.

Therefore, the Court concludes that defendant's mo-
tion to reconsider should be granted.

Accordingly, it is hereby

ORDERED that defendant's motion to stay discovery
is denied; and it is further

ORDERED that defendant's motion to reconsider is
granted; and it is further

**\*2** ORDERED that a status conference in the present
action is scheduled for October 28, 1991, at 9:30 a.m.

D.D.C.,1991.
People With Aids Health Group v. Burroughs

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1991 WL 221179 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**


Wellcome Co.
Not Reported in F.Supp., 1991 WL 221179 (D.D.C.)

Briefs and Other Related Documents (Back to top)

• 1:91cv00574 (Docket) (Mar. 18, 1991)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E

(Slip Opinion)          OCTOBER TERM, 2006          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.*, 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MEDIMMUNE, INC. *v.* GENENTECH, INC., ET AL.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
THE FEDERAL CIRCUIT

No. 05–608.   Argued October 4, 2006—Decided January 9, 2007

After the parties entered into a patent license agreement covering, *inter
alia,* respondents' then-pending patent application, the application
matured into the "Cabilly II" patent.  Respondent Genentech, Inc.,
sent petitioner a letter stating that Synagis, a drug petitioner manu-
factured, was covered by the Cabilly II patent and that petitioner
owed royalties under the agreement.  Although petitioner believed no
royalties were due because the patent was invalid and unenforceable
and because Synagis did not infringe the patent's claims, petitioner
considered the letter a clear threat to enforce the patent, terminate
the license agreement, and bring a patent infringement action if peti-
tioner did not pay.  Because such an action could have resulted in pe-
titioner's being ordered to pay treble damages and attorney's fees and
enjoined from selling Synagis, which accounts for more than 80 per-
cent of its sales revenue, petitioner paid the royalties under protest
and filed this action for declaratory and other relief.  The District
Court dismissed the declaratory-judgment claims for lack of subject-
matter jurisdiction because, under Federal Circuit precedent, a pat-
ent licensee in good standing cannot establish an Article III case or
controversy with regard to the patent's validity, enforceability, or
scope.  The Federal Circuit affirmed.

*Held:*

  1. Contrary to respondents' assertion that only a freestanding pat-
ent-invalidity claim is at issue, the record establishes that petitioner
has raised and preserved the contract claim that, because of patent
invalidity, unenforceability, and noninfringement, no royalties are
owing.  Pp. 3–6.

  2. The Federal Circuit erred in affirming the dismissal of this ac-
tion for lack of subject-matter jurisdiction.  The standards for deter-

Syllabus

mining whether a particular declaratory-judgment action satisfies the case-or-controversy requirement—*i.e.,* "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant" relief, *Maryland Casualty Co.* v. *Pacific Coal & Oil Co.,* 312 U. S. 270, 273—are satisfied here even though petitioner did not refuse to make royalty payments under the license agreement. Where threatened *government* action is concerned, a plaintiff is not required to expose himself to liability before bringing suit to challenge the basis for the threat. His own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction because the threat-eliminating behavior was effectively coerced. Similarly, where the plaintiff's self-avoidance of imminent injury is coerced by the threatened enforcement action of *a private party* rather than the government, lower federal and state courts have long accepted jurisdiction. In its only decision in point, this Court held that a licensee's failure to cease its royalty payments did not render nonjusticiable a dispute over the patent's validity. *Altvater* v. *Freeman,* 319 U. S. 359, 364. Though *Altvater* involved an injunction, it acknowledged that the licensees had the option of stopping payments in defiance of the injunction, but that the *consequence* of doing so would be to risk "actual [and] treble damages in infringement suits" by the patentees, a consequence also threatened in this case. *Id.,* at 365. Respondents' assertion that the parties in effect settled this dispute when they entered into their license agreement is mistaken. Their appeal to the common-law rule that a party to a contract cannot both challenge its validity and continue to reap its benefits is also unpersuasive. Lastly, because it was raised for the first time here, this Court does not decide respondents' request to affirm the dismissal of the declaratory-judgment claims on discretionary grounds. That question and any merits-based arguments for denial of declaratory relief are left for the lower courts on remand. Pp. 7–18.

427 F. 3d 958, reversed and remanded.

SCALIA, J., delivered the opinion of the Court, in which ROBERTS, C. J., and STEVENS, KENNEDY, SOUTER, GINSBURG, BREYER, and ALITO, JJ., joined. THOMAS, J., filed a dissenting opinion.

Cite as: 549 U. S. ____ (2007)                    1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 05–608

_____

## MEDIMMUNE, INC., PETITIONER v. GENENTECH, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

[January 9, 2007]

JUSTICE SCALIA delivered the opinion of the Court.

We must decide whether Article III's limitation of federal courts' jurisdiction to "Cases" and "Controversies," reflected in the "actual controversy" requirement of the Declaratory Judgment Act, 28 U. S. C. §2201(a), requires a patent licensee to terminate or be in breach of its license agreement before it can seek a declaratory judgment that the underlying patent is invalid, unenforceable, or not infringed.

I

Because the declaratory-judgment claims in this case were disposed of at the motion-to-dismiss stage, we take the following facts from the allegations in petitioner's amended complaint and the unopposed declarations that petitioner submitted in response to the motion to dismiss. Petitioner MedImmune, Inc., manufactures Synagis, a drug used to prevent respiratory tract disease in infants and young children. In 1997, petitioner entered into a patent license agreement with respondent Genentech, Inc. (which acted on behalf of itself as patent assignee and on behalf of the coassignee, respondent City of Hope). The

Opinion of the Court

license covered an existing patent relating to the production of "chimeric antibodies" and a then-pending patent application relating to "the coexpression of immunoglobulin chains in recombinant host cells." Petitioner agreed to pay royalties on sales of "Licensed Products," and respondents granted petitioner the right to make, use, and sell them. The agreement defined "Licensed Products" as a specified antibody, "the manufacture, use or sale of which . . . would, if not licensed under th[e] Agreement, infringe one or more claims of either or both of [the covered patents,] which have neither expired nor been held invalid by a court or other body of competent jurisdiction from which no appeal has been or may be taken." App. 399. The license agreement gave petitioner the right to terminate upon six months' written notice.

In December 2001, the "coexpression" application covered by the 1997 license agreement matured into the "Cabilly II" patent. Soon thereafter, respondent Genentech delivered petitioner a letter expressing its belief that Synagis was covered by the Cabilly II patent and its expectation that petitioner would pay royalties beginning March 1, 2002. Petitioner did not think royalties were owing, believing that the Cabilly II patent was invalid and unenforceable,[1] and that its claims were in any event not infringed by Synagis. Nevertheless, petitioner considered the letter to be a clear threat to enforce the Cabilly II patent, terminate the 1997 license agreement, and sue for patent infringement if petitioner did not make royalty payments as demanded. If respondents were to prevail in a patent infringement action, petitioner could be ordered to pay treble damages and attorney's fees, and could be enjoined from selling Synagis, a product that has ac-

---

[1] Hereinafter, invalidity and unenforceability will be referred to simply as invalidity, with similar abbreviation of positive (validity and enforceability) and adjectival (valid and invalid, enforceable and unenforceable) forms.

Opinion of the Court

counted for more than 80 percent of its revenue from sales
since 1999. Unwilling to risk such serious consequences,
petitioner paid the demanded royalties "under protest and
with reservation of all of [its] rights." *Id.*, at 426. This
declaratory-judgment action followed.

Petitioner sought the declaratory relief discussed in
detail in Part II below. Petitioner also requested damages
and an injunction with respect to other federal and state
claims not relevant here. The District Court granted
respondents' motion to dismiss the declaratory-judgment
claims for lack of subject-matter jurisdiction, relying on
the decision of the United States Court of Appeals for the
Federal Circuit in *Gen-Probe Inc.* v. *Vysis, Inc.*, 359 F. 3d
1376 (2004). *Gen-Probe* had held that a patent licensee in
good standing cannot establish an Article III case or con-
troversy with regard to validity, enforceability, or scope of
the patent because the license agreement "obliterate[s]
any reasonable apprehension" that the licensee will be
sued for infringement. *Id.*, at 1381. The Federal Circuit
affirmed the District Court, also relying on *Gen-Probe*.
427 F. 3d 958 (2005). We granted certiorari. 546 U. S.
1169 (2006).

II

At the outset, we address a disagreement concerning the
nature of the dispute at issue here—whether it involves
only a freestanding claim of patent invalidity or rather a
claim that, both because of patent invalidity and because
of noninfringement, no royalties are owing under the
license agreement.[2] That probably makes no difference to
the ultimate issue of subject-matter jurisdiction, but it is

---

[2] The dissent contends that the question on which we granted certio-
rari does not reach the contract claim. *Post*, at 5 (opinion of THOMAS,
J.). We think otherwise. The question specifically refers to the "license
agreement" and to the contention that the patent is "not infringed."
Pet. for Cert. (i). The unmistakable meaning is that royalties are not
owing under the contract.

Opinion of the Court

well to be clear about the nature of the case before us.

Respondents contend that petitioner "is not seeking an interpretation of its present contractual obligations." Brief for Respondent Genentech 37; see also Brief for Respondent City of Hope 48–49. They claim this for two reasons: (1) because there is no dispute that Synagis infringes the Cabilly II patent, thereby making royalties payable; and (2) because while there is a dispute over patent validity, the contract calls for royalties on an infringing product whether or not the underlying patent is valid. See Brief for Respondent Genentech 7, 37. The first point simply does not comport with the allegations of petitioner's amended complaint. The very first count requested a *"DECLARATORY JUDGMENT ON CONTRACTUAL RIGHTS AND OBLIGATIONS,"* and stated that petitioner "disputes its obligation to make payments under the 1997 License Agreement because [petitioner's] sale of its Synagis® product does not infringe any valid claim of the [Cabilly II] Patent." App. 136. These contentions were repeated throughout the complaint. *Id.*, at 104, 105, 108, 147.[3] And the phrase "does not infringe any *valid* claim" (emphasis added) cannot be thought to be no more than a challenge to the patent's validity, since elsewhere the amended complaint states with unmistakable clarity that "the patent is . . . not infringed by [petitioner's] Synagis product and that [petitioner] owes no payments under license agreements with [respondents]." *Id.*, at 104.[4]

---

[3] In addition to agreeing with respondents that (despite the face of the complaint) this case does not involve a contract claim, *post*, at 4–5, the dissent evidently thinks the contract claim is weak. That, however, goes to the merits of the claim, not to its existence or the courts' jurisdiction over it. Nor is the alleged "lack of specificity in the complaint," *post*, at 4, a jurisdictional matter.

[4] The dissent observes that the District Court assumed that Synagis was "'covered by the patents at issue.'" *Post*, at 5 (quoting App. 349–350). But the quoted statement is taken from the District Court's separate opinion granting summary judgment *on petitioner's antitrust*

Opinion of the Court

As to the second point, petitioner assuredly did contend that it had no obligation under the license to pay royalties on an invalid patent. *Id.*, at 104, 136, 147. Nor is that contention frivolous. True, the license requires petitioner to pay royalties *until* a patent claim has been held invalid by a competent body, and the Cabilly II patent has not. But the license at issue in *Lear, Inc.* v. *Adkins*, 395 U. S. 653, 673 (1969), similarly provided that "royalties are to be paid until such time as the 'patent . . . is held invalid,'" and we rejected the argument that a repudiating licensee must comply with its contract and pay royalties until its claim is vindicated in court. We express no opinion on whether a *nonrepudiating licensee* is similarly relieved of its contract obligation during a successful challenge to a patent's validity—that is, on the applicability of licensee estoppel under these circumstances. Cf. *Studiengesellschaft Kohle, M. B. H.* v. *Shell Oil Co.*, 112 F. 3d 1561, 1568 (CA Fed. 1997) ("[A] licensee . . . cannot invoke the protection of the *Lear* doctrine until it (i) actually ceases payment of royalties, and (ii) provides notice to the licensor that the reason for ceasing payment of royalties is because it has deemed the relevant claims to be invalid"). All we need determine is whether petitioner has alleged a contractual dispute. It has done so.

Respondents further argue that petitioner waived its contract claim by failing to argue it below. Brief for Respondent Genentech 10–11; Tr. of Oral Arg. 30–31. The record reveals, however, that petitioner raised the contract point before the Federal Circuit. See Brief for Plantiff-Appellant MedImmune, Inc. in Nos. 04–1300, 04–1384

───────────

*claims.* For purposes of that earlier ruling, whether Synagis infringed the patent was irrelevant, and there was no harm in accepting respondents' contention on the point. This tells us nothing, however, about petitioner's contract claim or the District Court's later jurisdictional holding with respect to it.

6          MEDIMMUNE, INC. *v.* GENENTECH, INC.

Opinion of the Court

(CA Fed.), p. 38 ("Here, MedImmune is seeking to define its rights and obligations under its contract with Genentech—precisely the type of action the Declaratory Judgment Act contemplates"). That petitioner limited its contract argument to a few pages of its appellate brief does not suggest a waiver; it merely reflects counsel's sound assessment that the argument would be futile. The Federal Circuit's *Gen-Probe* precedent precluded jurisdiction over petitioner's contract claims, and the panel below had no authority to overrule *Gen-Probe*.[5] Having determined that petitioner has raised and preserved a contract claim,[6] we turn to the jurisdictional question.

---

[5] Respondents obviously agree. They said in the District Court: "The facts of this case are, for purposes of this motion, identical to the facts in *Gen-Probe*. . . . Like Gen-Probe, MedImmune filed an action seeking a declaratory judgment that: (a) it owes nothing under its license agreement with Genentech because its sales of Synagis® allegedly do not infringe any valid claim of the [Cabilly II] patent; (b) the [Cabilly II] patent is invalid; (c) the [Cabilly II] patent is unenforceable; and (d) Synagis® does not infringe the [Cabilly II] patent." App. in Nos. 04–1300, 04–1384 (CA Fed.), p. A2829 (record citations omitted).

[6] The dissent asserts that petitioner did not allege a contract claim in its opening brief or at oral argument. *Post*, at 5. This is demonstrably false. See, *e.g.*, Brief for Petitioner 8 (the Cabilly II patent was "not infringed by Synagis®, so that royalties were not due under the license"); *id.*, at 12 (Summary of Argument: "[The purpose] of the Declaratory Judgment Act . . . was to allow contracting parties to resolve their disputes in court without breach and without risking economic destruction and multiplying damages. . . . The holding [below] . . . would . . . disrupt the law of licenses and contracts throughout the economy, essentially undoing the achievement of the reformers of 1934"); Tr. of Oral Arg. 15 ("We're saying this is a contract dispute"); *id.*, at 16 ("[T]he purpose of this [the Declaratory Judgment Act] is so that contracts can be resolved without breach"); *id.*, at 57 ("The contract claim is clear in the record. It's at page 136 of the joint appendix. I don't think more needs to be said about it").

The dissent also asserts that the validity of the contract claim "hinges entirely upon a determination of the patent's validity," since "'the license requires [MedImmune] to pay royalties *until* a patent claim has been held invalid by a competent body,'" *post*, at 5, quoting

Opinion of the Court

### III

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U. S. C. §2201(a). There was a time when this Court harbored doubts about the compatibility of declaratory-judgment actions with Article III's case-or-controversy requirement. See *Willing* v. *Chicago Auditorium Assn.*, 277 U. S. 274, 289 (1928); *Liberty Warehouse Co.* v. *Grannis*, 273 U. S. 70 (1927); see also *Gordon* v. *United States*, 117 U. S. Appx. 697, 702 (1864) (the last opinion of Taney, C. J., published posthumously) ("The award of execution is . . . an essential part of every judgment passed by a court exercising judicial power"). We dispelled those doubts, however, in *Nashville, C. & St. L. R. Co.* v. *Wallace*, 288 U. S. 249 (1933), holding (in a case involving a declaratory judgment rendered in state court) that an appropriate action for declaratory relief *can* be a case or controversy under Article III. The federal Declaratory Judgment Act was signed into law the following year, and we upheld its constitutionality in *Aetna Life Ins. Co.* v. *Haworth*, 300 U. S. 227 (1937). Our opinion explained that the phrase "case of actual controversy" in the Act refers to the type of "Cases" and "Controversies" that are justiciable under Article III. *Id.*, at 240.

*Aetna* and the cases following it do not draw the brightest of lines between those declaratory-judgment actions that satisfy the case-or-controversy requirement and those that do not. Our decisions have required that the dispute be "definite and concrete, touching the legal relations of

---

*infra*, at 5. This would be true only if the license required royalties on all products under the sun, and not just those that practice the patent. Of course it does not.

8              MEDIMMUNE, INC. *v.* GENENTECH, INC.

Opinion of the Court

parties having adverse legal interests"; and that it be "real
and substantial" and "admi[t] of specific relief through a
decree of a conclusive character, as distinguished from an
opinion advising what the law would be upon a hypotheti-
cal state of facts." *Id.,* at 240–241. In *Maryland Casualty
Co.* v. *Pacific Coal & Oil Co.,* 312 U. S. 270, 273 (1941), we
summarized as follows: "Basically, the question in each
case is whether the facts alleged, under all the circum-
stances, show that there is a substantial controversy,
between parties having adverse legal interests, of suffi-
cient immediacy and reality to warrant the issuance of a
declaratory judgment."[7]

There is no dispute that these standards would have
been satisfied if petitioner had taken the final step of
refusing to make royalty payments under the 1997 license
agreement. Respondents claim a right to royalties under
the licensing agreement. Petitioner asserts that no royal-

---

[7]The dissent asserts, *post,* at 1, that "the declaratory judgment pro-
cedure cannot be used to obtain advanced rulings on matters that
would be addressed in a future case of actual controversy." As our
preceding discussion shows, that is not so. If the dissent's point is
simply that a defense cannot be raised by means of a declaratory-
judgment action where there is no "actual controversy" or where it
would be "premature," phrasing that argument as the dissent has done
begs the question: whether this is an actual, ripe controversy.

*Coffman* v. *Breeze Corps.,* 323 U. S. 316, 323–324 (1945), cited *post,*
at 3, does not support the dissent's view (which is why none of the
parties cited it). There, a patent owner sued to enjoin his licensee from
paying accrued royalties to the Government under the Royalty Adjust-
ment Act of 1942, and sought to attack the constitutionality of the Act.
The Court held the request for declaratory judgment and injunction
nonjusticiable because the patent owner asserted no right to recover
the royalties and there was no indication that the licensee would even
raise the Act as a defense to suit for the royalties. The other case the
dissent cites for the point, *Calderon* v. *Ashmus,* 523 U. S. 740, 749
(1998), simply holds that a litigant may not use a declaratory-judgment
action to obtain piecemeal adjudication of defenses that *would not
finally and conclusively resolve* the underlying controversy. That is, of
course, not the case here.

Opinion of the Court

ties are owing because the Cabilly II patent is invalid and not infringed; and alleges (without contradiction) a threat by respondents to enjoin sales if royalties are not forthcoming. The factual and legal dimensions of the dispute are well defined and, but for petitioner's continuing to make royalty payments, nothing about the dispute would render it unfit for judicial resolution. Assuming (without deciding) that respondents here could not claim an anticipatory breach and repudiate the license, the continuation of royalty payments makes what would otherwise be an imminent threat at least remote, if not nonexistent. As long as those payments are made, there is no risk that respondents will seek to enjoin petitioner's sales. Petitioner's own acts, in other words, eliminate the imminent threat of harm.[8] The question before us is whether this causes the dispute no longer to be a case or controversy within the meaning of Article III.

Our analysis must begin with the recognition that, where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced. The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction. For example, in *Terrace* v. *Thompson*, 263

---

[8]The justiciability problem that arises, when the party seeking declaratory relief is himself preventing the complained-of injury from occurring, can be described in terms of standing (whether plaintiff is threatened with "imminent" injury in fact "'fairly . . . trace[able] to the challenged action of the defendant,'" *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560 (1992)), or in terms of ripeness (whether there is sufficient "hardship to the parties [in] withholding court consideration" until there is enforcement action, *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 149 (1967)). As respondents acknowledge, standing and ripeness boil down to the same question in this case. Brief for Respondent Genentech 24; Brief for Respondent City of Hope 30–31.

U. S. 197 (1923), the State threatened the plaintiff with forfeiture of his farm, fines, and penalties if he entered into a lease with an alien in violation of the State's anti-alien land law. Given this genuine threat of enforcement, we did not require, as a prerequisite to testing the validity of the law in a suit for injunction, that the plaintiff bet the farm, so to speak, by taking the violative action. *Id.,* at 216. See also, *e.g., Village of Euclid* v. *Ambler Realty Co.,* 272 U. S. 365 (1926); *Ex parte Young,* 209 U. S. 123 (1908). Likewise, in *Steffel* v. *Thompson,* 415 U. S. 452 (1974), we did not require the plaintiff to proceed to distribute hand-bills and risk actual prosecution before he could seek a declaratory judgment regarding the constitutionality of a state statute prohibiting such distribution. *Id.,* at 458–460. As then-Justice Rehnquist put it in his concurrence, "the declaratory judgment procedure is an alternative to pursuit of the arguably illegal activity." *Id.,* at 480. In each of these cases, the plaintiff had eliminated the imminent threat of harm by simply not doing what he claimed the right to do (enter into a lease, or distribute handbills at the shopping center). That did not preclude subject-matter jurisdiction because the threat-eliminating behavior was effectively coerced. See *Terrace, supra,* at 215–216; *Steffel, supra,* at 459. The dilemma posed by that coercion—putting the challenger to the choice between abandoning his rights or risking prosecution—is "a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate." *Abbott Laboratories* v. *Gardner,* 387 U. S. 136, 152 (1967).

Supreme Court jurisprudence is more rare regarding application of the Declaratory Judgment Act to situations in which the plaintiff's self-avoidance of imminent injury is coerced by threatened enforcement action of *a private party* rather than the government. Lower federal courts, however (and state courts interpreting declaratory judgment Acts requiring "actual controversy"), have long ac-

Opinion of the Court

cepted jurisdiction in such cases. See, *e.g., Keener Oil & Gas Co.* v. *Consolidated Gas Utilities Corp.*, 190 F. 2d 985, 989 (CA10 1951); *American Machine & Metals, Inc.* v. *De Bothezat Impeller Co.*, 166 F. 2d 535 (CA2 1948); *Hess* v. *Country Club Park*, 213 Cal. 613, 614, 2 P. 2d 782, 783 (1931) (in bank); *Washington-Detroit Theater Co.* v. *Moore*, 249 Mich. 673, 675, 229 N. W. 618, 618–619 (1930); see also Advisory Committee's Note on Fed. Rule Civ. Proc. 57.[9]

The only Supreme Court decision in point is, fortuitously, close on its facts to the case before us. *Altvater* v. *Freeman*, 319 U. S. 359 (1943), held that a licensee's failure to cease its payment of royalties did not render non-justiciable a dispute over the validity of the patent. In that litigation, several patentees had sued their licensees to enforce territorial restrictions in the license. The licensees filed a counterclaim for declaratory judgment that the underlying patents were invalid, in the meantime paying "under protest" royalties required by an injunction the patentees had obtained in an earlier case. The patentees argued that "so long as [licensees] continue to pay royalties, there is only an academic, not a real controversy, between the parties." *Id.*, at 364. We rejected that argument and held that the declaratory-judgment claim presented a justiciable case or controversy: "The fact that royalties were being paid did not make this a 'difference or dispute of a hypothetical or abstract character.'" *Ibid.*

---

[9]The dissent claims the cited cases do not "rely on the coercion inherent in making contractual payments." *Post,* at 9, n. 3. That is true; they relied on (to put the matter as the dissent puts it) the coercion inherent in complying with *other* claimed contractual obligations. The dissent fails to explain why a contractual obligation of payment is magically different. It obviously is not. In our view, of course, the relevant coercion is not compliance with the claimed contractual obligation, but rather the consequences of failure to do so.

12      MEDIMMUNE, INC. *v.* GENENTECH, INC.

Opinion of the Court

(quoting *Aetna*, 300 U. S., at 240). The royalties "were being paid under protest and under the compulsion of an injunction decree," and "[u]nless the injunction decree were modified, the only other course [of action] was to defy it, and to risk not only actual but treble damages in infringement suits." 319 U. S., at 365. We concluded that "the requirements of [a] case or controversy are met where payment of a claim is demanded as of right and where payment is made, but where the involuntary or coercive nature of the exaction preserves the right to recover the sums paid or to challenge the legality of the claim." *Ibid.*[10]

---

[10] The dissent incorrectly asserts that *Altvater* required actual infringement, quoting wildly out of context (and twice, for emphasis) *Altvater*'s statement that " '[t]o hold a patent valid if it is not infringed is to decide a hypothetical case.' " *Post*, at 3, 7 (quoting 319 U. S., at 363). In the passage from which the quotation was plucked, the *Altvater* Court was distinguishing the Court's earlier decision in *Electrical Fittings Corp.* v. *Thomas & Betts Co.*, 307 U. S. 241 (1939), which involved an affirmative defense of patent invalidity that had become moot in light of a finding of no infringement. Here is the full quotation:

"The District Court [in *Electrical Fittings*] adjudged a claim of a patent valid although it dismissed the bill for failure to prove infringement. We held that the finding of validity was immaterial to the disposition of the cause and that the winning party might appeal to obtain a reformation of the decree. To hold a patent valid if it is not infringed is to decide a hypothetical case. But the situation in the present case is quite different. We have here not only bill and answer but a counterclaim. Though the decision of non-infringement disposes of the bill and answer, it does not dispose of the counterclaim which raises the question of validity." *Altvater, supra*, at 363 (footnote omitted).

As the full quotation makes clear, the snippet quoted by the dissent has nothing to do with whether infringement must be actual or merely threatened. Indeed, it makes clear that in appropriate cases to hold a noninfringed patent valid is *not* to decide a hypothetical case.

Though the dissent acknowledges the central lesson of *Altvater, post*, at 8—that payment of royalties under "coercive" circumstances does not eliminate jurisdiction—it attempts to limit that rationale to the particular facts of *Altvater*. But none of *Altvater*'s "unique facts," *post*, at 8,

Opinion of the Court

The Federal Circuit's *Gen-Probe* decision distinguished *Altvater* on the ground that it involved the compulsion of an injunction. But *Altvater* cannot be so readily dismissed. Never mind that the injunction had been privately obtained and was ultimately within the control of the patentees, who could permit its modification. More fundamentally, and contrary to the Federal Circuit's conclusion, *Altvater* did not say that the coercion dispositive of the case was governmental, but suggested just the opposite. The opinion acknowledged that the licensees had the option of stopping payments in defiance of the injunction, but explained that the *consequence* of doing so would be to risk "actual [and] treble damages in infringement suits" by the patentees. 319 U. S., at 365. It significantly did not mention the threat of prosecution for contempt, or any other sort of governmental sanction. Moreover, it cited approvingly a treatise which said that an "actual or threatened serious injury to business or employment" by a private party can be as coercive as other forms of coercion supporting restitution actions at common law; and that "[t]o imperil a man's livelihood, his business enterprises, or his solvency, [was] ordinarily quite as coercive" as, for example, "detaining his property." F. Woodward, The Law of Quasi Contracts §218 (1913), cited in *Altvater, supra,* at 365.[11]

---

suggests that a different test applies to the royalty payments here. Other than a conclusory assertion that the payments here were "voluntarily made," *post,* at 10, the dissent never explains why the threat of treble damages and the loss of 80 percent of petitioner's business does not fall within *Altvater*'s coercion rationale.

[11] Even if *Altvater* could be distinguished as an "injunction" case, it would still contradict the Federal Circuit's "reasonable apprehension of suit" test (or, in its evolved form, the "reasonable apprehension of *imminent* suit" test, *Teva Pharm. USA, Inc.* v. *Pfizer, Inc.,* 395 F. 3d 1324, 1333 (2005)). A licensee who pays royalties under compulsion of an injunction has no more apprehension of imminent harm than a licensee who pays royalties for fear of treble damages and an injunction

Jurisdiction over the present case is not contradicted by *Willing* v. *Chicago Auditorium Association*, 277 U. S. 274. There a ground lessee wanted to demolish an antiquated auditorium and replace it with a modern commercial building. The lessee believed it had the right to do this without the lessors' consent, but was unwilling to drop the wrecking ball first and test its belief later. Because there was no declaratory judgment act at the time under federal or applicable state law, the lessee filed an action to remove a "cloud" on its lease. This Court held that an Article III case or controversy had not arisen because "[n]o defendant ha[d] wronged the plaintiff or ha[d] threatened to do so." *Id.,* at 288, 290. It was true that one of the colessors had disagreed with the lessee's interpretation of the lease, but that happened in an "informal, friendly, private conversation," *id.,* at 286, a year before the lawsuit was filed; and the lessee never even bothered to approach the other colessors. The Court went on to remark that "[w]hat the plaintiff seeks is simply a declaratory judgment," and "[t]o grant that relief is beyond the power conferred upon the federal judiciary." *Id.,* at 289. Had *Willing* been decided after the enactment (and our upholding) of the Declaratory Judgment Act, and had the legal disagreement between the parties been as lively as this one, we are confi-

---

fatal to his business. The reasonable-apprehension-of-suit test also conflicts with our decisions in *Maryland Casualty Co.* v. *Pacific Coal & Oil Co.,* 312 U. S. 270, 273 (1941), where jurisdiction obtained even though the collision-victim defendant could not have sued the declaratory-judgment plaintiff-insurer without first obtaining a judgment against the insured; and *Aetna Life Ins. Co.* v. *Haworth*, 300 U. S. 227, 239 (1937), where jurisdiction obtained even though the very reason the insurer sought declaratory relief was that the insured had given no indication that he would file suit. It is also in tension with *Cardinal Chemical Co.* v. *Morton Int'l, Inc.*, 508 U. S. 83, 98 (1993), which held that appellate affirmance of a judgment of noninfringement, eliminating any apprehension of suit, does not moot a declaratory judgment counterclaim of patent invalidity.

Cite as: 549 U. S. ____ (2007)            15

Opinion of the Court

dent a different result would have obtained.  The rule that
a plaintiff must destroy a large building, bet the farm, or
(as here) risk treble damages and the loss of 80 percent of
its business, before seeking a declaration of its actively
contested legal rights finds no support in Article III.[12]

Respondents assert that the parties in effect settled this
dispute when they entered into the 1997 license agree-
ment.  When a licensee enters such an agreement, they
contend, it essentially purchases an insurance policy,
immunizing it from suits for infringement so long as it
continues to pay royalties and does not challenge the

---

[12] The dissent objects to our supposed "extension of *Steffel* [v. *Thomp-
son*] . . . to apply to voluntarily accepted contractual obligations be-
tween private parties."  *Post,* at 9.  The criticism is misdirected in
several respects.  The coercion principle upon which we rely today did
not originate with *Steffel* v. *Thompson,* 415 U. S. 452 (1974), see *supra,*
at 9–10, and we have no opportunity to *extend* it to private litigation,
because *Altvater* v. *Freeman,* 319 U. S. 359 (1943) already did so, see
*supra,* at 12.  Moreover, even if today's decision could be described as
an "extension of *Steffel*" to private litigation, the dissent identifies no
principled reason why that extension is not appropriate.  Article III
does not favor litigants challenging threatened *government* enforcement
action over litigants challenging threatened *private* enforcement action.
Indeed, the latter is perhaps the easier category of cases, for it presents
none of the difficult issues of federalism and comity with which we
wrestled in *Steffel.*  See 415 U. S., at 460–475.

The dissent accuses the Court of misapplying *Steffel's* rationale.
*Post,* at 10.  It contends that *Steffel* would apply here only if respon-
dents had threatened petitioner with a patent infringement suit *in the
absence of a license agreement,* because only then would petitioner be
put to the choice of selling its product or facing suit.  *Post,* at 10.  Here,
the dissent argues, the license payments are "voluntarily made."  *Ibid.*
If one uses the word "voluntarily" so loosely, it could be applied with
equal justification (or lack thereof) to the *Steffel* plaintiff's "voluntary"
refusal to distribute handbills.  We find the threat of treble damages
and loss of 80 percent of petitioner's business every bit as coercive as
the modest penalties for misdemeanor trespass threatened in *Steffel.*
Only by ignoring the consequences of the threatened action in this case
can the dissent claim that today's opinion "contains no limiting princi-
ple whatsoever," *post,* at 10.

Opinion of the Court

covered patents. Permitting it to challenge the validity of the patent without terminating or breaking the agreement alters the deal, allowing the licensee to continue enjoying its immunity while bringing a suit, the elimination of which was part of the patentee's *quid pro quo*. Of course even if it were valid, this argument would have no force with regard to petitioner's claim that the agreement does not call for royalties because their product does not infringe the patent. But even as to the patent invalidity claim, the point seems to us mistaken. To begin with, it is not clear where the prohibition against challenging the validity of the patents is to be found. It can hardly be implied from the mere promise to pay royalties on patents "which have neither expired nor been held invalid by a court or other body of competent jurisdiction from which no appeal has been or may be taken," App. 399. Promising to pay royalties on patents that have not been held invalid does not amount to a promise *not to seek* a holding of their invalidity.

Respondents appeal to the common-law rule that a party to a contract cannot at one and the same time challenge its validity and continue to reap its benefits, citing *Commodity Credit Corp.* v. *Rosenberg Bros. & Co.*, 243 F. 2d 504, 512 (CA9 1957), and *Kingman & Co.* v. *Stoddard*, 85 F. 740, 745 (CA7 1898). *Lear,* they contend, did not suspend that rule for patent licensing agreements, since the plaintiff in that case had already repudiated the contract. Even if *Lear's* repudiation of the doctrine of licensee estoppel was so limited (a point on which, as we have said earlier, we do not opine), it is hard to see how the common-law rule has any application here. Petitioner is not repudiating or impugning the contract while continuing to reap its benefits. Rather, it is asserting that the contract, properly interpreted, does not prevent it from challenging the patents, and does not require the payment of royalties because the patents do not cover its products

Opinion of the Court

and are invalid. Of course even if respondents were correct that the licensing agreement or the common-law rule precludes this suit, the consequence would be that respondents win this case *on the merits*—*not* that the very genuine contract dispute disappears, so that Article III jurisdiction is somehow defeated. In short, Article III jurisdiction has nothing to do with this "insurance-policy" contention.

Lastly, respondents urge us to affirm the dismissal of the declaratory-judgment claims on discretionary grounds. The Declaratory Judgment Act provides that a court "*may* declare the rights and other legal relations of any interested party," 28 U. S. C. §2201(a) (emphasis added), not that it *must* do so. This text has long been understood "to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton* v. *Seven Falls Co.*, 515 U. S. 277, 286 (1995); see also *Cardinal Chemical Co.* v. *Morton Int'l, Inc.*, 508 U. S. 83, 95, n. 17 (1993); *Brillhart* v. *Excess Ins. Co. of America*, 316 U. S. 491, 494–496 (1942). We have found it "more consistent with the statute," however, "to vest district courts with discretion in the first instance, because facts bearing on the usefulness of the declaratory judgment remedy, and the fitness of the case for resolution, are peculiarly within their grasp." *Wilton, supra,* at 289. The District Court here gave no consideration to discretionary dismissal, since, despite its "serious misgivings" about the Federal Circuit's rule, it considered itself bound to dismiss by *Gen-Probe.* App. to Pet. for Cert. 31a. Discretionary dismissal was irrelevant to the Federal Circuit for the same reason. Respondents have raised the issue for the first time before this Court, exchanging competing accusations of inequitable conduct with petitioner. See, *e.g.,* Brief for Respondent Genentech 42–44; Reply Brief for Petitioner 17, and n. 15. Under these circumstances, it would be imprudent for us to decide whether the District

18      MEDIMMUNE, INC. *v.* GENENTECH, INC.

Opinion of the Court

Court should, or must, decline to issue the requested declaratory relief. We leave the equitable, prudential, and policy arguments in favor of such a discretionary dismissal for the lower courts' consideration on remand. Similarly available for consideration on remand are any merits-based arguments for denial of declaratory relief.

\*      \*      \*

We hold that petitioner was not required, insofar as Article III is concerned, to break or terminate its 1997 license agreement before seeking a declaratory judgment in federal court that the underlying patent is invalid, unenforceable, or not infringed. The Court of Appeals erred in affirming the dismissal of this action for lack of subject-matter jurisdiction.

The judgment of the Court of Appeals is reversed, and the cause is remanded for proceedings consistent with this opinion.

*It is so ordered.*

Cite as: 549 U. S. ____ (2007)     1

THOMAS, J., dissenting

# SUPREME COURT OF THE UNITED STATES

No. 05–608

## MEDIMMUNE, INC., PETITIONER v. GENENTECH, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

[January 9, 2007]

JUSTICE THOMAS, dissenting.

We granted certiorari in this case to determine whether a patent licensee in good standing must breach its license prior to challenging the validity of the underlying patent pursuant to the Declaratory Judgment Act, 28 U. S. C. §2201. 546 U. S. 1169 (2006). The answer to that question is yes. We have consistently held that parties do not have standing to obtain rulings on matters that remain hypothetical or conjectural. We have also held that the declaratory judgment procedure cannot be used to obtain advanced rulings on matters that would be addressed in a future case of actual controversy. MedImmune has sought a declaratory judgment for precisely that purpose, and I would therefore affirm the Court of Appeals' holding that there is no Article III jurisdiction over MedImmune's claim. The Court reaches the opposite result by extending the holding of *Steffel* v. *Thompson*, 415 U. S. 452 (1974), to private contractual obligations. I respectfully dissent.

I

Article III of the Constitution limits the judicial power to the adjudication of "Cases" or "Controversies." §2. We have held that the Declaratory Judgment Act extends "to controversies which are such in the constitutional sense." *Aetna Life Ins. Co.* v. *Haworth*, 300 U. S. 227, 240 (1937).

2        MEDIMMUNE, INC. *v.* GENENTECH, INC.

In the context of declaratory judgment actions, this Court's cases have provided a uniform framework for assessing whether an Article III case or controversy exists. In the constitutional sense, a "Controversy" is "distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot." *Ibid.* (citing *United States* v. *Alaska S. S. Co.*, 253 U. S. 113, 116 (1920)). "The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests." 300 U. S., at 240–241. Finally, "[i]t must be a real and substantial controversy . . . , as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id.*, at 241.

The Declaratory Judgment Act did not (and could not) alter the constitutional definition of "case or controversy" or relax Article III's command that an actual case or controversy exist before federal courts may adjudicate a question. See *Maryland Casualty Co.* v. *Pacific Coal & Oil Co.*, 312 U. S. 270, 272–273 (1941). Thus, this Court has held that "the operation of the Declaratory Judgment Act is procedural only." *Aetna Life Ins.*, 300 U. S., at 240. In other words, the Act merely provides a different procedure for bringing an actual case or controversy before a federal court. The Court applied that principle in *Aetna Life Ins.*, where an insurance company brought a declaratory judgment action against an insured who claimed he had become disabled, had formally presented his claims, and had refused to make any more insurance payments. *Id.*, at 242. In the course of deciding that it could entertain the insurer's declaratory judgment action, the Court specifically noted that, had the insured filed his traditional cause of action first, "there would have been no question that the controversy was of a justiciable nature . . . ." *Id.*, at 243. Accordingly, the Act merely provided a different procedural tool that allowed the insurance company to bring an otherwise justiciable controversy before a federal court.

THOMAS, J., dissenting

We have also held that no controversy exists when a declaratory judgment plaintiff attempts to obtain a premature ruling on potential defenses that would typically be adjudicated in a later actual controversy. In *Coffman* v. *Breeze Corps.*, 323 U. S. 316 (1945), a patent owner brought a declaratory judgment action against his licensees seeking to have the Royalty Adjustment Act of 1942 declared unconstitutional and to enjoin his licensees from paying accrued royalties to the Government. This Court held that no case or controversy existed because the validity of the Royalty Adjustment Act would properly arise only as a defense in a suit by the patentholder against the licensees to recover royalties. *Id.*, at 323–324. Accordingly, the complaint at issue was "but a request for an advisory opinion as to the validity of a defense to a suit for recovery of the royalties." *Id.*, at 324. And the Court noted that "[t]he declaratory judgment procedure . . . may not be made the medium for securing an advisory opinion in a controversy which has not arisen." *Ibid.; see also Calderon* v. *Ashmus*, 523 U. S. 740, 747 (1998) (holding that a prisoner may not use a declaratory judgment action to determine the validity of a defense that a State might raise in a future habeas proceeding).

These principles apply with equal force in the patent licensing context. In *Altvater* v. *Freeman*, 319 U. S. 359, 365–366 (1943), the Court, quite unremarkably, held that a "licensee" had standing to bring a declaratory judgment counterclaim asserting the affirmative defense of patent invalidity in response to a patent infringement suit. But not to be mistaken, the *Altvater* Court expressly stated that "[t]o hold a patent valid if it is not infringed is to decide a hypothetical case." *Id.*, at 363. So too, in *Cardinal Chemical Co.* v. *Morton Int'l, Inc.*, 508 U. S. 83, 86 (1993), the affirmative defense of patent invalidity was raised as a counterclaim to a patent infringement suit. Although we held that a finding of noninfringement on

4       MEDIMMUNE, INC. *v.* GENENTECH, INC.

appeal did not moot a counterclaim alleging invalidity, *id.,* at 102–103, we stated that our holding was limited to the jurisdiction of an appellate court and reiterated that "[i]n the trial court, of course, a party seeking a declaratory judgment has the burden of establishing the existence of an actual case or controversy," *id.,* at 95.

II

Against the foregoing background, the case before us is not a justiciable case or controversy under Article III.

A

As a threshold matter, I disagree with the Court's characterization of this case as including a "contractual dispute." *Ante,* at 5. To substantiate this characterization, the Court points to a three-paragraph count in MedImmune's complaint entitled "*'DECLARATORY JUDGMENT ON CONTACTUAL RIGHTS AND OBLIGATIONS'*" and to MedImmune's broad allegations that "'its Synagis® product does not infringe any valid claim of the [Cabilly II] Patent.'" *Ante,* at 4. Nowhere in its complaint did MedImmune state why "sale[s] of its Synagis® product d[o] not infringe any valid claim of the [Cabilly II] Patent." App. 136.[1] Given the lack of specificity in the complaint, it is hardly surprising that the Court never explains what the supposed contract dispute is actually about. A fair reading of the amended complaint (and a review of the litigation thus far) shows that MedImmune's "contract count" simply posits that because the patent is invalid and unenforceable (as alleged in counts II and III), MedImmune is not bound by its contractual obligations. As the

---

[1] In addition, the fact that MedImmune did not identify anywhere in the record which provision of the contract was at issue suggests that there is no contractual provision to "be construed before or after breach." Advisory Committee's Notes on Fed. Rule Civ. Proc. 57, 28 U. S. C. App., pp. 790–791.

THOMAS, J., dissenting

Court admits, "the license requires [MedImmune] to pay royalties *until* a patent claim has been held invalid by a competent body . . . ." *Ante*, at 5 (emphasis in original). Thus, even assuming the existence of a cognizable contract claim, the validity of that claim hinges entirely upon a determination of the patent's validity, independent of any contractual question. As such, MedImmune's "contract claim" simply repackages its patent invalidity claim.

Probably for this reason, MedImmune has not pursued a contract claim at any level of the litigation. The District Court stated that the product that was the subject of the license, Synagis, was "covered by the patents at issue," App. 349–350, and MedImmune has never challenged that characterization. The Federal Circuit decided this case on the sole ground that a licensee in good standing may not bring a declaratory judgment action to challenge the validity of the underlying patent without some threat or apprehension of a patent infringement suit. See 427 F. 3d 958, 965 (2005). The question MedImmune presented in its petition for certiorari, which we accepted without alteration, says nothing about a contract claim. Neither does MedImmune's opening brief allege a contractual dispute. Even at oral argument, it was not MedImmune, but an *amicus*, that alleged there was a contract dispute at issue in this case. Tr. of Oral Arg. 21–22.

In short, MedImmune did not "rais[e] and preserv[e] a contract claim." *Ante*, at 6. In reaching a contrary conclusion, the Court states that its identification of a contract claim "probably makes no difference to the ultimate" outcome of this case. *Ante*, at 3. This may very well be true, if only because of the broad scope of the Court's holding.

B

The facts before us present no case or controversy under Article III. When MedImmune filed this declaratory

judgment action challenging the validity of the Cabilly II patent, it was under no threat of being sued by Genentech for patent infringement. This was so because MedImmune was a licensee in good standing that had made all necessary royalty payments. Thus, by voluntarily entering into and abiding by a license agreement with Genentech, MedImmune removed any threat of suit. See *ante*, at 9 (stating the threat of suit was "remote, if not nonexistent"). MedImmune's actions in entering into and continuing to comply with the license agreement deprived Genentech of any cause of action against MedImmune. Additionally, MedImmune had no cause of action against Genentech. Patent invalidity is an affirmative defense to patent infringement, not a freestanding cause of action. See 35 U. S. C. §§282(2)–(3). Therefore, here, the Declaratory Judgment Act must be something more than an alternative procedure for bringing on otherwise actual case or controversy before a federal court. But see *Aetna Life Ins.*, 300 U. S., at 240 ("[T]he operation of the Declaratory Judgment Act is procedural only").

Because neither Genentech nor MedImmune had a cause of action, MedImmune's prayer for declaratory relief can be reasonably understood only as seeking an advisory opinion about an affirmative defense it might use in some future litigation. MedImmune wants to know whether, if it decides to breach its license agreement with Genentech, and if Genentech sues it for patent infringement, it will have a successful affirmative defense. Presumably, upon a favorable determination, MedImmune would then stop making royalty payments, knowing in advance that the federal courts stand behind its decision. Yet as demonstrated above, the Declaratory Judgment Act does not allow federal courts to give advisory rulings on the potential success of an affirmative defense before a cause of action has even accrued. *Calderon*, 523 U. S., at 747 (dismissing a suit that "attempt[ed] to gain a litigation

THOMAS, J., dissenting

advantage by obtaining an advance ruling on an affirmative defense"); see also *Coffman,* 323 U. S., at 324 (rejecting use of the Declaratory Judgment Act as a "medium for securing an advisory opinion in a controversy which has not arisen"). MedImmune has therefore asked the courts to render "an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Ins., supra,* at 241; see also *Public Serv. Comm'n of Utah* v. *Wycoff Co.,* 344 U. S. 237, 244 (1952) ("The disagreement must not be nebulous or contingent but must have taken on fixed and final shape . . ."). A federal court cannot, consistent with Article III, provide MedImmune with such an opinion.

Finally, as this Court has plainly stated in the context of a counterclaim declaratory judgment action challenging the validity of a patent, "[t]o hold a patent valid if it is not infringed is to decide a hypothetical case." *Altvater,* 319 U. S., at 363. Of course, MedImmune presents exactly that case. Based on a clear reading of our precedent, I would hold that this case presents no actual case or controversy.

### III

To reach today's result, the Court misreads our precedent and expands the concept of coercion from *Steffel,* 415 U. S. 452, to reach voluntarily accepted contractual obligations between private parties.

### A

The Court inappropriately relies on *Altvater,* which is inapplicable to this case for three reasons. First, in *Altvater,* the affirmative defense of patent invalidity arose in a declaratory judgment motion filed as a counterclaim to a patent infringement suit. See 319 U. S., at 360. Second, the opinion in *Altvater* proceeds on the understanding that no license existed. Both the District Court and the Court of Appeals had already held that the underlying license had been terminated prior to the filing of the case. *Id.,* at

THOMAS, J., dissenting

365 ("Royalties were being demanded and royalties were being paid. But they were being paid . . . under the compulsion of an injunction decree"). Third, and related, though the one-time licensee continued to pay royalties, it did so under the compulsion of an injunction that had been entered in a prior case. *Ibid. Altvater* simply held that under the unique facts of that case, the Court of Appeals erred in considering the declaratory judgment counterclaim moot because the "involuntary or coercive nature of the exaction preserve[d] the right to recover the sums paid or to challenge the legality of the claim." *Ibid.*

*Cardinal Chemical Co.* v. *Morton Int'l, Inc.*, 508 U. S. 83 (1993), is similarly inapt here. In that case, as in *Altvater*, the defendant raised the affirmative defense of patent invalidity in a counterclaim to a patent infringement suit. 508 U. S., at 86. We specifically held that a finding of noninfringement on appeal did not moot a counterclaim alleging invalidity. *Id.*, at 102–103. But we stressed:

> "[T]he issue before us, therefore[,] concern[s] the jurisdiction of an intermediate appellate court—not the jurisdiction of a trial . . . court . . . . In the trial court, of course, a party seeking a declaratory judgment has the burden of establishing the existence of an actual case or controversy." *Id.*, at 95.

We went on to offer a hypothetical that showed a party could seek a declaratory judgment "[i]n patent litigation . . . even if the patentee has not filed an infringement action." *Ibid.* However, that hypothetical involved a patent-holder that threatened an infringement suit against a competitor (*not* a licensee) that continued to sell the allegedly infringing product and faced growing liability. In doing so, we hypothesized a situation that paralleled the facts in *Aetna Life Ins.:* The patentee had a cause of action against an alleged infringer and could have brought suit at any moment, and the declaratory judg-

THOMAS, J., dissenting

ment procedure simply offered the alleged infringer a different method of bringing an otherwise justiciable case or controversy into court.[2]

B

The Court's more serious error is its extension of *Steffel*, *supra*, to apply to voluntarily accepted contractual obligations between private parties. No court has ever taken such a broad view of *Steffel*.

In *Steffel*, the Court held that in certain limited circumstances, a party's anticipatory cause of action qualified as a case or controversy under Article III. Based expressly on the coercive nature of governmental power, the Court found that "it is not necessary that petitioner first expose himself to *actual arrest* or *prosecution* to be entitled to challenge a *statute* that he claims deters the exercise of his constitutional rights." *Id.,* at 459 (emphasis added). Limited, as it is, to governmental power, particularly the power of arrest and prosecution, *Steffel* says nothing about coercion in the context of private contractual obligations. It is therefore not surprising that, until today, this Court has never applied *Steffel* and its theory of coercion to private contractual obligations; indeed, no court has ever done so.[3]

The majority not only extends *Steffel* to cases that do

---

[2] Additionally, *Lear, Inc.* v. *Adkins*, 395 U. S. 653 (1969), has little to do with this case. It addressed the propriety and extent of the common-law doctrine of licensee estoppel, and the licensee in *Lear* had ceased making payments under the license agreement—a fact that makes the case singularly inapposite here. *Id.,* at 659–660. *Lear* did not involve the Declaratory Judgment Act because the case was brought as a breach-of-contract action for failure to pay royalties.

[3] Admitting that such decisions are "rare," *ante,* at 9, the Court cites cases predating *Steffel* that hold that a court may construe contractual provisions prior to breach. Those cases do not rely on the coercion inherent in making contractual payments. See, *e.g., Keener Oil & Gas Co.* v. *Consolidated Gas Util. Corp.*, 190 F. 2d 985, 989 (CA10 1951).

10 MEDIMMUNE, INC. *v.* GENENTECH, INC.

THOMAS, J., dissenting

not involve governmental coercion, but also extends *Steffel*'s rationale. If "coercion" were understood as the Court used that term in *Steffel*, it would apply only if Genentech had threatened MedImmune with a patent infringement suit *in the absence of a license agreement.* At that point, MedImmune would have had a choice, as did the declaratory plaintiff in *Steffel*, either to cease the otherwise protected activity (here, selling Synagis) or to continue in that activity and face the threat of a lawsuit. But MedImmune faced no such choice. Here, MedImmune could continue selling its product without threat of suit because it had eliminated any risk of suit by entering into a license agreement. By holding that the voluntary choice to enter an agreement to avoid some other coerced choice is itself coerced, the Court goes far beyond *Steffel*.

The majority explains that the "coercive nature of the exaction preserves the right . . . to challenge the legality of the claim." *Ante*, at 12 (internal quotation marks omitted). The coercive nature of what "exaction"? The answer has to be the voluntarily made license payments because there was no threat of suit here. By holding that contractual obligations are sufficiently coercive to allow a party to bring a declaratory judgment action, the majority has given every patent licensee a cause of action and a free pass around Article III's requirements for challenging the validity of licensed patents. But the reasoning of today's opinion applies not just to patent validity suits. Indeed, today's opinion contains no limiting principle whatsoever, casting aside Justice Stewart's understanding that *Steffel*'s use would "be exceedingly rare." 415 U. S., at 476 (concurring opinion).

For the foregoing reasons, I respectfully dissent.

# EXHIBIT F



Not Reported in F.Supp.
Not Reported in F.Supp., 1991 WL 317019 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

Page 1

**H**
Briefs and Other Related Documents
Conoco, Inc. v. SkinnerD.Del.,1991.Only the West-law citation is currently available.
United States District Court, D. Delaware.
CONOCO, INC., et al., Plaintiffs,
v.
Samuel K. SKINNER, as Secretary of Transporta-tion, et al., Defendants.
**Civ. A. No. 91-122-JLL.**

Nov. 12, 1991.

Richard Allen Paul of E.I. du Pont de Nemours and Company, Wilmington, and Mark P. Schlefer, T.S.L. Perlman, Leonard Egan, and William C. Buckhold of Fort & Schlefer, Washington, D.C., of counsel, for plaintiff.
William C. Carpenter, Jr., United States Attorney and Kent A. Jordan, Assistant United States Attorney, Wilmington, Stuart M. Gerson, Assistant Attorney General, Washington, D.C., Sandra M. Schraibman, Assistant Director, and Susan Friedman Cohen, Civil Division Trial Attorney, for the United States Depart-ment of Justice, Rosalind Avnet Lazarus for the De-partment of Transportation, Robert J. Patton, Jr., Deputy Chief Counsel and Sandra L. Jenkins, Assist-ant Chief Counsel, for the Maritime Administration, John Astley for the United States Coast Guard, and William Sandler for the United States Customs Ser-vice, Washington, D.C., for defendants.

MEMORANDUM OPINION
LATCHUM, Senior District Judge.
*1 Plaintiffs, E.I. du Pont de Nemours and Company ("Du Pont") and its wholly owned subsidiary Conoco, Inc. ("Conoco"), seek judicial review in this Court of federal agency action concerning document-ation, ownership, and chartering of vessels in coast-wise trade under the Administrative Procedure Act ("APA"). 5 U.S.C. § 701 et seq. (Docket Item ["D.I."] 1, 13.) Defendants, the United States Depart-ments of Transportation and Treasury, the United States Coast Guard, the United States Customs Ser-vice, the Maritime Commission, and the United States of America, contend that these issues fall with-

in the exclusive jurisdiction of the court of appeals under the Hobbs Act. 28 U.S.C. § 2342. Accordingly, the defendants moved this Court to dismiss the action for lack of jurisdiction. (D.I. 6, 7.)

The plaintiffs then moved for summary judgment on the merits. (D.I. 11, 12.) In response, defendants' moved to stay consideration of the motion for sum-mary judgment in order to resolve the preliminary is-sue of whether this Court has subject matter jurisdic-tion. (D.I. 18.) In this Court's discretion, after balan-cing the competing interests at issue, consideration of the plaintiffs' motion for summary judgment must be suspended until the jurisdictional issue in defendants' motion to dismiss is resolved.

*Discussion*

The power to stay proceedings, so as to promote fair and efficient adjudication, is incidental to the Court's inherent power to control the disposition of the cases on its docket. *Gold v. Johns-Manville Sales Corp.,* 723 F.2d 1068 (3d Cir.1983) (citing *Landis v. North American Co.,* 299 U.S. 248, 254 (1936)). When de-termining whether a stay is appropriate, the Court should balance the competing interests, consider the possible damage, hardship, and inequities and con-serve judicial resources. *Lenox Hotel Co. v. Charter Builders, Inc.,* 717 F.Supp. 1558, 1564 (N.D.Ga.1989). For the reasons set forth below, granting a stay is appropriate under the facts and cir-cumstances of this case.

First, this Court cannot consider the merits of the case until it first is assured of its jurisdiction. *Allied Poultry Processors Co. v. Polin,* 134 F.Supp 278, 279 (D.Del.1955) (jurisdiction must be secured before proceeding with the other substantive contentions). Here, this Court seriously questions its jurisdiction and it cannot proceed until it is assured that jurisdic-tion is appropriate. Although the Third Circuit may welcome the views of this Court on the merits even if this Court ultimately lacks jurisdiction, the United States Constitution forbids this Court from fulfilling such an advisory role. The judicial power in Article III is not unconditioned authority to determine the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 2
Not Reported in F.Supp., 1991 WL 317019 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

constitutionality of legislative or executive acts. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 471, 473-75 (1982).*

Second, this Court believes that discussion on the merits raises issues separate and distinct from any discussion of jurisdiction. In this Court's discretion, these two complex matters cannot be efficiently considered in a single proceeding. Not only will examination of discrete issues risk confusion, a determination of the merits is contingent upon subject matter jurisdiction and it would be wasteful to deal with contentions possibly rendered moot on jurisdictional grounds. Also, an initial probe into the jurisdictional issue will allow the parties to sharpen the inquiry on the merits and concentrate their efforts in a subsequent hearing, regardless of the forum. This Court believes that a stay will eliminate the possibility of duplicate hearings addressing plaintiffs' substantive contentions and conserve the time, effort and resources of all involved.

*\*2* The plaintiffs' state their intention to appeal any order to dismiss on jurisdictional grounds, apparently to convince this Court that a stay is inappropriate. The plaintiffs' intentions do not persuade this Court to simultaneously resolve both the jurisdictional and substantive issues. To the contrary, it makes the necessity of a deliberate, isolated look at the jurisdictional issue more important. Moreover, the plaintiffs' argument that their victory on appeal would force "this Court to address the case a second time with the probability of a second appeal on the merits" is not well taken. (D.I. 19.) It appears to this Court that plaintiffs' anticipate not only an unwarranted dismissal on jurisdictional grounds but an erroneous decision by this Court on the merits. This argument is not only speculative and demeaning to the Court but subsequent appeals on this Court's legal decisions have little bearing on its discretionary control of the cases on its docket.

Third, this Court can find no harm or prejudice accruing to either party. The plaintiffs' apparently oppose a stay only on the grounds of judicial economy, contending that it "makes good sense" to determine both the jurisdictional and substantive issues in a single

proceeding. (D.I. 19.) Neither the plaintiffs nor the defendants outline any damage, hardship, or inequities arising from the granting of a stay. Quite the opposite appears to be true, the parties will obtain a timely ruling on the merits regardless of the ultimate determination of the jurisdictional issue. The action is currently pending before the Third Circuit and it appears that the Third Circuit could resolve the matter should this Court lack jurisdiction. To the extent that plaintiffs raise claims ancillary to those matters over which the court of appeals has exclusive review under the Hobbs Act, such a claim is subject to review exclusively by the court of appeals. *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743 (1985) (preliminary or ancillary issues to the core issue in a proceeding should be reviewed in the same forum as the final order resolving the core issue); *Telecommunications Research and Action Center v. FCC,* 750 F.2d 70, 75 (D.C.Cir.1984) (where statute grants exclusive jurisdiction, any suit possibly affecting future jurisdiction is subject to the same exclusive review by use of the All Writs Act).

*Conclusion*

This Court holds that postponement of consideration of the plaintiffs' motion for summary judgment is appropriate to promote fair and efficient adjudication. Therefore, defendants' motion to stay will be granted. An order will be entered in accordance with this Memorandum Opinion.

D.Del.,1991.
Conoco, Inc. v. Skinner
Not Reported in F.Supp., 1991 WL 317019 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:91cv00122 (Docket) (Mar. 11, 1991)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT G

1

1               IN THE UNITED STATES DISTRICT COURT

2               IN AND FOR THE DISTRICT OF DELAWARE

3                          -  -  -

4    MERCK & CO., INC.,            :        Civil Action
5                                  :
                 Plaintiff,        :
6                                  :
         v.                        :
7                                  :
     APOTEX INC.,                  :
8                                  :
                 Defendant.        :        No. 06-230-GMS
9                          -  -  -

10
                        Wilmington, Delawrae
11                   Friday, November 3, 2006
                          10:00 a.m.
12                       Teleconference

13                         -  -  -

14   BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.

15   APPEARANCES:

16           MARY B. GRAHAM, ESQ.
             Morris, Nichols, Arsht & Tunnell
17                   -and-
             NICHOLAS G. BARZOUKAS, ESQ., and
18           JASON C. ABAIR, ESQ.
             Weil, Gotshal & Manges LLP
19           (Houston, Texas)

20                          Counsel for Plaintiff

21           RICHARD G. HORWITZ, ESQ.
             Potter Anderson & Corroon LLP
22                   -and-
             ROBERT B. BREISBLATT, ESQ., and
23           LOUISE T. WALSH, ESQ.
             Welsh & Katz, Ltd.
24           (Chicago, Illinois)

25                          Counsel for Defendant

```
 1              THE COURT:  Good morning, counsel.  We have for

 2    Merck today Ms. Graham.

 3              MS. GRAHAM:  Yes.  Good morning, Your Honor.

 4    With me today are Nick Barzoukas and Jason Abair from Weil

 5    Gotshal.

 6              (Counsel say "Good morning.")

 7              THE COURT:  Mr. Horwitz.

 8              MR. HORWITZ:  Good morning, Your Honor.  Rich

 9    Horwitz from Potter Anderson along with Robert Breisblatt

10    Louise Walsh from Welsh & Katz in Chicago.

11              THE COURT:  Good morning.

12              We have a dispute, one, regarding Merck's

13    responses to Apotex's first set of requests for admissions

14    and interrogatories.  Who is going to take this up?

15              MS. WALSH:  I will, Your Honor.  Louise Walsh.

16              On September 11, I believe it was, we served

17    discovery requests to Merck.  They consisted of 12 requests

18    to admit and 12 interrogatories, which correspond to the

19    requests to admit.

20              Basically, nine of the requests to admit were

21    asking Merck to admit that Apotex's generic version didn't

22    infringe any of the claims of each of the nine patents that

23    were asserted by Merck, and that was nine of the requests to

24    admit.  Then there were three requests to admit that were

25    directed at the validity of three of the patents.  We asked
```

3

1    Merck to admit that each of those three patents was invalid

2    in light of the Federal Circuit's decision in the Merck v.

3    Teva case, which found that two of the claims of the '329

4    patent were invalid.

5              And then for each of those requests to admit,

6    there was a corresponding interrogatory, which, if the

7    response to the request to admit was anything other than an

8    unqualified admission, we asked them to identify each claim

9    of the patent that they thought was infringed and state, you

10   know, the basis for their contention that it was infringed

11   or, in the case of the invalidity request, we asked them to

12   state the basis for why they thought the relevant claim was

13   not invalid.

14             And on October 13, I believe, we received

15   Merck's responses to the requests to admit and the

16   interrogatories.  And basically, Merck objected to each of

17   the requests to admit and the interrogatories as irrelevant

18   in light of the covenant not to sue that they served.

19             So I guess they denied each of the requests to

20   admit, and then in the interrogatories they responded that

21   it was irrelevant and therefore didn't go beyond that.

22             So our dispute is, of course, we don't

23   believe -- I mean, we realize that Merck's motion to dismiss

24   is pending.  It hasn't been decided.  The discovery has not

25   been stayed.  Merck has not moved to stay discovery.

4

1    Therefore, we are trying to proceed along with this case in

2    terms of discovery.  And we don't believe that the covenant

3    not to sue renders our requests to admit or interrogatories

4    irrelevant.

5         The covenant not to sue specifically declined to

6    admit noninfringement or invalidity.  We still have a

7    controversy over those issues because they do affect this

8    Court's decision-triggering event of the 180-day exclusivity

9    period, and therefore, we don't think that they are

10   irrelevant.  They should be answered because there has been

11   no stay in discovery.

12        THE COURT:  Okay.  Who is going to respond?

13        MR. BARZOUKAS:  Your Honor, Nick Barzoukas here.

14   I will be responding.

15        THE COURT:  Okay.

16        MR. BARZOUKAS:  With respect to responses to the

17   requests for admission to the interrogatories, we have

18   responded to the questions that were asked of us.  We did

19   object on the ground that we have provided them with a

20   covenant not to sue.  Therefore, there is no issue of

21   infringement.  However, we went ahead and otherwise

22   responded because we said, subject to our objections to the

23   requests for admissions, we denied them.

24        Now, with respect to interrogatories, they

25   proceeded to ask to state in detail any legal and factual

1    basis for our contentions.  We stated our objections and we

2    did not, you know, to their satisfaction provide contentions

3    because we don't have any.

4              So this is our response regardless of whether

5    you were to grant or not grant our motion to dismiss.  And

6    therefore, we feel that we have answered their requests for

7    admission.

8              Now, Ms. Walsh brought up this issue about a

9    triggering event, and that that somehow provides a basis for

10   controversy.  With respect to that, this is an issue that

11   Apotex has litigated multiple times in D.C. and the D.C.

12   Circuit, to try to assert that somehow the fact that there

13   could be this possible triggering event provides a

14   controversy.  And that is something that has been decided

15   against Apotex in multiple cases.  It is a fact that it does

16   not provide a controversy.

17             If I may, this is something I hate to do, but I

18   can read you, it's actually three long sentences from a

19   decision that came out this summer.

20             THE COURT:  Okay.

21             MR. BARZOUKAS:  By the D.C. Circuit.

22             THE COURT:  The cite?

23             MR. BARZOUKAS:  Yes, Your Honor.  449 Federal

24   Circuit 3d, the first page of the case is 1249.  And this

25   appears on Page 1253.  The style of the case is Apotex v.

6

```
 1   SDA:

 2              As Apotex observes, no generic manufacturer can

 3   maintain an action against a patentholder who has promised

 4   never to sue for infringement, since under settled Federal

 5   Circuit law any such promise would relieve the challenger of

 6   a reasonable apprehension of suit and moot a declaratory

 7   judgment action.  See Super Sack.  According to Apotex, this

 8   creates an anomalous situation.  Although a patent might be

 9   unenforceable because of the patentholder's representations,

10   no court would have jurisdiction to render a holding to that

11   effect.

12              The D.C. Circuit goes on then to state:

13              This arguable anomaly, however, nullifies

14   nothing in the Hatch-Waxman Act.  Congress knew that the

15   federal courts lacked jurisdiction where no case or

16   controversy exists, yet it nonetheless chose to make the

17   exclusivity trigger a decision of the Court holding the

18   challenged patent to be invalid or not infringed.

19              Therefore, I think the point that Ms. Walsh

20   brings up with respect to triggering event is not sufficient

21   to create a controversy.  I am addressing that because she

22   raised that as an issue as to the lack of mootness of the

23   request.

24              Our position remains that we have answered their

25   requests the way they were phrased.
```

7

1          THE COURT:  Okay, Mr. Barzoukas.

2          Ms. Walsh.

3          MS. WALSH:  Your Honor, I don't think you could

4    consider their answers to be answers the way they are

5    phrased.  I mean, there is nothing really tricky about the

6    way that we phrased the requests or the interrogatories.  I

7    will just read one.  For example.  The first request to

8    admit is the alendronate sodium tablets disclosed in

9    Apotex's ANDA No. 077,982 do not infringe any claims of the

10   '941 patent.

11          And they answer that it's irrelevant.  And then:

12   To the extent that the request for admission might be deemed

13   to seek any relevant information, the request should be

14   considered denied.

15          Then in the interrogatories, we ask if your

16   response to Request to Admit to No. 1 is anything other than

17   an unqualified admission, identify each claim of the '941

18   patent that you believe is infringed by Apotex's ANDA No.

19   077,987 and state in detail the legal and factual basis for

20   your contentions.

21          And they answer that it's irrelevant in light of

22   the covenant not to sue and it's overly broad, and that's

23   it.

24          That is not a responsive answer.  It assumes

25   that the motion to dismiss is going to be granted.  It

1    assumes much of what we have briefed before Your Honor right

2    now.

3              And Mr. Barzoukas brought up the Apotex v. FDA

4    case.  We are aware of that line of cases that all deal with

5    that reasonable apprehension test, which is currently before

6    the Supreme Court right now in the Medimmune case.

7              This case is somewhat different than the other

8    Apotex cases that went before and different than the Teva v.

9    Pfizer case in that in those other cases Apotex was not sued

10   first and they brought the declaratory judgment action.  In

11   this case, Merck sued Apotex first and then presented Apotex

12   with a covenant not to sue.

13             We think that that creates a couple of

14   differences from that other line of cases.  One is the

15   collateral consequences doctrine.  I mean, they are arguing

16   basically that their covenant not to sue renders the case

17   moot.  They have the burden of showing mootness.  It is not

18   our burden.  It is their burden.  And there are these

19   collateral consequences of our right to the triggering event

20   of this 180-day exclusivity period.  And there also clearly

21   is the manipulation of jurisdiction, which, you know, the

22   City of Erie case, the Supreme Court City of Erie case, and

23   the Federal Circuit's 3M case, did not allow the plaintiff

24   to manipulate jurisdiction in the matter that Merck is

25   trying to.

9

1           So we have briefed these issues fully before

2    Your Honor, I think.  And I think the question here is

3    simply the discovery responses.  Until Your Honor dismisses

4    the case, I think, you know, whether they want to admit it

5    or not, there is the issue of, there is a controversy over

6    whether the patents are valid and/or not infringed.  And it

7    goes to this Court's decision-triggering event.  And they

8    don't say in their responses to the interrogatory why or how

9    we infringe the patents.

10           THE COURT:  Mr. Barzoukas.

11           MR. BARZOUKAS:  Yes.  Your Honor, in the way

12   they phrased their interrogatories, they have asked for our

13   contentions.  We believe we have provided what our

14   contentions are and our answers remain that, irrespective of

15   the pending motions.  We believe we have answered their

16   requests.

17           Again, to address, since Ms. Walsh addressed the

18   triggering-event issue again, the D.C. Circuit case very

19   specifically says that the triggering event does not change

20   the fact of whether a court is divested of its jurisdiction.

21   As you well know, and you are familiar with patent cases,

22   there are very few cases in patent law that one can refer to

23   truly as black-letter law.  One of them is in the presence

24   of a covenant not to sue there is no jurisdiction in Article

25   III courts.

1          The D.C. Circuit very specifically addresses

2    this issue of a triggering event and says, look, Congress --

3    you know, what Apotex is trying to do here and was trying to

4    do before is trying to strip other generic companies of a

5    statutorily-provided 180 day exclusivity through this

6    triggering event.  What the D.C. Circuit observes is

7    Congress knew about the fact that Article III Courts could

8    be divested of jurisdiction through a covenant not to sue,

9    and yet it made the triggering event to be a decision on the

10   merits.  Therefore, there is no right by Apotex, in that

11   specific case or by anyone, if one draws the conclusions

12   from that case, to force a triggering event in the absence

13   of subject matter jurisdiction over the case.

14          THE COURT:  So, Mr. Barzoukas, Ms. Walsh seeks

15   to distinguish in discussing the line of cases you have

16   brought up this case from those that you contended support

17   your view by pointing out that in this case Merck sued

18   Apotex.

19          MR. BARZOUKAS:  Your Honor, in practicality and

20   in fact, in the absolutely flagship of cases that address

21   covenant not to sue removing subject matter jurisdiction is

22   a case in which the patentee brought the case, in Super

23   Sack, Super Sack, who was a party who granted the covenant

24   not to sue, was the plaintiff.  The fact that the plaintiff

25   is the patentee who later grants a covenant not to sue once

1    the decision is made not to proceed with the case does not

2    in any way affect whether there is subject matter

3    jurisdiction or not.

4              THE COURT:  Ms. Walsh, I will give you the last

5    word on this.

6              MS. WALSH:  I think, just with respect to what

7    Mr. Barzoukas said at the end, I mean, you know, Super Sack

8    and those line of cases were not under the Hatch-Waxman.  He

9    relies on the Super Sack case when it helps him on the one

10   hand and then he relies on the Apotex cases and the Teva v.

11   Pfizer case when he thinks they help him on the other hand.

12   I don't think you can have it both ways.

13             The Super Sack case was not a Hatch-Waxman case.

14   I don't think you can look at this as being in the

15   Hatch-Waxman scheme as just making this different.

16             The Apotex v. --

17             THE COURT:  Why is that, Ms. Walsh?

18             MS. WALSH:  Because the Hatch-Waxman, you know,

19   sets up this regime where a generic can challenge a

20   patent -- or I mean the brand can sue the generic before it

21   even brings the product on the market.  And there is also

22   provisions in the Hatch-Waxman scheme, in fact, there are

23   now explicit, after the Medicare Amendments Act, that allows

24   the generic manufacturer to bring a declaratory judgment

25   action if it is not sued within 45 days.

```
 1              So you have this whole statutory scheme set up
 2    to direct the situation where a brand can challenge a
 3    generic before the generic can even come on the market.  It
 4    is not technically infringing by making, using or selling,
 5    which is the traditional test for infringement.  And you
 6    also have on the flip-side the ability of the generic to
 7    bring a declaratory judgment action if it hasn't been sued.
 8              So, you know, Mr. Barzoukas on certain
 9    language -- and there is certain language in the legislative
10    history about the, in the Medicare Amendments Act about the
11    provision to bring a declaratory judgment action.  But there
12    is also some countervailing arguments about that.
13              It doesn't make sense for Congress to have
14    allowed a generic to bring a declaratory judgment action if
15    it hasn't been sued, but then it can simply be dismissed
16    because there is no reasonable apprehension of suit.  I
17    think that issue will become clearer once the Supreme Court
18    renders its decision in the Medimmune case.
19              Then I think it will be clear that a generic can
20    bring a declaratory judgment action even though it hasn't
21    been threatened by suit.
22              THE COURT:  Did you want to comment any further,
23    Mr. Barzoukas?
24              MR. BARZOUKAS:  Yes, Your Honor.  My point
25    simply is that the law as it exists today is actually very
```

13

```
 1   clear.  Apotex, indeed, in essence, forced us to sue them by
 2   not providing us information prior to filing of this suit
 3   they had offered to provide and which was requested of it.
 4   In cases where Apotex has not been sued it then seeks to
 5   bring a declaratory judgment action in order to achieve the
 6   same result, which is the result that the D.C. Circuit told
 7   them this summer they cannot achieve because of the Super
 8   Sack law in patent jurisprudence and because of the way the
 9   Hatch-Waxman Act is written.
10               We believe that the law is actually very
11   well-settled on this point.
12               THE COURT:  Okay.  Counsel, could you hold a
13   second, please.
14               (Pause.)
15               THE COURT:  Mr. Barzoukas, were Merck to suffer
16   an adverse ruling on the motion, would the answers, the
17   responses to the requests we are discussing be altered in
18   any way?
19               MR. BARZOUKAS:  We would not alter them, Your
20   Honor.  We believe that we have complied with our obligation
21   to their requests as they were framed to us.
22               THE COURT:  What would your reaction to that be,
23   Ms. Walsh?
24               MS. WALSH:  I think we would have another
25   discovery dispute.  I don't think these answers are answers.
```

14

```
 1   That's really what we are talking about here, is a discovery

 2   dispute.  And basically, they are saying that they are not

 3   going to answer because it's irrelevant.  Well, you can't

 4   refuse to answer based on relevancy.

 5             THE COURT:  I think you just hit the nail on the

 6   head.  You may have been hitting it right along and I have

 7   been missing the point.  But I suspect you were.

 8             Mr. Barzoukas, since this is a discovery

 9   dispute, the Court is going to attend the merits of the

10   underlying motion as quickly as it can.  I think briefing

11   was just completed September 7.  I would love to tell you

12   tomorrow you are going to get an answer.  That is not the

13   case.

14             Meanwhile, with all due respect -- and I accept

15   your response -- I think you need to or we need to discuss

16   and reexamine whether the answers in light of an adverse

17   ruling to Merck would stand up in the projected discovery

18   dispute, that, in all likelihood, Ms. Walsh properly

19   suggests, would occur down the road should you similarly

20   respond.

21             Do you follow what I am saying?  Or was that a

22   little obtuse?

23             MR. BARZOUKAS:  I think I do, Your Honor.

24   Again, all I can say to that is that it is at least our

25   belief that we have responded to the request.  And that is,
```

```
 1    in a sense, irrespective of the motions to dismiss.
 2    Perhaps, I think what this gets down to is that given the
 3    fact that Apotex is in possession of a covenant not to sue,
 4    we can't give them that which we don't have.  If we don't
 5    have contentions on something, you know, we don't have
 6    contentions.
 7              MS. WALSH:  Your Honor, if they don't have
 8    contentions, they ought to admit that the product doesn't
 9    infringe.  They can't make contentions.  They don't respond
10    to our requests to admit with an admission.
11              THE COURT:  Mr. Barzoukas, the logic of that
12    seems rather compelling.  No?
13              MR. BARZOUKAS:  I don't believe so, Your Honor.
14              THE COURT:  Why not?
15              MR. BARZOUKAS:  I don't, because again -- and I
16    think this discovery dispute, it's difficult to separate it
17    from the issue of the covenant not to sue.  Again, this is
18    not attaching it to the motion to dismiss.  But Merck has
19    decided and has granted Apotex with a covenant not to sue,
20    which means for any past, present or future infringement
21    that is covered by it Merck will not assert any of the
22    claims of these patents against Apotex.
23              So to the extent that we are talking about
24    contentions of asserting particular claims, an infringement
25    action directly contravenes what we were doing.  In some
```

16

1    respect, our contention is they have a covenant not to sue.

2    We have given them a covenant not to sue for the

3    infringement of those claims.  And that's perhaps in some

4    sense a situation that is created by the fact that we have a

5    case in which they have a covenant not to sue.  And again,

6    going back to Super Sack, the recognition is that there is

7    no controversy here.

8            THE COURT:  Hold on just a second.

9            (Pause.)

10           THE COURT:  Practical question.  Ms. Walsh, we

11   have infringement and invalidity.  You continue to insist

12   that the claims are invalid.  Right?

13           MS. WALSH:  Well, there are three patents that

14   we believe are invalid, and then the other six patents we

15   believe are not infringed.

16           THE COURT:  Is there the possibility that a

17   solution to this might be to separate out the requests,

18   parse them validity/invalidity versus infringement?

19           MS. WALSH:  They are parsed, actually.  We have

20   nine of the requests to admit and interrogatories are asking

21   whether they claim we infringe, asking them to admit that we

22   don't in fact infringe each of the nine patents.  Then there

23   is three separate ones, because there is 12 altogether,

24   three separate ones are directed at validity of the three

25   patents we contend are invalid.

```
 1              MR. BARZOUKAS:  Your Honor, to give you an

 2    example, in Request for Admission No. 10, it reads, All

 3    claims of the '329 patent that Merck would assert are

 4    infringed by Apotex's ANDA.  And this is exactly the

 5    problem.  We have given them a covenant not to sue which

 6    promises them we are not going to assert any claims against

 7    them.  So we don't assert any claims against them.  They are

 8    asking us to admit that any claims we would assert are

 9    invalid.  We are not asserting any claims.  They have a

10    covenant not to sue.

11              I hate to go back to Super Sack, that is I

12    believe why Super Sack says there is no controversy if a

13    party gets a covenant not to sue.  We can't give them

14    contentions on claims we would assert when we said we are

15    not asserting any of these claims against you.

16              MR. HORWITZ:  Your Honor, I just want to get

17    back to discovery, because that's what we are here about

18    today.  As Your Honor said, we are not talking about Super

19    Sack today.  The case exists.  And interrogatories and

20    Request for Admission No. 1, just so we are focused, the

21    request for admission says, do we infringe?  We don't

22    infringe.  They deny that.  Then the interrogatory says,

23    give us your basis for why -- if it is anything other than

24    an unqualified admission, identify each claim that you

25    believe is infringed and state in detail the legal and
```

1    factual basis.

2              So they deny the request for admission that says

3    that we don't infringe.  They have a denial.  Then we say,

4    tell us why.  And in the response, they say, it's

5    irrelevant.

6              You can't hide the ball like that.  The case

7    exists until it doesn't exist.

8              MR. BARZOUKAS:  The case, Your Honor, may exist.

9    The problem I think we are running into is there is no

10   controversy.

11             MR. HORWITZ:  There is no controversy, Your

12   Honor, because we don't infringe.  And that is what they

13   should admit, or they should tell us why they can't admit

14   that.

15             THE COURT:  That's, Mr. Barzoukas, I think,

16   again -- now Mr. Horwitz speaking has properly focused the

17   issue, or redirected our focus to where it should be.  I

18   understand your point.  But again, as both Ms. Walsh and Mr.

19   Horwitz have stated directly and intimated, I am not quite

20   sure why we are talking about Super Sack today.

21             MR. BARZOUKAS:  Your Honor, I do, because what

22   they are asking us here, they are asking us for our

23   contentions on infringement and with respect to claims we

24   assert against them.  And we are contractually, by covenant,

25   bound not to assert claims against them and we do not assert

1    claims against them.

2              Therefore, we do not have contentions on that.

3              THE COURT:  Let me ask a question, Mr.

4    Barzoukas:  Why did you sue Apotex?

5              MR. BARZOUKAS:  Your Honor, we sued Apotex

6    because they filed a Paragraph 4 certification.  We sought

7    from them information as to how they were formulating their

8    product.  They never responded to us.  So we had sufficient

9    reason to think that they might -- that there might be a

10   reason for us to maintain the suit against them.

11             Had they provided us the information that they

12   had claimed they are supplying to us, we may not have -- we

13   may have decided not to sue them.  Again, I can't tell you

14   what would have happened if events had not occurred as they

15   have.

16             THE COURT:  Mr. Barzoukas, and I don't mean to,

17   I am not trying to cast any specters around here, but given

18   what you just said in response to my question, one has to

19   wonder, the specter of Rule 11 does raise its head, doesn't

20   it?

21             MR. BARZOUKAS:  Your Honor, there are actually

22   cases out there that -- you know, you request the

23   information that would form the basis for such a complaint,

24   and it is not provided to you, you have a Rule 11 basis to

25   assert your complaint.  Again, our view would have been, if

1    there was -- if they wanted us to reach a conclusion,

2    perhaps -- again, I don't know what would have occurred if

3    events didn't occur the way they did -- that we wouldn't

4    have asserted the claims to begin with, so it would seem

5    simple for them to have provided to us the information that

6    we had requested, and indeed, they had originally offered to

7    provide and then apparently backed off from it.

8            THE COURT:  So the basis for the averments in

9    the complaint, that is, the invocation of the Court's

10   jurisdiction, is that the thought-to-be, the assumed-to-be

11   infringer wouldn't respond to inquiries posited as to

12   whether they are in fact engaged in infringing activity?

13           MR. BARZOUKAS:  That is correct, Your Honor.

14   There are cases, in fact, that find that sufficient as a

15   Rule 11 basis to have a belief that the party infringes.

16           I may add, on this topic, even, you know, if

17   that had occurred and Merck had not sued, the pattern of

18   conduct that Apotex has shown in this case is then to

19   proceed and DJ the research drug company in order, again, to

20   create a controversy that doesn't exist, and again, in an

21   attempt to strip another generic of its 180 days that it

22   received because it was a first filer with respect to

23   Paragraph 4 filing under the Hatch-Waxman Act.

24           THE COURT:  Mr. Barzoukas, prior to giving the

25   covenant not to sue, were you provided with, during the

1    initial discovery phases of this matter, maybe the initial

2    disclosures, whatever, with the information that you sought

3    prior to initiation of this action?

4              MR. BARZOUKAS:  We received information that we

5    found sufficient to decide we did not want to assert our

6    patents against Apotex, Your Honor.

7              THE COURT:  Did that information provide you

8    with the ability to conclude one way or the other, or to

9    formulate a position one way or the other that would enable

10   you to admit or deny in an unqualified way the contentions

11   that are sought of Merck?

12             MR. BARZOUKAS:  Your Honor, it formed a

13   sufficient basis for us to reach a decision, through

14   extensive consultation among the attorneys and our client,

15   that we were willing to grant Apotex a covenant not to sue,

16   that we would not assert our claims against them, and that

17   no dispute existed now that we saw what they were proposing

18   to do.

19             THE COURT:  Given that response, I am going to

20   grant Apotex's motion to compel, and direct, Mr. Barzoukas,

21   that Merck respond, consistent with what you have just

22   reported to this Court.  I am not, with due respect, sir,

23   going to permit the advocacy process and the artful advocacy

24   of very able counsel to subvert this Court's process and the

25   intent of the rules that have been set up via the Federal

22

1    Rules of Civil Procedure.

2              The responses are inadequate.  I don't know how

3    much clearer I can be.  I am not going to tell you how to

4    respond.  You know, you have information, you have just told

5    me that, more specific information with which to respond to

6    these what appear to me to be quite specific requests, both

7    for admission and interrogatory.

8              Is there a question that you have for me with

9    regard to what I am requiring of Merck?  I want it to be

10   clear.

11             MR. BARZOUKAS:  Your Honor, you are requiring us

12   to further answer.  But again, what I can say is we will

13   answer --

14             THE COURT:  I can tell you this, Mr. Barzoukas:

15   To reiterate what you have already stated regarding the

16   perceived irrelevance or lack of relevance or materiality or

17   whatever the case might be of the sought-after information

18   or the interrogs themselves would not be viewed favorably by

19   the Court.  Okay?  I don't know how much clearer I can be.

20             Ms. Walsh, do you have any questions?

21             MS. WALSH:  My only question would be --

22             THE COURT:  Do I need to be more specific?

23             MS. WALSH:  No, Your Honor.  My only question

24   would be if we want to set a date for when these

25   responses --

23

```
 1              THE COURT:  I think that's fair.  Mr. Barzoukas,
 2    when can Apotex expect your amended responses?
 3              MR. BARZOUKAS:  I would ask for ten days, Your
 4    Honor.
 5              THE COURT:  Is that adequate, Ms. Walsh?
 6              MS. WALSH:  That is fine, Your Honor.
 7              THE COURT:  Counsel, the Court will get after
 8    the motion as soon as it can.  I don't know whether that
 9    will moot out the issue or not, quite frankly.  I don't
10    presume to predict the outcome.
11              MR. BARZOUKAS:  Thank you, Your Honor.
12              Your Honor, I think Apotex had asked for
13    argument on those motions.  Would the Court think that might
14    be appropriate?
15              THE COURT:  Not at this time.  If I determine
16    that your papers leave gaps, information gaps, that it would
17    be beneficial for the Court to hear from counsel and give
18    counsel the opportunity to respond to specific questions
19    that the Court might have, I certainly will afford the
20    opportunity to do that early.  Okay?
21              MS. WALSH:  Thank you, Your Honor.
22              MR. BARZOUKAS:  Thank you, Your Honor.
23              (Conference concluded at 10:40 a.m.)
24                         -  -  -
25    Reporter:  Kevin Maurer
```